IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

_____
                              )
United States of America,     )
                              )
      Plaintiff,              )
                              )   Case No. 2:19-cr-00014-HCN
vs.                           )
                              )
Stoney Westmoreland,          )
                              )
      Defendant.              )
_____)

**SENTENCING BEFORE THE HONORABLE**

**JUDGE HOWARD C. NIELSON, JR.**


Tuesday, March 21, 2022


Pages 1 through 86 reported by Teena Green

Pages 87 through 169 reported by Laura Robinson

Time:  10:15 a.m. to 3:01 p.m.


Reported by:

      Teena Green, RPR, CRR, CSR, CBC
      Laura Robinson, RPR, FCRR, CSR, CP
      Orrin G. Hatch United States Courthouse
      351 South West Temple, 7.430 and 8.430
      Salt Lake City, Utah   84101
      (801) 910-4092
      teena_green@utd.uscourts.gov

1                              **APPEARANCES**

2    FOR THE PLAINTIFF:

3    KARIN FOJTIK
     MARK Y. HIRATA
4    US ATTORNEY'S OFFICE
     111 South Main Street, Suite 1800
5    Salt Lake City, Utah   84111-2176
     (801) 524-5682
6    karin.fojtik@usdoj.gov

7    FOR THE DEFENDANT:

8    WENDY M. LEWIS
     NESTER LEWIS PLLC
9    50 West Broadway, Suite 300
     Salt Lake City, Utah   84101
10   801-535-4375
     wendy@nesterlewis.com
11
     ADAM G. BRIDGE
12   UTAH FEDERAL DEFENDER OFFICE
     46 West Broadway, Suite 110
13   Salt Lake City, Utah   84101
     (801)524-4010
14   adam_bridge@fd.org

15

16

17

18

19

20

21

22

23

24

25

1

2      **Witness:**                                          **Page**

3      DR. FRED BERLIN

4      Direct Examination by Ms. Lewis                          21
       Cross Examination by Ms. Fojtik                          95
5      Redirect Examination by Ms. Lewis                       117

6

7      **Witness:**                                          **Page**

8      MITCHELL STUBBS

9      Direct Examination by Mr. Bridge                         87

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|              |    |                                                                    |
|--------------|----|--------------------------------------------------------------------|
|              | 1  | March 21, 2022                                    10:15 a.m.        |
|              | 2  | **P R O C E E D I N G S**                                          |
|              | 3  | **THE COURT:**  Good morning.  I apologize for the delay           |
|              | 4  | in starting.  I had something of a personal matter come up, an     |
| 10:15:58     | 5  | emergency that I had to take care of.                              |
|              | 6  | We are here today for a sentencing hearing in the                  |
|              | 7  | matter of *United States versus Stoney Westmoreland,*              |
|              | 8  | Case No. 2:19-CR-14.                                               |
|              | 9  | It looks as though Mr. Westmoreland is here today; is              |
| 10:16:12     | 10 | that correct?                                                      |
|              | 11 | **MS. LEWIS:**  That's correct, Your Honor.                        |
|              | 12 | **THE COURT:**  Welcome.                                           |
|              | 13 | Will counsel for the United States introduce                       |
|              | 14 | themselves.                                                        |
| 10:16:20     | 15 | **MS. FOJTIK:**  Your Honor, Karin Fojtik on behalf of             |
|              | 16 | the United States.  And at table with me I have Mr. Mark           |
|              | 17 | Hirata.                                                            |
|              | 18 | **THE COURT:**  All right.  Welcome, both of you.                  |
|              | 19 | And will counsel for the defendant introduce                       |
| 10:16:30     | 20 | themselves.                                                        |
|              | 21 | **MS. LEWIS:**  Wendy Lewis and Adam Bridge for                    |
|              | 22 | Mr. Westmoreland.                                                  |
|              | 23 | **THE COURT:**  Welcome, both of you.                              |
|              | 24 | All right.  Give me just one moment.                               |
| 10:17:15     | 25 | Now, before we begin, I'd like to remind you all that              |

10:17:17   1   we need to help the reporter create an accurate transcript, so

2   please speak slowly and clearly.  Please do not speak over each

3   other or interrupt.

4              Now, at our last hearing, Mr. Westmoreland entered a

10:17:30   5   plea of guilty to Count I of the felony information and

6   the parties reached a plea agreement pursuant to Federal Rule

7   of Criminal Procedure 11(c)(1)(C), and we're here for the

8   sentencing today.

9              Now, Ms. Lewis, it was my understanding that the

10:17:47  10   defense intended to have a witness testify today.  Is that

11   correct?

12         **MS. LEWIS:**  Your Honor, we have two witnesses.

13         **THE COURT:**  Two witnesses.

14         **MS. LEWIS:**  Yes.

10:17:56  15         **THE COURT:**  All right.  Very well.

16              Will the United States have any witnesses or

17   evidence?

18         **MS. FOJTIK:**  No, Your Honor.

19         **THE COURT:**  All right.  I've reviewed the statement

10:18:04  20   in advance of plea, the presentence report, the parties'

21   sentencing memoranda, the various attachments, the psychosexual

22   evaluation, the defendant's character letters, and the

23   government's supplementary evidence.

24              Is there anything else that I should have reviewed in

10:18:22  25   preparation for the hearing?

10:18:25   1            **MS. LEWIS:** No, not from us, Your Honor.

        2            **MS. FOJTIK:** Nothing from us, Your Honor.

        3            **THE COURT:** All right.  Thank you.

        4            And, Ms. Lewis, have you and Mr. Westmoreland read

10:18:34   5   and discussed the presentence report?

        6            **MS. LEWIS:** We have, Your Honor.

        7            **THE COURT:** All right.

        8            I'll start by raising one possible correction for the

        9   presentence report.  Paragraph 58 says this guideline range

10:18:49 10   here is -- the guidelines range is 57 to 71 months based on the

     11   defendant's adjusted offense level and the criminal history

     12   category.  It's my understanding, however, that the maximum

     13   term of imprisonment under 18 USC Section 2425 is five years.

     14            So I think it follows that 60 months becomes the top

10:19:11 15   end of the guidelines range and that the actual guidelines

     16   range would be 57 to 60 months.

     17            Does anyone disagree with that?

     18            **MS. FOJTIK:** I do not, Your Honor.

     19            **MS. LEWIS:** Your Honor, is that the revised

10:19:22 20   presentence report?  I'm wondering because the one I'm looking

     21   at has this guideline as 46 to 57, after acceptance.

     22            **THE COURT:** That is not the one I have seen.  Let me

     23   just make sure.  What was the filing date of that?

     24            **MS. LEWIS:** I don't -- I don't know, but it's got

10:19:48 25   base offense of 24, plus 2 for computer, minus three for

10:19:53   1   acceptance, level of 23, criminal is category 1, which I

2   believe is 46 to 57.

3          THE COURT:  Right.  The one I saw had an additional

4   two levels.

10:20:03   5          (Attorneys talking over each other.)

6          THE COURT:  Okay.  Let's not all talk at the same

7   time.

8          The one I saw had an additional two-level offense

9   level adjustment.

10:20:13  10          MS. FOJTIK:  That's correct, Your Honor.  There was a

11   two-level offense adjustment because Mr. Westmoreland

12   misrepresented his identity.  And so that's what bumped it up

13   the two points, to 57 to 71.

14          THE COURT:  Right.

10:20:27  15          MS. FOJTIK:  So that is the report dated March 10th.

16   That is the revised report.

17          THE COURT:  I think that's the one I've reviewed.

18          MS. LEWIS:  Can I just have a moment?  I guess I

19   hadn't seen that.  I was working off the earlier draft.

10:20:51  20          THE COURT:  Of course.  Of course.

21          MS. LEWIS:  Your Honor, I'm sorry that I hadn't

22   noticed that prior, but we would object to that two-level

23   enhancement.

24          I believe the purpose of that enhancement is that he

10:21:29  25   used an identity in order to persuade or induce a minor, but

10:21:33  1   that's not the case.  He was on Grindr using the identity of a

2   police officer.  It had nothing to do with who he was talking

3   with.  Everyone he was talking with, he said that he was a

4   police officer.  So I don't think that applies in this case.

10:21:48  5          THE COURT:  So your position would be that the -- you

6   know, to the extent he said he was a police officer, that was

7   not intended to induce anything?

8          MS. LEWIS:  Right.  Correct.  It wasn't intended to

9   induce a minor.  It was a persona he was using on that

10:22:02 10   particular app with everyone that he spoke with.

11          THE COURT:  Right.  And, in fact, it would seem that

12   that would make it less likely that the people would be

13   interested in meeting with him if there was anything unlawful.

14          MS. FOJTIK:  Exactly.

10:22:13 15          THE COURT:  All right.

16          Ms. Fojtik, would you like to speak to that?

17          MS. FOJTIK:  Yes, Your Honor.  Obviously, since there

18   was not a formal objection filed, we didn't have a chance to

19   respond, but we would disagree with that assessment.  The

10:22:25 20   guidelines are meant to be interpreted very broadly and it was,

21   was it used to induce a minor?  I think if you look -- and we

22   submitted to the Court the exact language.

23          From the minute that he's on Grindr, his personality

24   is -- his persona is identified as a cop.  He then says, during

10:22:42 25   the course of the chat, he's in from DC.  He doesn't say he's

10:22:46   1   in from Cleveland.  He says he's in from DC.  He's implying

2   that he's a person of authority.

3            He's also doing that to make the minor he's talking

4   to feel safe, feel secure.  He also, during the course of the

10:22:57   5   chat, says, "I'm here training other Homeland Security guys."

6   So he's a position of authority.  He's someone trustworthy.

7            This we believe is part and parcel of his grooming

8   and his belief he's talking to a minor and has an intent to

9   make that minor feel safe and secure.  And so his use of that

10:23:17  10   persona we think is a purposeful choice.

11            He says in his own psychosexual evaluation, I believe

12   he's disclosed it in other pleadings, "I did this when I was

13   talking to adults, not to meet people that were using drugs and

14   things of that nature."

10:23:32  15            So it seems to me Mr. Westmoreland can't have it both

16   ways and say, "This is something I did to dis-encourage

17   people," but at the same time he's saying, "Well, it made me

18   look as a figure of authority.  It made me look as someone

19   safe."

10:23:45  20            He embraced this identity.  And even during the

21   context of the chat, he said his name was Kirk.  He didn't say

22   his name was Stoney Westmoreland, he didn't identify himself as

23   that.  This persona was picked on purpose.  And, yes, it's a

24   persona he used with adults, but during the course of the chat

10:24:02  25   he takes it a step further.  "I'm here from DC.  I'm here to

10:24:05  1    train other agents."

2              The first question in the chat, "Are you really a

3    cop?"

4              He answers yes to all of these.  This is a knowing

10:24:13  5    misrepresentation, this is exactly why these two points are put

6    into place.  If we had a little more time I probably could find

7    some more citations, but I know the notes related to that

8    particular enhancement encourage it to be looked at broadly.

9              THE COURT:  Right.  Remind me the citation to that

10:24:29 10    again.  Because there wasn't a formal objection filed, I hadn't

11    looked at that too closely.

12             MS. FOJTIK:  It is 2G1.3 Section (b)(2).

13             THE COURT:  2G1.3.

14             MS. FOJTIK:  Section (b)(2).

10:24:44 15             THE COURT:  (b)(2).

16             MS. FOJTIK:  And admittedly, Your Honor, since our

17    proposed guideline range is between zero and 24 months, this

18    may be a distinction ultimately without difference.  But I know

19    that Your Honor is well aware, a properly calculated guideline

10:24:57 20    range is a critical starting point for evaluating whether or

21    not the (c)(1)(C) agreement is appropriate.

22             THE COURT:  Exactly.  So even though it's -- you

23    know, if the parties persuade me to accept the range agreed to

24    in the Rule 11(c)(1)(C) agreement, then it doesn't really make

10:25:15 25    a difference, but it is necessary to calculate the range

10:25:20   1   correctly.

2          Ms. Lewis, you were standing a moment ago.  I gather

3   you probably wanted to speak to that, or had something to say.

4          MS. LEWIS:  I really don't.  I just -- we don't deny

10:25:36   5   that he was using a false identity, but it was not for the

6   purpose of inducing a minor.  And Your Honor said it I think

7   best that, if anything, that would have turned off someone who

8   was engaged in illegal or inappropriate activity.  So saying

9   you're a police officer I think is a stretch to say that would

10:25:55  10   be the go-to persona to try and induce a minor.

11          THE COURT:  Okay.  Any final words on that,

12   Ms. Fojtik?

13          MS. FOJTIK:  No, Your Honor.

14          I would just -- as you're aware, he's admitted, he

10:26:08  15   pled guilty to talking to a minor or sending messages relating

16   to a minor.  So the audience is already well-established by his

17   plea.

18          So he's acknowledged and pled guilty to having

19   communications with a minor.  And I think the fact that a minor

10:26:28  20   is the targeted audience of this chat, by his own admissions,

21   is relevant to the application of this enhancement.

22          THE COURT:  All right.  Let me just -- give me just a

23   moment.  I'm looking at the application notes just for a

24   moment.

10:27:07  25          All right.  Let me -- I'll continue to think about

10:27:09  1    that for just a minute.

2              Are there any other objections to the report from

3    either party?

4              **MS. LEWIS:**  No, Your Honor.

10:27:18  5    **MS. FOJTIK:**  No, Your Honor.

6              **THE COURT:**  All right.  Now, the -- and this would

7    not be affected by the issue we were just discussing.  The

8    report suggests that the defendant's offense level should be

9    decreased by two levels in light of his acceptance of

10:27:36  10   responsibility pursuant to sentencing guideline 3E1.1(a).

11             Does the United States move for an additional

12   one-level decrease pursuant to 3E1.1(b)?

13             **MS. FOJTIK:**  We do, Your Honor.

14             **THE COURT:**  All right.  And I grant that motion.

10:27:51  15   Now, I do think this is a close question with regard

16   to 2G1.3(b)(2).  I think there's no question that

17   Mr. Westmoreland did misrepresent his identity.  You know, he

18   described himself as a Homeland Security person from

19   Washington.  I'm not persuaded, based on what I've heard,

10:28:36  20   however, that he would have done so to persuade, induce,

21   entice, coerce or facilitate the travel of a minor.

22             In fact, as I said, it would seem like the -- you

23   know, given the unlawful nature of conduct between a minor and

24   an adult that, if anything, the representation that

10:28:58  25   Mr. Westmoreland was a law enforcement officer would probably

10:29:02  1  not -- would probably have the opposite effect.

2  So I see the argument that maybe it would make him

3  feel safer, but I think it's a close question.  I am not going

4  to apply that two-level adjustment, though.

10:29:16  5  And, again, that is a close question.  I do have to

6  calculate the guidelines as best I can as a starting point.  I

7  don't have briefing on this, which probably would have been

8  helpful.  But as I sit here right now, I'm not planning to

9  apply that.

10:29:35  10  At the end of the day, I doubt it will make a

11  difference in the sentencing, except for the fact that I just

12  have to start in the right place.  So if we have that -- if I

13  don't apply that two-level offense level, what would the range

14  be?  It would be --

10:29:54  15  **MS. FOJTIK:**  Your Honor, I believe we'd be back at

16  the 46 to 60-month.  I think it would be 46 to 57.

17  **THE COURT:**  With an offense level of 23 instead of

18  25?

19  **MS. FOJTIK:**  Right.

10:30:09  20  **THE COURT:**  And what would the fine range then be?

21  **MS. FOJTIK:**  I think that would remain the same

22  but...

23  **MR. HIRATA:**  Your Honor, it would remain the same.

24  **THE COURT:**  All right.  So that's one where they're

10:30:19  25  in the same category still for the fine.

13

10:30:23  1        All right.  I'm going to direct the probation officer

2    to make the change to the offense level calculation to remove

3    that adjustment for 2G1.3(b)(2), the two-level offense level

4    increase, and then to make any needed conforming changes to the

10:30:42  5    report.

6        But with that change and absent any other objections,

7    I will adopt the presentence report.

8        Now, absent any departures, I then calculate the

9    following advisory guideline range.

10:30:59  10       The defendant's offense level is 23.  His criminal

11   history category is 1.  This produces a guideline range of 46

12   to 57 months imprisonment, a supervised release range following

13   imprisonment of five years to life, and a fine range of 20,000

14   to $200,000.  The special assessment is $100.

10:31:22  15       Now, in light of my ruling on 2G1.3(b)(2), which I

16   know that the United States probably thinks is erroneous, do

17   you agree with the calculation?

18       **MS. FOJTIK:**  Other than our objection to those two

19   points, Your Honor, yes, we agree.

10:31:39  20       **THE COURT:**  All right.  Thank you.

21       And, Ms. Lewis, do you agree with the calculation?

22       **MS. LEWIS:**  We do, Your Honor.

23       **THE COURT:**  All right.

24       And again, I think that is a close question.  It

10:31:49  25   probably would have benefited from briefing, but at the end of

10:31:55  1    the day, I don't think it will make a difference.  The range of

2    sentences the parties are discussing are well below either the

3    range that would apply if that two-level adjustment is included

4    or if it is not.

10:32:12  5        All right.  Now, leaving aside the possibility of a

6    variance, which certainly appears to be reflected in the

7    proposed sentence, does either party seek a departure under the

8    guidelines themselves?

9            **MS. FOJTIK:**  We are not formally seeking a departure

10:32:29  10   under the guideline.  Our recommendations are based on 3553(a)

11   factors.

12           **THE COURT:**  That was my understanding, but I wanted

13   to confirm that.

14           Ms. Lewis, is the defense formally seeking a

10:32:40  15   departure under the guidelines?

16           **MS. LEWIS:**  We are not seeing a departure under the

17   guidelines.  We agree with the 11(c)(1)(C) that's set forth

18   before the Court.  We do, however, believe that there is a

19   variance that could be applied under the guidelines.  Again,

10:32:53  20   it's not affecting the 11(c)(1)(C), though.

21           **THE COURT:**  All right.

22           **MS. LEWIS:**  I don't know if you want me to address

23   that.

24           **THE COURT:**  All right.  And what would the variance

10:33:01  25   or the -- I guess it would be a departure if it was under the

15

10:33:05   1    guidelines.

2          **MS. LEWIS:**  Well, I guess it depends on the language

3    of departure and variance, but the case law calls it a

4    variance.  We believe that the Court in its discretion can

10:33:16   5    choose not to apply the two extra points for use of a computer.

6    And I can address that now if you wish or we can address that

7    later.

8          **THE COURT:**  Right.  I understand that argument, I

9    think.  And it's an argument that comes up a lot in this

10:33:32  10    context.

11          I think I'll consider that just in connection with

12    the 3553(a) factors, rather than as a formal departure or

13    variance.  I guess it's odd to speak of variances under the

14    guidelines but I guess the case law sometimes does.

10:33:49  15          **MS. LEWIS:**  Yes.  That's what the case law refers to,

16    that particular --

17          **THE COURT:**  Right.

18          **MS. LEWIS:**  -- adjustment.

19          **THE COURT:**  Okay.  But I'll consider that in

10:33:57  20    connection with the 3553(a) factors, rather than depart or vary

21    under the guidelines themselves.

22          All right.  So what it comes down to, then, is I must

23    consider the relevant factors set forth in 18 USC

24    Section 3553(a) and ensure that I impose a sentence sufficient,

10:34:20  25    but not greater than necessary, to comply with the purposes of

16

10:34:24  1    sentencing.

2          These purposes include the need for the sentence to

3    reflect the seriousness of the crime, to promote respect for

4    the law, and to provide just punishment for the offense.

10:34:35  5          The sentence should also deter criminal conduct,

6    protect the public from future crime by the defendant, and

7    promote rehabilitation.

8          In addition to the guidelines and policy statements,

9    I must consider the nature and circumstances of the offense,

10:34:51 10    the history and characteristics of the defendant, the need to

11    avoid unwarranted sentence disparities among similarly situated

12    defendants, and the types of sentences available.

13          Now, the agreed-upon sentence is 0 to 24 months

14    incarceration; correct?

10:35:10 15          **MS. LEWIS:**  That's correct, Your Honor.

16          **MS. FOJTIK:**  Yes, Your Honor.

17          **THE COURT:**  All right.  And although the Statement in

18    Advance of Plea indicates that the United States will seek a

19    lifetime term of supervised release, I do not understand that

10:35:20 20    to be part of the agreed-upon sentence.

21          Does either party disagree with that?

22          **MS. FOJTIK:**  No.  That is correct, Your Honor.

23          **MS. LEWIS:**  That is correct.  We'll be asking for the

24    five years supervised release.

10:35:30 25          **THE COURT:**  Right, or five years probation, actually,

10:35:33  1  correct, is what you're asking for?

2  **MS. LEWIS:**  We're asking for either five years

3  probation or however the Court wishes to --

4  **THE COURT:**  Oh, I see.

10:35:41  5  **MS. FOJTIK:**  -- form the sentence, because

6  technically, you could also term it as credit for time served,

7  because he has spent a handful of days in jail, with supervised

8  release to follow.  So whatever the Court --

9  **THE COURT:**  Understood.  Understood.  Thank you.

10:35:54  10  All right.  Now, it's my understanding that the

11  parties did not reach an agreement regarding a fine, though the

12  presentence report states that the defendant does not have

13  sufficient resources to pay a fine, and it explains why that

14  is.  And I guess, though the defense -- the defendant's

10:36:13  15  sentencing memo doesn't specifically speak to that, it also

16  discusses the economic impact these charges have had on

17  Mr. Westmoreland.

18  Does either party disagree that a fine would not be

19  appropriate here, given Mr. Westmoreland's financial

10:36:28  20  circumstances?

21  **MS. FOJTIK:**  We agree a fine would not be

22  appropriate.  And it's not supported in the presentence report

23  financial calculations as well, Your Honor.

24  **THE COURT:**  Right.

10:36:38  25  And I'm sure the defense agrees with that.

10:36:39  1              **MS. LEWIS:**  We agree.

        2              **THE COURT:**  All right.

        3              Now, the plea agreement does not specifically address

        4       the $100 special assessment, but the statement in advance of

10:36:49  5       plea acknowledges that it's mandatory.

        6              I assume there are no objections to my treating the

        7       special assessment as part of the agreed-upon sentence.  Are

        8       there any objections to that?

        9              **MS. LEWIS:**  No, no objection.

10:37:01 10              **MS. FOJTIK:**  No, Your Honor.

       11              **THE COURT:**  All right.  Okay.

       12              Now, I'm going to give the parties the opportunity to

       13       address the sentencing factors, including through argument and

       14       evidence.  Since the United States is seeking a sentence and

10:37:14 15       the prosecution, I'm going to let the United States start.

       16              I want you, Ms. Fojtik or Mr. Hirata, whichever of

       17       you would prefer, to address these factors, explain why I

       18       should accept the agreement, and argue in favor of the

       19       government's proposed sentence.

10:37:33 20              I've read your sentencing memorandum, so please don't

       21       feel that you have to repeat everything you've said there, but

       22       you're certainly welcome to present whatever you would like on

       23       that.

       24              **MS. FOJTIK:**  Your Honor, I spoke with Ms. Lewis

10:37:45 25       before the hearing, and we thought it might be for the benefit

10:37:47   1    of the Court to probably hear from Dr. Berlin first.

        2              **THE COURT:** Okay.

        3              **MS. FOJTIK:** Because that, I think, would inform both

        4    our arguments and the defense's arguments. So it would be our

10:37:59   5    proposal that we hear from Dr. Berlin initially and then we can

        6    respond with argument if --

        7              **THE COURT:** All right. We can hear the -- that's

        8    fine with me. And I think, Ms. Lewis, you said you had two

        9    witnesses?

10:38:09  10             **MS. LEWIS:** We do, Your Honor. And I think it would

     11    make more sense to have those testify first.

     12             **THE COURT:** All right. Let's hear the testimony and

     13    then let's hear your arguments based on the testimony and

     14    other -- anything else after the testimony, then.

10:38:22  15         So, Ms. Lewis, at this time, I'll let you call your

     16    first witness.

     17             **MS. LEWIS:** Your Honor, we call Dr. Fred Berlin to

     18    the stand.

     19             **THE COURT:** All right. Let's have him come forward.

10:38:32  20             **THE COURTROOM DEPUTY:** Please raise your right hand.

     21         You do solemnly swear that the testimony you're about

     22    to give in this case now before the Court to be the truth, the

     23    whole truth and nothing but the truth, so help you God?

     24             **THE WITNESS:** I do.

10:38:58  25             **THE COURTROOM DEPUTY:** Please be seated. Thank you,

10:38:59  1    sir.

       2                MS. FOJTIK:  Your Honor, would you mind if I just

       3    move over there?  It's a little tricky with the plastic.

       4                THE COURT:  That's fine.  And I almost had it taken

10:39:09  5    down last week but I didn't get it quite done before the

       6    hearing.

       7                MS. FOJTIK:  Okay.  Thank you, Your Honor.

       8                THE COURT:  Just make sure you're near a microphone

       9    if you're ever speaking.

10:39:16 10                MS. FOJTIK:  Yes.  Thank you, Your Honor.

      11                MS. LEWIS:  Good morning, Dr. Berlin.

      12                THE WITNESS:  Good morning.

      13                THE COURTROOM DEPUTY:  Please state your name and

      14    spell it for the record.

10:39:25 15                THE WITNESS:  My name is Fred Berlin, B-E-R-L-I-N.

      16                THE COURT:  Right.  Thank you.

      17                              **FRED BERLIN,**

      18    called as a witness for and on behalf of the defense, being

      19    first duly sworn, was examined and testified as follows:

10:39:16 20                         **DIRECT EXAMINATION**

      21    **BY MS. LEWIS:**

      22    **Q.**   Dr. Berlin, could you also state where you are currently

      23    employed for the record.

      24    **A.**   I'm sorry, where I was born?

10:39:38 25    **Q.**   Where you're currently employed.

10:39:39   1   **A.**   Oh, where I'm currently employed.

2        I'm employed, well, both by the Johns Hopkins University

3   School of Medicine as well as the Johns Hopkins Hospital.   And

4   I also see patients privately as well.

10:39:51   5   **Q.**   Thank you.

6        So, Dr. Berlin, could you just briefly summarize for the

7   Court your professional training and certificates --

8   certifications?   Excuse me.

9   **A.**   Sure.   I have both a Ph.D. degree, which is in psychology,

10:40:04   10   as well as a medical degree.   Beyond my basic medical training,

11   I rotated through the various subspecialties as an intern in

12   pediatrics, medicine, surgery and so on.   I then took residency

13   training in psychiatry and was subsequently the chief resident

14   of psychiatry.

10:40:21   15        I am currently board certified by the American Board of

16   Psychiatry and Neurology.

17   **Q.**   And within your field of psychiatry do you have a

18   particular area of expertise?

19   **A.**   The area of expertise would be issues related to sex and

10:40:36   20   also issues related to gender.

21   **Q.**   All right.   What are your current professional positions?

22   **A.**   I'm an attending physician at the Johns Hopkins Hospital.

23   I'm an associate professor in Johns Hopkins University School

24   of Medicine.   I'm the director of the Johns Hopkins Sex and

10:40:54   25   Gender Clinic.   I'm also the director of the National Institute

10:40:57   1   with the study prevention and treatment of sexual trauma.

2   **Q.**   And how do you spend the majority of your professional

3   time there?

4   **A.**   I'd say that I spend it in three ways.

10:41:11   5       One is clinical care, which means evaluating and treating

6   patients.  I do that with patients who have general kinds of

7   psychiatric issues, but also, as mentioned a moment ago, often

8   patients where the issue is related to other sex or gender.  So

9   clinical care is number one.

10:41:28   10       The second thing I do is a lot of teaching.  Some of it's

11   bedside teaching of residents and medical students.  Others are

12   more formal lectures to various groups, but teaching would be

13   the second.

14       And the third major area of responsibility would be

10:41:43   15   research.  And I have a number of publications, have done

16   research of various sorts.

17   **Q.**   And have you previously testified in court?

18   **A.**   Yes, ma'am.

19   **Q.**   How many times do you think you've done that?

10:41:56   20   **A.**   I don't keep track of that.  I've been doing this work for

21   about 40 years, so it's been a number of times.  It's not the

22   main thing I do, but in any given year, you know, perhaps four

23   or five times.

24   **Q.**   All right.  Thank you.

10:42:09   25       As a consequence of your work, have you been asked to

10:42:12   1   provide any professional consultation?

2   **A.**   I've done a variety of consultation and various

3   presentations.

4        I've been invited, for example, to participate in a White

10:42:26   5   House conference on child sexual abuse.

6        I've been invited to address various subcommittees --

7   well, one particular subcommittee of the United States Senate.

8        I have been invited to address colleges of judges in a

9   number of jurisdictions.

10:42:39  10   I've been invited to participate in symposiums sponsored

11   by the Federal Bureau of Investigations.

12        You have my vita, but those would be some examples.

13   **Q.**   And are you also asked to consult with media outlets?

14   **A.**   I've done -- I've been on a number of media presentations.

10:42:57  15   I don't know how much that means, but I've been on 60 Minutes

16   and 2020 and Face The Nation.

17        I also, if you're asking about consultations, was

18   consulted by the National Conference of Catholic Bishops when

19   they were facing their crisis that I think most people know

10:43:12  20   about.

21        I've provided consultation to the European Parliament.

22   Also to the Division of Corrections for people who are

23   receiving treatment for sexual offenses in Maryland.

24        Those would be some examples.

10:43:26  25   **Q.**   Thank you.

10:43:27  1          Do you have professional publications?

2    **A.**   I have a number of professional publications in various

3    journals, *The Journal of the American Medical Association, The*

4    *American Journal of Psychiatry, The American Journal of*

10:43:40  5    *Forensic Psychiatry.*

6          I've also done peer reviews for a number of these

7    journals, where they want me to review an article to decide if

8    it's up to scratch in terms of whether or not it should be

9    published.

10:43:51  10   **Q.**   And do these deal with a variety of topics?  Are the

11   majority of them around sex and gender issues?

12   **A.**   Well, certainly, what would be relevant here would be

13   that.  I've published articles about pedophilia, I've published

14   articles about recidivism, about treatment.  Some of the

10:44:07  15   articles are much more basic science, looking at changes in

16   brain chemistry during sexual arousal.  So again, you have my

17   vita, but there's quite a spectrum.

18   **Q.**   All right.  Thank you.

19          Do you serve as a member of any professional

10:44:23  20   organizations?

21   **A.**   Again, I've been -- I don't know how to answer that

22   because a number -- I'm trying to keep it relevant.

23          I was asked to serve as a member of the subcommittee on

24   the paraphilias for the third revision of the Diagnostic and

10:44:40  25   Statistical Manual of Mental Disorders.  It goes by the name of

25

10:44:44  1    DSM.  So I was asked to be a participant in that.

2    **Q.**   And do you serve as a member of any professional

3    organizations or committees?

4        You just said that, I'm sorry.

10:44:56  5    **A.**   Yes, I believe I answered that.

6    **Q.**   That's what we were just talking about.

7        And has your program received any special recognition,

8    national recognition?

9    **A.**   Oh, yes.  I am rather proud of that.  The treatment

10:45:07  10   program that I direct was designated as a national resource

11   site by the United States Department of Justice.

12   **Q.**   All right.

13          **MS. LEWIS:**  Your Honor, you have a copy of the

14   doctor's CV; correct?

10:45:20  15          **THE COURT:**  I do.

16          **MS. LEWIS:**  All right.

17   **BY MS. LEWIS**

18   **Q.**   So, Dr. Berlin, are you familiar with Mr. Stoney

19   Westmoreland?

10:45:26  20   **A.**   Yes, ma'am.

21   **Q.**   And how is it that you became familiar with him?

22   **A.**   You had contacted me and asked if I would be willing to

23   evaluate him.

24   **Q.**   And you did, in fact, evaluate him; correct?

10:45:38  25   **A.**   Yes.

10:45:38  1           If memory serves me correctly, I think it was on January

2      25th of 2020, so a little more than two years ago.

3   **Q.**   All right.

4           Could you please explain to the Court the procedures that

10:45:51  5      you used and employed in evaluating Mr. Westmoreland.

6   **A.**   Well, it was both a forensic and psychosexual evaluation,

7      but to kind of get away from the jargon and explain it, I'm

8      seeing him in a situation where he is accused of engaging in

9      criminal sexual misconduct.  I'm interested in trying to

10:46:12 10     evaluate and figure out what this is all about.

11          But I also, in terms of your question of procedure, don't

12     want to be dependent simply upon what he tells me.  Common

13     sense is that anyone in that situation would try to present

14     themselves in as positive of way as possible.  So I wanted to

10:46:28 15     make sure I had as much independent information about him and

16     about the charges so that I could put into context what he is

17     telling me when I actually do the assessment.

18          So it's basically what's often referred to in court as the

19     discovery materials.  If you need the exact information, it's

10:46:44 20     listed at the front of my evaluation, which I know you have.

21  **Q.**   Yes.  Thank you.

22          What was the purpose of this evaluation?

23  **A.**   Well, again, it was to try to understand what he did and

24     why he did it.  Was this behavior that was predisposed because

10:47:02 25     of the presence of a sexual disorder or perhaps not?  If it was

10:47:07  1    a sexual disorder, for example, pedophilia, did he need

2    treatment, how might that affect prognosis and future risk.  So

3    these were the categories of issues that I was attempting to

4    address.

10:47:22  5    **Q.**   And you mentioned you were looking at pedophilia.

6         Were there other particular psychiatric diagnoses that you

7    were considering in evaluating --

8    **A.**   Well, it's always important to do a comprehensive

9    assessment.  So I'm going to try to determine if there's

10:47:37  10   anything there of a psychiatric nature, but given the nature of

11   the charge against him, certainly pedophilia would have been

12   very high up on the list of diagnoses that I would need to

13   consider.

14   **Q.**   And what is that disorder?  How do you diagnose or what is

10:47:54  15   the characteristics of pedophilia?

16   **A.**   Well, again, I'll try to keep this in layman's terms.

17        It simply means that a person's sexual orientation is

18   directed, either in whole or in part, towards prepubescent

19   children.

10:48:11  20        Now, if I may, we do distinguish between pedophilia, which

21   is what I described, and a pedophilic disorder.  The reason we

22   do that in mental health is simply because we don't want to say

23   if you're different, that automatically means you have a

24   disorder.  If someone is attracted to children, they're

10:48:28  25   completely in control of themselves, they're not acting on it,

they're not distressed by the fact that sometimes they have these feelings, that's still certainly a different sexual makeup from the norm, but it's not necessarily a disorder.

It would be a pedophilic disorder if that person was impaired in a capacity to control their behavior, which would, again, clearly make them a risk to children. So we want to -- when we see something as a disorder, if someone is not able to control themselves well, we want to help them with that.

And secondly, it could be a disorder if a person is just distressed by the fact that they are having these attractions. Over the years -- and I'm trying to talk slowly here.

Over the years, I've had a number of patients come in who are not acting upon those urges, but I think it's understandable why they might be very distressed about the fact they're having them, again. Because they're distressed that it's a mental health issue, we want to help to alleviate that distress. So being distressed about experiencing these attractions would also elevate to the level of a pedophilic disorder rather than just pedophilia.

**Q.** All right. Thank you.

Is there a different name or a different disorder for someone who is attracted to postpubescent children, primarily teenage --

**A.** There's a term, and I always try to stay away from jargon, but to answer your question, there's a term that -- it's either

10:49:52   1   called ephebophilia or sometimes hebephilia.  And it refers to

2   the fact that somebody may have an inordinately high attraction

3   to postpubescent adolescents, 14, 15, 16-year-olds.

4        Now, to be clear, almost any adult can notice an

10:50:11   5   attractive person of that age, so that's not necessarily

6   something we'd say is pathological.  It's meant to identify a

7   person where there's this inordinately high attraction.

8        To give an example that I think would help clarify, it

9   might be a 50-year-old man who never seems interested in

10:50:31  10   individuals his own age, but recurrently is seeking out for

11   sexual activity 14, 15, 16-year-olds.  So that's where the term

12   ephebophilia is meant to refer to.

13   **Q.**   Again, this arises to a disorder if someone is unable to

14   control those desires or is particularly distressed by those

10:50:52  15   desires, would that be accurate?

16   **A.**   Yeah.  Again, it's just that way in medicine.  You know,

17   if someone's different, it's not a disorder.  You can have one

18   blue eye and one green eye, but that doesn't mean it's a

19   disorder, even though you're clearly different.  But if you're

10:51:03  20   suffering in some way from the condition we're discussing,

21   you're impaired in some way, that makes it a disorder, and

22   again, the suffering, that makes it a disorder.  So it's the

23   same principle across the board.

24   **Q.**   Or if you're committing criminal activity because of a

10:51:19  25   disorder?

30

10:51:20   1   **A.**   Well, not -- I mean the diagnosis doesn't depend upon

2   whether you're committing criminal activity, but if you have a

3   pedophilic disorder in the sense that you're impaired in your

4   capacity to be in good control of yourself, certainly, that

10:51:34   5   would predispose the risk that you might engage in criminal

6   activity.

7   **Q.**   And with Mr. Westmoreland, did you also consider -- I'm

8   sorry, is it ephebophilia disorder?

9   **A.**   Well, the age of the purported child -- and I just say

10:51:48  10   that because it was not an actual child, but the age here was

11   13.  I would probably be more concerned about pedophilia than

12   ephebophilia in this case.

13       You know, we could debate it and go over it, but my

14   concern would be more whether he was attracted based on it

10:52:06  15   being a 13-year-old to someone who is prepubescent and hasn't

16   really gone through the changes of puberty.

17   **Q.**   All right.  Are there known causes of pedophilia or

18   ephebophilic disorder?

19   **A.**   I'm going to be brief in answering this because I

10:52:23  20   certainly don't want to give a lecture here, but the two things

21   that we can look at are the things in the environment that

22   predispose a development of pedophilia, or other things about

23   nature biology --

24       I'm sorry.  Again, thank you for reminding me, I've got to

10:52:34  25   speak slowly.

10:52:34   1            But maybe the first point that I should make when it

2     comes to etiology or cause, because I think it's very

3     important, is what pedophilia is not due to.  And that is, it's

4     not due to a volitional decision, not due to choice.  And if I

10:52:53   5     can take a moment to explain that.

6     **Q.**   Please.

7     **A.**   None of us decide the nature of the sexual attractions

8     we're going to experience.  For example, when I was a young

9     child, I didn't have to say to myself, look, you have choices.

10:53:10  10     Do you want to grow up to be attracted to women?  Do you want

11     to grow up to be attracted to men?  Do you want to grow up to

12     be attracted to children?

13            In growing up, we discover the nature of our sexual

14     attractions.  We don't decide them.  And so in my case, I

10:53:25  15     discovered that I'm attracted to women.  And in our society,

16     it's probably made my life much easier than it might otherwise

17     have been.

18            A person who is attracted sexually to children isn't that

19     way because he was a child who decided to be defiant and chose

10:53:42  20     somehow to be different.  Like the rest of us, he discovers

21     that this is the nature of his sexual makeup.  He's afflicted

22     with that disorder.  It's not one that's there by choice.

23            Now, it is going to be, whatever our sexual orientation

24     is, our responsibility to deal with it in a proper fashion.

10:54:02  25     But I'm just making the point that the attractions we feel --

10:54:04  1    separating that from behavior, the attractions we feel are not

2    the consequence of any choice.

3         Now, in terms -- that's what pedophilia is not due to.

4         Did you want to take just a minute to talk about factors

10:54:19  5    that can predispose it?

6    **Q.**   Yes, please.

7    **A.**   Okay.  And I apologize, I've got a little mucous in my

8    throat here.  It's okay, I'll be all right.  But thanks for

9    your concern.

10:54:33 10        In terms of biology, I'm not going to get much into it,

11    but it's very clear that there are biological changes in brain,

12    for example, that can lead to pedophilia.  And there's people

13    who develop Alzheimer's disease, dementia later in life, and

14    sometimes associated with that is some change in the kinds of

10:54:54 15    sexual feelings and urges that they have.  There have actually

16    been documented cases of people developing pedophilia de novo

17    in association with a brain tumor.  So those are just examples

18    that make the point that it can be sometimes related to

19    biology.

10:55:14 20        On the environmental side, what we call nature, one of the

21    risk factors for developing pedophilia that is now pretty clear

22    is being a boy who was the victim of childhood sexual abuse.

23         Now, just to be clear, just as most cigarette smokers

24    don't get lung cancer, but most people with lung cancer are or

10:55:38 25    have been cigarette smokers, thank God most sexually abused

10:55:44   1   boys don't develop pedophilia.  But if you look at adults who

2   do have pedophilia, very significant numbers of them, in almost

3   every study that's been done, find that significant numbers of

4   them were victims of childhood sexual abuse.

10:56:00   5        We'd love to learn more about why some children aren't

6   damaged in that way.  But clearly, sometimes, when we're

7   looking at an adult with pedophilia, tragically we are looking

8   at a former victim grown older.

9   **Q.**   All right.  Must a sexual attraction to children be

10:56:17  10   present for a period of time to be diagnosed as pedophilia or

11   can a fleeting attraction be that?

12   **A.**   The diagnostic manual, which I mentioned earlier, spells

13   that out.  And they say that it -- these attractions that I'm

14   talking about here must have been present for a period of at

10:56:37  15   least six months.

16        Now, I would want to concede, that's probably arbitrary,

17   the six months, but the point is, it wants to make it clear

18   that this is an ongoing part of a person's sexual makeup, that

19   it's not something fleeting.  It's not something that just

10:56:55  20   briefly somebody noticed a child that may have seemed in some

21   way sexually attractive.

22        So the idea is we're talking about a sexual orientation.

23   And if that's what we're discussing, for it to be meaningful,

24   it really needs to be something that's present in a sustained

10:57:12  25   way over a long duration of time.  In fact, for most people

10:57:16    1    with pedophilia.  As for the rest of us, our orientation exists

            2    over the course of our lifetime.

            3    **Q.**    So you indicated in evaluating Mr. Westmoreland that you

            4    considered this diagnosis.  And in your professional opinion,

10:57:32    5    why is that important in this situation?

            6    **A.**    Well, I may have touched on it briefly before, but it

            7    would have implications in terms of, is here somebody that

            8    likely is going to have an ongoing attraction to children?

            9    There's going to be the worry is he going to act on it?  Does

10:57:50   10    he have the capacity through his willpower to make sure he

           11    doesn't get into unacceptable temptations?

           12        It's going to have implications in terms of prognosis,

           13    particularly risk if he's someone who needs treatment and isn't

           14    getting it.  So I don't want to go on too much, but those are

10:58:07   15    the examples of why it was important.

           16    **Q.**    All right.

           17        Were there particular factors that you looked at in this

           18    case to try and determine whether or not Mr. Westmoreland had

           19    this disorder?

10:58:20   20    **A.**    The most important factors to look at are, I think, ones

           21    that I would call objective.  So I can give some examples.

           22        I looked at whether or not there had been any evidence of

           23    preexisting behaviors directed towards children.  In his case,

           24    his arrest had gotten a fair amount of publicity.  No child had

10:58:43   25    come forward making allegations.

10:58:46  1          This is very different, by the way, from certain other

2      public figures who have been identified, where subsequently

3      numbers of people came out and kind of indicated, this has

4      happened to me before.  So there was no evidence that I could

10:58:58  5      find of that having happened previously.

6          In this case, it was an advantage, I thought, that his

7      electronics had been confiscated and forensically analyzed.  I

8      was able to look at whether or not he had engaged in other

9      chats and -- I shouldn't say I was able, the people analyzing

10:59:20 10      it were able to determine whether they had found other chats in

11      which he had attempted to talk in sexual ways or to meet up

12      with a child for sexual purposes.  To the best of my knowledge,

13      if it's out there, I'd look at it, but I have seen no such

14      evidence.

10:59:36 15          They were able to look at whether there was child

16      pornography on his electronics.  Again, something you might

17      expect in someone -- in a case of someone who is attracted to

18      children.  That wasn't there.

19          Was there evidence he'd ever used pornography to try to

10:59:54 20      seduce a child into sexual activity?  Again, nothing -- nothing

21      there.

22          So I'm really looking at whether there's any objective

23      evidence that would lead me to conclude, with a reasonable

24      degree of medical confidence, that this is a man who's had a

11:00:11 25      longstanding attraction to children.

11:00:13   1       Again, he's worked with children over the years, he has

        2   children of his own.  None of them have made an allegation.  So

        3   I simply did not have any evidence that would let me conclude

        4   with confidence that this was a person who has a sexual

11:00:29   5   attraction towards children in general.

        6   **Q.**  And stepping back just a little, how often do you do

        7   evaluations that are in connection with criminal charges?  Is

        8   it a regular part of your practice?

        9   **A.**  Yes.  As I said earlier, I don't testify in court all that

11:00:47 10   often, maybe a few times a year, but I do have referrals of

      11   patients where there are criminal issues.  I work regularly,

      12   for example, with parole and probation authorities.  If

      13   someone's in treatment with us and they're noncooperative, we

      14   don't tolerate people being irresponsible.  We notify the

11:01:09 15   appropriate probation office.

      16       So I'd say many, many cases over the years, where there's

      17   the overlap of forensic issues and mental health issues, if I

      18   can put it that way.

      19   **Q.**  And have you diagnosed any of these people in the past

11:01:25 20   with pedophilia?

      21   **A.**  Oh, absolutely.  Again, had I diagnosed -- had I felt

      22   there was a basis for diagnosing Mr. Westmoreland with

      23   pedophilia, I would have done so.  I'm certain I would have

      24   laid out what I thought were appropriate treatments for him.  I

11:01:41 25   would have talked about what types of risks might or might not

11:01:45  1    exist and address whether or not treatment could adequately

2    minimize any risks that might be present.

3         So, yes, I had no preconceived notions here.  And had I

4    found evidence that would lead me to conclude with comments

11:02:00  5    that he had pedophilia or pedophilic disorder, I would

6    certainly have said so.  I've said so in many, many instances.

7    **Q.**   And you treat patients that do have pedophilia or

8    pedophilic disorders; is that correct?

9    **A.**   Yes, that's correct.

11:02:12  10   **Q.**   You mentioned in your evaluation that Mr. Westmoreland had

11   been a victim of sexual abuse as a child.

12        Has he -- and I'll get back to that, but has he

13   experienced any other traumatic events during his childhood

14   that you think are significant, or during his life, not just

11:02:33  15   his childhood?

16   **A.**   Sorry.  I mean it was clearly a very chaotic childhood

17   much as that is spelled out in my report.  His parents had

18   separated, he'd moved around a bit.  His mom had remarried, I

19   think four times, if I remember correctly.  But -- and, again,

11:02:50  20   there was an older cousin, if I remember correctly, who had

21   engaged in sexual activity when -- a cousin a number of years

22   older than he.

23        He reported about an older woman who had had sex with him

24   when he was still quite young.  But perhaps the most traumatic

11:03:09  25   event in his life occurred a bit later, when he was age 32, at

11:03:14   1   which point he found his father dead from a suicide.  It was

2   very gory.  His father had tried to dig into his own legs to

3   remove some stents that had been surgically placed there.  And

4   again, I don't think I have to explain how traumatic it would

11:03:30   5   be for anyone, including Mr. Westmoreland, to be in that

6   circumstance.

7   **Q.**   And why is that significant?

8   **A.**   Well, first of all, just answering your question of what

9   had occurred, but there are actually some parallels to his

11:03:49   10   current situation.  His father had been in a very stressful

11   circumstance at the time of the suicide and -- I'm sorry,

12   the -- yeah, at the time of the suicide.  And as I said,

13   Mr. Westmoreland had seen that.

14        He's now in a very difficult circumstance.  His whole life

11:04:10   15   because of his actions has been turned upside down.  He's been,

16   in terms of my evaluation of him, you know, on edge and

17   emotionally labile.

18        So in terms of your question, I also -- it's relevant

19   because I would be concerned, this is clinically, that is he

11:04:28   20   going to be someone who might be at risk of repeating what his

21   father did given the similarities and the stress that he's now

22   experiencing?

23   **Q.**   In evaluating Mr. Westmoreland did you -- well, you did.

24   You know what app it was that he was using when this took

11:04:46   25   place; correct?

11:04:47  1   **A.**   Yes.  I'm sorry.  I didn't mean to speak over you.

2        The app was one that's called Grindr.

3   **Q.**   And could you just explain briefly what Grindr is and how

4   it works.

11:04:59  5   **A.**   Okay.  And again, I'll try to keep this as nontechnical as

6   possible.

7        But basically, it's a dating app.  Grindr is used

8   predominantly by individuals who are gay rather than straight.

9   I can talk in a moment about a heterosexual and it's similar,

11:05:17 10   but Grindr is mostly for people who are gay.  That's kind of

11   well-known.

12        The way it works is that it has a geolocator.  What it

13   means is that people who post on Grindr can find names and

14   images and information about other people, including sometimes

11:05:40 15   pictures, and approach the people that are closest to them

16   geographically.

17        In other words, if someone is looking to meet up fairly

18   soon with an individual they can identify, who maybe is five

19   blocks away, ten blocks away, twenty blocks away.  So in that

11:05:58 20   sense, it can be used to meet people quickly for dating

21   purposes, which can, in some instances, perhaps many instances,

22   include sexual intimacy between those individuals.

23   **Q.**   And people make a self-profile on Grindr; is that correct?

24   **A.**   That's correct.

11:06:25 25   **Q.**   And what does that or can that include in a self-profile?

11:06:29   1   **A.**   What does it include?

2   **Q.**   Yeah, or can it include.

3   **A.**   Well, I think people can pretty much put what they want

4   to.  They're asked to be honest about that in their profiles,

11:06:41   5   but my experience is that often people simply are not.  So it's

6   what I call expectations that are put out there, but in

7   reality, that's not often always how it works.

8   **Q.**   All right.  So if someone's using Grindr trying to meet

9   someone, is it unusual that they would maybe be speaking to

11:07:02   10   more than one potential person to meet at a time?

11   **A.**   No, that's common.  I mean, and I'm an older person, all

12   of this is kind of foreign to me, but there's a younger

13   generation out there now and they may be kind of scrolling

14   through.  They can be communicating with more than one person

11:07:24   15   at a time.  I'm not so savvy as to do that easily, but

16   certainly, many people are quite able to do that quite easily.

17   **Q.**   And you're aware that Mr. Westmoreland was doing just

18   that; correct?

19   **A.**   That's my understanding.

11:07:41   20   **Q.**   Have you ever seen a case before where an individual was

21   speaking with a potential minor to meet up and, at the same

22   time, trying to meet up with an adult individual?

23   **A.**   I don't recall seeing that.  I've seen people speaking to

24   multiple adults.  I've been involved in cases where people on

11:08:04   25   the dark web, which is not what we're talking about here, are

11:08:08   1   talking about children and sharing an interest in children, and

           2   there may be multiple screens depicting, sadly, child

           3   pornography.

           4        But to answer your question specifically, I haven't seen

11:08:21   5   it where somebody is conversing multiply with both adults and

           6   children.  Certainly not on something like Grindr, no.  Has it

           7   ever happened?  I don't know.  But in terms of my experience

           8   and kind of knowledge of the literature that's out there, I've

           9   not seen it or heard about that.

11:08:40  10   Q.   You said -- so there are places, if someone's looking for

          11   a child on the Internet, that they can go to do that?

          12   A.   Yes, unfortunately.  It's called the dark web.  And there

          13   are numbers of sites out there where that can be done, yes.

          14   Q.   And is Grindr something that people typically use when

11:08:57  15   they're looking for a child or a young -- a teenager?

          16   A.   Certainly, in my experience, that doesn't happen.

          17        Now, the other way around, there's some people under the

          18   age of 18 who might go on Grindr, even though it's against the

          19   rules.  There have been some reports that that happens.

11:09:15  20   Sometimes an older adolescent will go on there and so on, but I

          21   haven't seen it in the reverse order.

          22   Q.   In fact, did Mr. Westmoreland express to you what he

          23   understood the rules of Grindr to be?

          24   A.   Well, he understood that you're supposed to be at least 18

11:09:35  25   years of age, and that's -- it does state on Grindr -- I'm

11:09:39  1  sorry, it does state on Grindr that that is the expectation.

2  Now, there's a lot of small print if you read through what

3  Grindr is telling people who are going to use it.  I doubt that

4  most people read all that small print.  So the general sense

11:09:55  5  that a person would have is that this is a site that's meant to

6  be used by adults.  That's certainly what the expectation

7  ordinarily would be.

8  **Q.**   In fact, isn't there -- when you sign up, you have to at

9  least click on something that certifies you're over 18?

11:10:12  10  **A.**   You do.  I think that's fair.

11  **Q.**   All right.  So there is a minimum age that is supposed to

12  be in place to be on Grindr.  And are you aware what the age

13  was that the detective in this case purported himself to be?

14  **A.**   Well, first, there's a profile, so I'm not certain what he

11:10:37  15  listed on the profile.  But what I do know is that once the

16  conversation started, he, on many occasions, presented himself

17  to Mr. Westmoreland as somebody who was a 13-year-old boy.

18  **Q.**   And are you aware of what the name was or the screen name

19  that the agent in this case was using?

11:11:06  20  **A.**   He used several.  I think one was seeking older, for

21  example, and a couple of others, it was the same general idea,

22  that it would have been somebody who had -- who was young

23  looking for someone who was older.  That was a general theme of

24  that.

11:11:25  25  **Q.**   And do these terms have any particular significance in the

11:11:27  1  gay community that might be different than the heterosexual

2  community?

3  **A.**   Well, you can see some of it in the heterosexual

4  community, but it's more common in the gay community.  But you

11:11:39  5  do see where seeking older might be a young adult wanting to be

6  with an older adult, for example.  There's a tremendous amount

7  of role playing that exists on the Internet, including sexual

8  role playing.

9      Examples in terms of your question of somebody who wants

11:11:59  10  to role play, one person is being, I don't know, 17 years old,

11  the other person is a 27-year-old coach of that person.  And

12  they kind of want to have sexual fantasies where they're each

13  playing out that role.  I know for many people this is

14  something that -- it was a lifestyle they wouldn't want to

11:12:23  15  lead.  It's not one I would want to lead, but it is very common

16  out there.

17      So I guess the point I want to make, I don't want to get

18  too long-winded, is that younger for older does not necessarily

19  by any means mean a child seeking an adult.  It could mean an

11:12:38  20  adult wanting to be with an older adult.

21  **Q.**   And you said there's an app that's a complimentary app or

22  the same kind of app but for heterosexual people; correct?

23  **A.**   Yes.  That's called Tinder, T-I-N-D-E-R, and that is used

24  predominantly by heterosexual individuals.  Lots and lots of

11:13:01  25  young people today use that for dating, sometimes, to use the

11:13:06  1    vernacular, to hook up for sexual purposes.

2         As I said earlier, I'm older.  This was nothing available

3    in my generation, so I have to kind of educate myself as to

4    what goes on in the world.  But it's very, very common amongst

11:13:23  5    people out there today to use these kinds of apps.

6    **Q.**   And talking about fantasy role play, I would assume that

7    that takes place on both Tinder and Grindr.  In your

8    experience, do you see more of that on Grindr or is it about

9    the same?

11:13:37  10   **A.**   There's a tremendous amount of role playing out there.

11   Sometimes, in doing the work I do, I've read chats for a long

12   time and might have assumed it seems real and then it turns out

13   that this was just role playing and not an example of intent.

14        In this example, and I'm not criticizing in any way, but

11:13:59  15   the investigating police officer was role playing.  He was

16   doing it for a legitimate reason.  He was concerned about

17   community safety, so that's one good reason to do it.  But

18   people do it because it's just something they enjoy.  It's not

19   necessarily illegal.  There's just lots and lots of role

11:14:17  20   playing out there on the heterosexual side, you know, people

21   wanting to play the role of a daddy having sex with a child.

22        Again, I find this very disturbing, but it's role playing.

23   It's not necessarily in any way whatsoever meaning that there's

24   an actual intent in these situations.  And if I may just expand

11:14:38  25   on that last comment because I think it's important, is that

11:14:42   1    okay to do?

2    **Q.**   Yeah.

3    **A.**   That's one of the challenges today with the Internet, is

4    to distinguish what is fantasy from what is intent.  For

11:14:53   5    example, there are women who role play the idea of being

6    manhandled or sexually assaulted.  They find that to be

7    arousing, but the overwhelming majority of them don't want, in

8    real life, to be raped.

9         There are people that spend hours on the Internet with war

11:15:12  10    games, shooting, killing people, but the overwhelming majority

11    of them don't in real life -- that's not an intent for them.

12         There's people that read all kinds of stories, horror

13    stories, Steven King horror stories on the Internet.  They can

14    be very disturbing.  That doesn't necessarily mean that in real

11:15:33  15    life, they would have an intent to want that to be a part of

16    their life.

17         So I just wanted to make it clear, you know, how

18    challenging it is, these days now, to distinguish role playing,

19    pretense and fantasy from what may be an actual real life

11:15:49  20    intention.

21    **Q.**   So just to clarify, someone might role play a child having

22    sex with an adult, but that doesn't mean that's what they would

23    actually want to do in real life?

24    **A.**   That's correct.  And, again, I understand for most of us

11:16:05  25    the idea that they're even doing that is disturbing, but you

11:16:09  1   know, we have rules in our society, and if consenting adults

2   are engaging in fantasy play that's not hurting anybody else

3   from a mental health point of view, we don't want to get into

4   the bedroom of consenting adults that aren't engaging in

11:16:24  5   illegal activity and the law tends to not want to do that

6   either.

7   **Q.**   And because of that, is it fair to say there's really

8   absolutely no way you can know if who you're talking to is who

9   they say they are when you're on the Internet?

11:16:40  10  **A.**   Well, I don't want to say there's absolutely no way, but

11  perhaps I can try to be specific to this case because I don't

12  want to get too far adrift.

13  **Q.**   Sure.

14  **A.**   So we know in this case, Mr. Westmoreland has argued that

11:16:53  15  he thought this was likely role playing.  It was -- he thought

16  it was likely an adult pretending to be a child, that he was

17  going to play along with it.  And perhaps in that way, meet up

18  with this person who, if it was an adult, he could have sex

19  with.

11:17:11  20      So the question is, in this case specifically, are there

21  things out there that would make it a plausible possibility

22  that Mr. Westmoreland might have believed that.  And I think

23  there are a few things that I looked at in this case.

24      One is that he had sent an actual picture of his face that

11:17:32  25  would identify him to this purported child.  Now, again, he's

11:17:38  1   an actor, he's pretty well-known.  If he thinks he's going to

2   get into trouble because he's actually meeting up with a child,

3   I'm asking myself why is he creating a record where it's going

4   to be his picture that's actually out there?

11:17:52  5       At one point, he asked the child, who says, again, that

6   he's 13 years old, his birth date.  And the child gives a birth

7   date that wouldn't have made him be 13.  It would have made him

8   be 15.  And I think for Mr. Westmoreland, this could have been

9   an ah-ha moment.  Well, what 13-year-old won't know his own

11:18:12  10   birth date?  I'm thinking this is just pretensive role playing.

11   This looks to me like it's probably pretense and role playing.

12       He'd spoken to at least one of the investigating officers

13   on the phone.  He argued that this -- you know, voices change

14   in males.  Between the age of 13 and later on, the hormones

11:18:33  15   kick in and the voice deepens.  Mr. Westmoreland, in speaking

16   with this individual, said as far as he was concerned, this

17   could not have been the voice of a 13-year-old.

18       So the only point that I'm making here is that it would be

19   very difficult for me, looking at everything that I've seen,

11:18:50  20   that I know from my experience and so on, to conclude, with

21   reasonable medical certainty, that Mr. Westmoreland believed

22   this was an actual child that he was going to have sex with.

23   It is equally possible that he really did think what he said he

24   thought and that he had reason to believe that this was not

11:19:13  25   actually a child.

11:19:15   1   **Q.**   You are aware, though, that he's pled guilty to

2   transmitting information about a minor; correct?

3   **A.**   I do.  Although again, I have to acknowledge, I'm just

4   going to tell you here.  You know, I'm not an attorney, I don't

11:19:26   5   quite understand exactly what that is from a legal point of

6   view, but perhaps I don't need to know that, but the language

7   of that was a little bit confusing to me.  I know he hasn't

8   pled guilty to being sexual with a child, but I'm not entirely

9   clear on that --

11:19:41  10   **Q.**   It's a confusing statute, that's for sure, but I think

11   that the -- and tell me if you agree with this, that he was

12   told he was speaking with a 13-year-old and he very well could

13   have been speaking with a 13-year-old; is that fair to say?

14   **A.**   Well, that to me is the most troublesome part of this.  As

11:19:57  15   I said, I can accept the idea that he thought it was not very

16   likely, for the reasons I just gave, that he was talking to a

17   13-year-old, but he couldn't know that with absolute certainty.

18        Now, reasonable medical certainty isn't that -- in a

19   courtroom, we don't need that, but if there's any chance at all

11:20:17  20   that this might be a child, the kinds of discussions he had,

21   the images that he sent and so on should not have been sent.

22   So to be fair to him, I am able to accept the idea that he

23   thought it was very likely someone role playing.

24        But also, to be fair to looking at it from the other

11:20:36  25   perspective, even if there was the slightest chance it was a

11:20:41    1    child, in my opinion at least, what he did was very wrong and

2    he made a very, very bad judgment in acting in that way.

3    **Q.**   Which his guilty plea is accepting that possibility;

4    correct?

11:20:58    5    **A.**   If that's the question, that guilty plea, in that sense,

6    is accepting responsibility for what he did.

7    **Q.**   All right.  You talked a little bit about this, but I want

8    to talk about -- there were pictures that were sent back and

9    forth between Mr. Westmoreland and the agent in this case.

11:21:19   10        Speaking first about what Mr. Westmoreland said to the

11    undercover agent, did you see any significance in the photos

12    that he sent?  And I think you mentioned this -- part of this,

13    but I wanted you to go over that and talk to me really about

14    the images.

11:21:37   15    **A.**   Clearly, he sent very sexually explicit images, which had

16    this been an adult, this theory that it's an adult role playing

17    been true, would not have been illegal.  Again, we can have

18    different opinions about it, but certainly, it wouldn't have

19    been a crime.

11:21:55   20        But the one that struck me I think is the one I already

21    commented about.  If he really thought this was a child and all

22    the trouble he could be in for doing that, I mean he hadn't

23    given his name, he wasn't identifying who he actually was, you

24    know, why -- if he really believed this is a child, why in the

11:22:13   25    world is he sending an actual picture of himself, particularly

11:22:19  1   of someone who is fairly well-known, especially in the younger

2   generation, and thereby self-incriminating?  That to me was

3   significant for that reason.

4   **Q.**   What about the pictures that were sent to Mr. Westmoreland

11:22:32  5   during this chat, did those seem significant to you in any way?

6   **A.**   Well, he had said that he didn't think that the picture --

7   well, some of the pictures looked like a 13-year-old.  I

8   believe at least one picture was of a -- one of the colleagues

9   of the investigating officer when he was 13.  If that's the

11:22:52  10   picture Mr. Westmoreland was talking about, I would

11   respectfully disagree.  I mean that looked to me like a picture

12   of a 13-year-old.

13        On the other hand, there were pictures he received

14   purporting to be the torso of a 13-year-old.  Those did not, to

11:23:07  15   me at least, look so much like a 13-year-old torso.

16   **Q.**   All right.  Mr. Westmoreland actually asked for pictures

17   of a sexual nature from the agent.

18        Do you recall that?

19   **A.**   He did.  And, again, he indicates that if he -- you know,

11:23:28  20   if this was really a child, that would be a way of finding out

21   what's actually going on there.  That's in his mind a way of

22   distinguishing, you know, is this a child or is this somebody

23   that is role playing?

24        I should also mention, because there could be more than

11:23:45  25   one thing going on, there were some discussions between he and

11:23:50  1    the investigator about whether the investigator was a police

2    officer.  The investigator assured Mr. Westmoreland he wasn't.

3    Mr. Westmoreland probably felt if it was a police officer, he

4    wouldn't be able to send images of a child that were of a

11:24:10  5    sexual nature.  So I would say there's probably more than one

6    issue that Mr. Westmoreland, in his mind, might have been

7    considering with respect to that.

8    **Q.**   All right.  And if it was an adult role playing, he

9    probably wouldn't have wanted to send pictures because it would

11:24:30  10    show -- it would break the fantasy; is that true also?

11    **A.**   Let me see if I understand the question.

12         If the -- I'm trying to understand.

13         If the pictures that he received back were one of a child,

14    that would have, I believe, surprised him.  And I think he

11:24:52  15    wasn't thinking he was going to get that, because he was

16    thinking this is probably someone who is role playing.  And in

17    fact, by the way, it was someone who was role playing, just not

18    in the way that he was thinking.

19    **Q.**   All right.  In reading through the discovery and

11:25:10  20    evaluating Mr. Westmoreland, did you read the reports about him

21    being interviewed by the arresting detective at that time?

22    **A.**   Yes.  I reviewed a lot, but as I recall, I did do that.

23    **Q.**   And what did he tell the arresting agent at that time of

24    his arrest --

11:25:33  25    **A.**   Well, he thought --

11:25:33    1    **Q.**   -- that's significant?

            2    **A.**   He talked about the fact that he thought that he was, you

            3    know, role playing or speaking with an adult.  And I guess the

            4    point would be he's been consistent throughout in how he has

11:25:45    5    said he had been thinking about this.  There was that

            6    consistency there.

            7           I'm aware that this is the allegation, this is just

            8    self-serving.  He's trying to get off the hook.  I understand

            9    the various possibilities that exist here, but certainly, he's

11:25:59   10    been consistent throughout in suggesting that he felt it was --

           11    he was role playing with an adult.  And as I've already said,

           12    there are legitimate reasons why he indeed could have thought

           13    that.

           14    **Q.**   All right.  So you talked a lot about role playing and

11:26:14   15    different role playing.  And in this case, this was a purported

           16    13-year-old with a man who was close to 50.  So if this is a

           17    fantasy role play, why this fantasy?  Why is Mr. Westmoreland

           18    interested in this particular fantasy if he doesn't have a

           19    sexual interest in children?  And you've touched on that a

11:26:33   20    little bit, but --

           21    **A.**   Well --

           22    **Q.**   -- I'd like to talk about, you know, why this, why did

           23    this keep him on the hook?

           24    **A.**   Well, one thing that I think is important is to -- I

11:26:43   25    remind myself.  In a sense, Mr. Westmoreland didn't choose the

11:26:48   1    fantasy.  In other words, he didn't have a message out there,

2    "older looking for younger."  He responded to something that

3    said "younger looking for older."

4         So if he believes this is role play and he's interested

11:27:07   5    in, again, to use the vernacular, hooking up with this person,

6    he is going to just play along with that.  So this was a --

7    sort of a fantasy -- I'm not criticizing.  The police are doing

8    very important work.  But this was a fantasy that was

9    introduced by the investigator.

11:27:27  10         And Mr. Westmoreland, you know, as a fantasy, simply

11    played along with it because if it was an adult male and he

12    plays along with the fantasy, and he's looking to meet an adult

13    for sex, this is an opportunity where he thinks he can do that.

14    **Q.**   And you've read the chat between Mr. Westmoreland and the

11:27:46  15    agent; correct?

16    **A.**   I have.  And, again, it's -- you know, it's disturbing to

17    read.  I think any time we -- you know, people talk about talk

18    dirty, these things happen in relationships.  It's not a

19    pleasant thing to read.  But I'll come back to what I said

11:28:05  20    earlier.

21         If this was a role playing fantasy, there was nothing

22    illegal about that.  The problem of course was, if there was

23    any chance at all it was a child, it shouldn't have been going

24    on.  So basically, I'm repeating myself.

11:28:18  25    **Q.**   So you did not diagnose Mr. Westmoreland with pedophilia

11:28:23  1    or pedophilic disorder.  Did you consider other possible

          2    psychiatric disorders at the time, and why is that significant

          3    in this type of evaluation?

          4    **A.**    Well, I considered other psychiatric disorders, and even

11:28:36  5    whether it's someone who, you know, didn't have a psychiatric

          6    disorder, who might they have been seeking a child, though it's

          7    hard to imagine why, you know, somebody just one day wakes up

          8    and decides, I'm going to try to be sexual with a 13-year-old.

          9    I guess it's certainly possible, but in my experience, it's

11:28:52  10   very unlikely.

          11        But I did consider other psychiatric possibilities.  Does

          12   he have -- I'm trying to slow again.  I apologize.  I know I

          13   start talking quickly.

          14        Does he have, for example, alcoholism or a drug addition?

11:28:52  15   That can impair someone's judgment, disinhibit impulses.  So

          16   again, I looked at the information available.  There was

          17   nothing in the reports from the investigating officers to

          18   suggest that there was alcohol on his breath, that he was high

          19   on drugs and so on.

11:29:24  20        In fact, the major concern at the time of his arrest was

          21   he's diabetic and he had a high glucose level.  So again, this

          22   one topic, I didn't see this as behavior that could have been

          23   occurring because someone had a problem with alcohol or with

          24   drugs.

11:29:42  25        I looked at whether is this a person who's just generally

11:29:46  1   antisocial, he doesn't have a conscience, he doesn't concern

2   himself with society's mores, and so maybe it didn't matter to

3   him whether somebody's 13 years old.  But there was no evidence

4   to suggest that this is someone who's antisocial in his makeup.

11:30:04  5   He had no prior criminal record.  He's been a responsible

6   member of the community.  He -- there's just nothing at all

7   that would suggest that I'm dealing with someone who has a

8   repeated pattern of disregarding society's mores and

9   expectations.  So I pretty much ruled that out.

11:30:24  10  Again, I don't want to go too far, but there are people

11  who have manic depressive disorder.  In a manic state, their

12  sex drive goes up, their contact with reality becomes impaired.

13  Could he have had that?  There's nothing at all that would have

14  suggested that was there.

11:30:42  15  So -- and I mentioned earlier, dementia.  The short answer

16  is I try to consider every diagnosis that might help to explain

17  this, to see if this would be some manifestation of a

18  preexisting psychiatric predilection, and I simply found no

19  evidence to support that conclusion.

11:31:06  20  Q.  And the fact that he did not have, in your opinion, any

21  Axis I or Axis II diagnoses, is that significant in terms of

22  risk, future risk?

23  A.  Well, it is.  I mean had he had pedophilia, by definition,

24  there's an ongoing attraction to children.  That would be

11:31:24  25  important.  If it's demonstrated that he becomes disinhibited

11:31:26  1   and including in sexual ways with drugs or alcohol, that he

2   better get some treatment or else that's going to continue to

3   be a risk.  So the absence of those risk factors, in my

4   judgment, was certainly of significance.

11:31:41  5   **Q.**   All right.  So even if someone -- and I don't want to dig

6   in too deep here, but if someone is not diagnosed as a

7   pedophile, or having pedophilic disorder, but they are

8   diagnosed with antisocial personality disorder, that person

9   would be at greater risk in the future than someone that does

11:31:57 10   not have that diagnosis; is that a fair statement?

11   **A.**   Not just of something sexual, but the antisocial

12   personality disorder is kind of pervasive.  I would expect not

13   only might they be at risk of misbehaving sexually, but that

14   they are very much at risk of misbehaving and engaging in

11:32:16 15   criminal activities in a variety of other ways as well.  Again,

16   not to repeat myself, but there's no evidence of anything like

17   that here.

18   **Q.**   Did you consider diagnosis of either like -- I don't know

19   if sexaholic is the proper term, but that or sex addiction?

11:32:32 20   **A.**   Those are not DSM terms, but I'm familiar with the

21   concept.  So I guess, did you want me to explain that a little

22   bit?

23   **Q.**   I'd like you to explain if you considered that.  And if

24   so, did you -- does he suffer from that, or if not, why it was

11:32:49 25   ruled out.

11:32:50  1    **A.**    Okay.  I did consider it, and I did not feel it was there,

2    but maybe to explain, to make it more understandable.

3        I mentioned earlier that we in mental health don't say

4    someone has a disorder simply because they're engaging --

11:33:07  5    they're different in some way or they're engaging in a

6    different lifestyle.

7        So when it comes to sex, for example, many of us are

8    monogamous or with one partner.  I've been married myself for

9    over 50 years, but there's other people that want to lead a

11:33:25 10    different lifestyle sexually.  They want to be active, very

11    active sexually, they perhaps want to be with multiple partners

12    and they have a right to decide that.  In fact, we at mental

13    health are troubled by the way that some of that previously was

14    stigmatized.

11:33:44 15        A woman who decided to be sexually active who was -- I

16    hate to say this, but they use words like slut and so on.  A

17    man who is sexually active, he was a womanizer.  So we

18    recognize it.  We live in a society where individuals have a

19    lot of freedom to choose as long as they're not breaking the

11:34:01 20    law.

21        And so Mr. Westmoreland is someone who has a lifestyle

22    where he has an interest in having multiple sexual partners.

23    Does that mean it's an addiction?  When something is an

24    addiction, it means that the person is having a difficult time

11:34:22 25    resisting the urge to behave in a particular way.  So I have

11:34:29  1   seen people who want to be monogamous, they are recurrently

        2   given urges to repeatedly pick up prostitutes or seek out sex

        3   elsewhere, and through their willpower alone, they're having a

        4   difficult time controlling themselves.

11:34:44  5       So if Mr. Westmoreland was not wanting to be sexually

        6   active in that way, and was having a difficult time living the

        7   way he wanted to live, then I could have concluded he has a

        8   sexual addiction.  But he was simply living a different sexual

        9   lifestyle, being frequently active sexually on Grindr with

11:35:09 10   other adults.  It's not my lifestyle, it's his, but this is the

       11   United States of America, he's free to do that.

       12       And I'm not going to say that means he's a sexual addict.

       13   And I do think there's a lot of misunderstanding in society

       14   about that, where because someone's sexual lifestyle is

11:35:26 15   different than our own, they're called an addict.

       16       You know, my lifestyle was very different than Hugh

       17   Hefner's, but I'm not going to go out there and diagnose him

       18   just because he has a different lifestyle than mine.  That's

       19   not the way our society works.

11:35:41 20   Q.   So again, the difference seems to be an ability to control

       21   it or if it's interfering with your life --

       22   A.   You know, we used to say to people "just stop."  We know

       23   now that was naive.  There's many behaviors that people can't

       24   just stop, not only addiction.  Some people can't stop

11:36:00 25   overeating and they need help with that.  But if you're just

11:36:04  1    choosing to behave in a particular way and you could behave

        2    differently if you wanted to, that's not an addiction.

        3    **Q.**   All right.

        4         In your professional opinion -- we've talked lot about

11:36:22  5    that he thought it was probably not a 13-year-old, and I just

        6    want to touch briefly, but do you believe he has accepted

        7    responsibility at this point for his actions, that he likely

        8    could have been talking to a 13-year-old?

        9    **A.**   I do.  I mean I think it's a little complicated.  I think

11:36:38 10    to the extent that he has pled guilty, that that's accepting

       11    responsibility.  I know he's also extremely remorseful about

       12    the pain he's caused his children, friends, loved ones.  And

       13    expressing that remorse, I think, is a way of accepting

       14    responsibility.

11:36:58 15         What he's not done, and I don't -- I'm not going to say

       16    this isn't accepting responsibility, he still insists that he

       17    felt there was a high probability that he was communicating

       18    with an adult.  Again, I'm not a mind reader, but as I said,

       19    based on my professional knowledge and expertise and so on, I

11:37:17 20    certainly can't conclude with reasonable medical certainty that

       21    he wasn't thinking that at the time.

       22         So the reason I'm bringing that up, if we're going to say

       23    he's only going to accept responsibility if he admits that he

       24    knew it was a child, I don't think he's going to admit because

11:37:35 25    I don't think he is confident that it was a child.  But I do

11:37:38  1   think he's accepting responsibility not by pretending that he

        2   didn't believe something he believed, but by recognizing he's

        3   hurting people or recognizing if it had been a child, that his

        4   behavior was absolutely unacceptable.

11:37:54  5       So at that level, I believe he's accepting responsibility.

        6   I know it's not a simple answer, but I think that's a

        7   complicated question, so I've tried to explain what I think is

        8   somewhat a complex response.

        9   **Q.**   Right, and it's not a simple statute.  But he has pled

11:38:08 10   guilty to transmitting information about a minor, a name or an

       11   address, which -- because we can't know, and it may have been a

       12   minor.  But that he did plead guilty to that, does that change

       13   any of your conclusions in terms of his diagnoses?

       14   **A.**   That's correct.  Although reading the materials, and I'm

11:38:29 15   not trying to be argumentative, I don't remember him

       16   transmitting the name of a minor.  I remember him asking the

       17   minor for a name.  But, again, you're the legal authority.  I'm

       18   just telling you, you know, what I've been thinking about in

       19   reviewing this.

11:38:45 20   **Q.**   What is your prognosis or your opinion about

       21   Mr. Westmoreland's prognosis in the future?

       22   **A.**   Well, I think it's excellent.  Regardless of how we want

       23   to conceptualize did he know the child -- I'm not going to go

       24   back and forth over that, but I think it's an excellent

11:39:03 25   prognosis.

11:39:04   1          This was clearly an isolated incident over a period of a

2     few hours on one particular day in his life.  It's absolutely

3     devastated his life.  He's learned an extremely painful lesson

4     from this.  As I've already said, there's no evidence that this

11:39:22   5     is part of some repeated pattern of seeking out sex with

6     children.

7          He doesn't have a diagnosis such as pedophilia which would

8     predispose him to do that.  He's not antisocial in his makeup.

9     He's someone who, in my judgment, is amenable to treatment so

11:39:43  10     long as it's treatment tailored to his specific needs.  He's an

11     intelligent man who knows that if he's given a break in terms

12     of how the Courts deal with him now, if he gets in trouble

13     again like this, I don't believe he ever would, but he knows

14     he'd be spending a substantial period of time in prison.  He's

11:40:02  15     highly motivated to try to rebuild his life and I believe would

16     be focused on that.

17          So in terms of his prognosis, with one caveat, that I do

18     worry sometimes about suicide, but assuming that he stays

19     alive, I believe that all the factors that would be suggestive

11:40:18  20     of an excellent future prognosis are present for the reasons I

21     just articulated in this instance.

22     **Q.**   So what kind of risk, if any, do you think he poses to the

23     community over the next two years, if he's still in the

24     community?

11:40:34  25     **A.**   I don't see anything here that suggests that he would pose

11:40:37  1    any heightened risk to the community.  I just don't see that.

2    I keep repeating it, I'm a little worried about risk to

3    himself, but, you know, he's not someone who's been into child

4    porn -- I'm just thinking out loud.  He's not someone who's

11:40:52  5    sought out sex with kids in the past.  Even in this instance,

6    initially, this didn't start with him looking for a child.  He

7    was responding to someone who was purporting to be a child.

8        So I don't want to just keep repeating myself.  I don't

9    see anything here that suggests he's at increased risk to

11:41:10  10   people in the community.

11   **Q.**   In terms of risk to himself, you had a conversation with

12   him about that yesterday, isn't that right, Dr. Berlin?

13   **A.**   Yes.  I hadn't seen him in two years, but we met yesterday

14   to discuss that, you know, I'd be testifying today.  He was

11:41:22  15   there at the time.

16       But I'd also reviewed the recent memorandum that had been

17   forwarded, which, of course, wouldn't have been available at

18   the time that I evaluated him.  And that was really before I

19   even met yesterday with -- Mr. Westmoreland had been cause for

11:41:41  20   a concern for me.

21   **Q.**   He reported yesterday to you, didn't he, that he is not

22   suicidal or having suicidal ideation at this time?

23   **A.**   Yes.  I don't think that's something that right this

24   minute is there.  If I may, some of what he said to me was that

11:41:59  25   he knew what it was like as a young person to find -- while his

11:42:05   1    father committed suicide, he would never want to put this on

2    his own children, of them having to deal with a father who's

3    committed suicide.

4        But having said that, we got into this conversation

11:42:18   5    talking about risk, I do see a number of risk factors in his

6    situation, where he should be having ongoing mental health

7    support and treatment, to be sure that that is a risk that is

8    being properly addressed over time.

9    **Q.**   And you said you would be available to treat

11:42:38  10    Mr. Westmoreland; correct?

11    **A.**   Well, again, I'm not inserting myself, but you know, he

12    and I have come to know each other.  If he is in a position

13    where he wants me to treat him in this day and age with Zoom

14    and so on, I could provide some.  So I'm not suggesting I

11:42:53  15    should do that, but if I was requested to do that, I would have

16    no reason not to try to provide some assistance.

17    **Q.**   And I know you have stated you don't think he needs

18    traditional sex offender treatment, but if the Court were to

19    order sex offender treatment, is that something you could

11:43:11  20    implement in to a treatment plan with Stoney?

21    **A.**   Well, let me first of all say this, clearly.  I'm not here

22    to suggest to the Court what they should do in any way

23    whatsoever.

24    **Q.**   I understand.

11:43:23  25    **A.**   And I certainly am going to respect whatever decision the

11:43:26 1   Court makes, having said that, as someone, you know, as an

2   expert witness here, to try to provide information to the trier

3   of fact, to the Court, so that in making a decision they have

4   as much information as possible that might be relevant.

11:43:44 5        So to answer your question, I am concerned whether or not

6   traditional, quote, sex offender treatment would be helpful for

7   Mr. Westmoreland.  It's kind of a, in my experience, one glove

8   fits all people into groups with persons who have committed a

9   variety of kinds of crimes, and they're often insisting in

11:44:07 10   these programs that the person admit that they did what they

11   were accused of doing.

12        If Mr. Westmoreland -- it's an if, but if he's in a,

13   quote, sex offender treatment program, it's going to insist

14   that he believed that he was talking with a child.  And again,

11:44:27 15   I'm not a mind reader, but I've just said, it's plausible he

16   could have believed this wasn't a child.  That's in a sense

17   setting him up for failure in treatment.

18        Most of these programs do polygraphs.  If he's asked on a

19   polygraph, did he intend to have sex with a child and he says

11:44:45 20   "no," and he's anxious about that, because he was very anxious

21   that the police were asking that question -- you know, the

22   polygraph is not a lie detector.  It just indicates a person is

23   getting very anxious about the question they're being asked.

24        He may look like he's, quote, failing a polygraph, and

11:45:02 25   that's going to cause all sorts of difficulties.  So I don't

11:45:05   1   want to belabor this point, but I believe, as someone with

2   mental health expertise, that we need to tailor the treatment

3   to the specific needs of the given individual.  And although

4   these programs tend to have what they call an ITP, an

11:45:22   5   individual treatment plan, it's pretty much that everyone is

6   expected to go through the same routine.

7        I believe that if you're asking about treatment for

8   Mr. Westmoreland, he should have it.  He needs support in

9   getting his life back on track.  One could look at that

11:45:38  10   treatment and say, "Why did you make such an awfully poor

11   judgment and set yourself up it in that way and so on," but I'm

12   not convinced that plugging him into a program where he's

13   expected to do the same thing everyone else is expected to do,

14   at least in my professional opinion, is going to be in his best

11:45:55  15   interest.

16        And if, again, our belief is that treatment is also

17   designed to serve society's best interest, I don't think for

18   the reasons I've just articulated it would do that.  I just --

19   no disrespect to the treatment people here, but I'm trying to

11:46:14  20   give an honest opinion based on my experience and my knowledge

21   of this case.  I'm not trying to be disrespectful.  And, again,

22   if he's ordered into this program, as I said, I respect

23   whatever decision that the Court is going to make.

24   **Q.**   Do you have a professional opinion, and I know nobody

11:46:30  25   knows this, maybe even Mr. Westmoreland, but do you have a

11:46:35   1   professional opinion, had there been an actual 13-year-old when

2   he showed up that night, do you think he would have had sex

3   with a 13-year-old?

4   **A.**   Again, no one has absolute certainty.  I think I said

11:46:49   5   earlier, you know, we don't just out of the blue, if we've

6   never had a sexual interest in a child, decide we're going to

7   do that.  So in the bright light of day, had this not been what

8   he says he thought it was, had it actually been a child, would

9   he have been able to bring himself to be sexual?  We could

11:47:12  10   probably go back and forth with it.

11       I think -- and I've probably given the reasons why, that

12   it would probably have been unlikely.  The best answer I guess

13   I can give is, I certainly could not conclude with reasonable

14   medical certainty in this case that, had there been a child, he

11:47:30  15   would have likely been sexual with that child.  There's other

16   cases where I certainly could conclude that.  I couldn't in

17   this case.

18       Now, I know there are some things out there, you know, and

19   you look at both sides of the ledger, would he have done it,

11:47:42  20   wouldn't he have done it?  He made some comments, for example,

21   to the Uber driver that had brought him to that location, where

22   he'd kind of said, maybe just keeping in role, he was going in

23   to check on a child.  A father had expressed some concern.

24       Again, each side of the coin, trying to look at was he

11:48:06  25   planning to have sex with a child?  If he's asking an Uber

11:48:10  1  driver to wait, he certainly isn't planning to spend much time

2  there, so he probably wasn't planning to have sex with anyone

3  at that location.

4     He did ask the Uber driver to wait and said he was

11:48:22  5  checking on a child.  But if he was really trying to cover

6  himself, what he didn't say to the Uber driver is, "I may be

7  coming back here with a child with me."

8     So, you know, the fact that he had that conversation with

9  the Uber driver, I'm trying to say what's on the side of the

11:48:37  10  coin that maybe he's thinking there's a child, that might be

11  one taken out of context that's on that side.  But looking at

12  the whole big picture that I've described altogether, I think I

13  couldn't possibly conclude with confidence that he was

14  intending to be sexual with a child.  I think that's the best I

11:48:55  15  can do in answering.

16  **Q.**   All right.  You used the term not "child" with the Uber

17  driver but "kid"; correct?  He was checking on a kid.

18  **A.**   Yeah.  I'm using the word child.  To me they're

19  synonymous, but the word that he used with the Uber driver, and

11:49:07  20  I'm going from having read the report of the FBI agent, was

21  "kid."

22  **Q.**   In preparing for today's hearing, did you read the

23  document that the government filed, the motion in support of

24  court acceptance of the plea agreement?

11:49:24  25  **A.**   Yes, ma'am.  That's what I mentioned a few moments ago

11:49:27   1    that I'd just seen recently.

2    **Q.**   And in that memorandum, the government references some

3    story, or a story, that Mr. Westmoreland had apparently looked

4    at, according to what was on his phone, on a website called

11:49:42   5    lifty.org.

6        Did you see that?

7    **A.**   Yes, ma'am.

8    **Q.**   And did you read that story?

9    **A.**   Yes, I did.

11:49:49  10    **Q.**   And what significance does that story have to the issues

11    here, in your opinion?

12    **A.**   Okay.  Well, a couple of points, if I may.

13        I don't know what percentage of stories that represented.

14    You know, is this one of a thousand stories and so on?  So I

11:50:06  15    want to make it clear, I can't put it into that context.  But

16    in terms of the actual content of the story -- and, again, it

17    could be disturbing to hear this, it's a fantasy story.

18        It's just a story, it's not real, but it's a story of

19    purportedly, as I recall, a nine-year-old girl kind of

11:50:26  20    fantasizing about being -- about tempting older males, about

21    sexually tempting and teasing her stepfather, her older

22    stepbrothers, even a teacher.

23        To me, I mean the content of this is nothing like what

24    we're discussing here with Mr. Westmoreland, where we're

11:50:51  25    discussing the idea of him meeting up with a 13-year-old boy

11:50:55   1   for sexual purposes.  So to suggest that these two are somehow
           2   related, to me, would just be a real stretch.
           3   **Q.**   The government in this case is asking for lifetime
           4   supervised release.
11:51:15   5       Do you have an opinion as to the appropriateness of
           6   lifetime supervision in this case?
           7   **A.**   Well, I'm just going to answer it from a mental health
           8   perspective, which can include talking about prognosis.  I
           9   continue to want to make the point, I'm not here to say what
11:51:31  10   should or shouldn't happen.  But, you know, there's people out
          11   there who have -- and I don't want to minimize what he's done.
          12   We're here because this is really serious, but you know,
          13   there's people out there that have committed murders and are on
          14   lifetime probation.
11:51:43  15       There are people, for example, who have pedophilia, who
          16   have recurrently been involved sexually with children.  There's
          17   something about their sexual makeup that on an ongoing basis
          18   could continue them posing a potential risk to children,
          19   particularly if they don't stay in some form of treatment.
11:52:06  20   Those would be people where I would likely say, "You know,
          21   we've got to be protecting society."
          22       I think lifetime supervision, to make sure that they're
          23   getting treatment to help guide them, and also to make sure we
          24   can intercede if we think the risk is increasing, either get
11:52:24  25   them in the hospital or violate the probation, there it would

11:52:27  1  make a lot of sense.

2      I've already explained here that I don't see anything that

3  suggests to me an ongoing risk throughout the course of the

4  rest of this man's life.  Again, there's no absolutes here,

11:52:40  5  but, again, I just don't see that.  So from a clinical point of

6  view, from what I know about him, what I know about what risk I

7  think he would likely be posing to the community, to put it in

8  mental health terms what I believe about his prognosis,

9  resources are limited.  Why should the resources in this case

11:53:01 10  need to keep him on lifetime probation when there's nothing to

11  suggest a lifetime risk.  That would be my answer.

12  **Q.**   A question I forgot.  I want to go back to the story for

13  just one moment.

14      The agent in this case represented that he, the

11:53:19 15  13-year-old, lived in a trailer park.

16      Does the story that Mr. Westmoreland have, have anything

17  to do with a minor in a trailer park?

18  **A.**   That -- that was kind of confusing.  The answer is no, not

19  in the story, but the report talked -- there's a report talking

11:53:34 20  about a link that mentioned the term "trailer park."

21      Now, it wasn't possible to even know what was on that link

22  or how Mr. Westmoreland might have gotten that link, but you

23  couldn't get to the link because there was a -- what's called a

24  404 error, which means that the server couldn't really open the

11:53:53 25  link in the first place.

11:53:54  1    So maybe they're talking about the fact that there was a
       2    link on his electronics that mentioned the term "trailer park"
       3    and so on.  But if the question was getting in the story, in
       4    this fantasy story by this nine-year-old girl, she says that
11:54:12  5    she lives -- and I'm paraphrasing here, but basically in a high
       6    class neighborhood, not in some sort of a trailer park.  So
       7    there's absolutely nothing in that story about her being in a
       8    trailer park.

       9    And again, how -- you know, this is maybe a link on his
11:54:30  10   computer.  And then later on, and I didn't even realize that,
       11   that the location he's going to might be near a trailer park?
       12   I just don't see how these connections make any sense to me.
       13   There might have been some bizarre coincidence, but I'm
       14   certainly not making a lot out of any of that.

11:54:50  15   **Q.**   So the one story that we do have a copy of is nothing like
       16   what happened in this particular instance?
       17   **A.**   No.  I mean if I read that story and said, "Is that a
       18   story I think would likely be" -- I keep having to slow myself
       19   down, I apologize.

11:55:05  20   Is that a story that would likely be of interest to a man
       21   who wants to meet up with a 13-year-old boy for the purpose of
       22   having sex?  No.  I mean it's like, you know, I'm reading this
       23   story, I don't know, fantasy story about something that's
       24   sexual in Playboy and somebody says, "Well, I betcha this is a
11:55:28  25   guy that's gonna go out and wanna have homosexual behaviors."

11:55:31  1   I mean where in the world is that coming from?

2   **Q.**   In the government's memorandum they state that

3   Mr. Westmoreland was attempting to groom the 13-year-old boy

4   that the agent was portraying.

11:55:44  5        Are you familiar with the term "grooming"?

6   **A.**   Yes, and I -- well, yes is the answer.  I'll wait for your

7   next question.

8   **Q.**   And what is grooming, in this context?

9   **A.**   Yeah.  Again, I try to stay away from jargon, but

11:55:57 10   basically it means seduction.  It's somebody who is trying to

11   seduce a child into sexual activity.  Examples of things I've

12   seen are in the literature that a person gets friendly with the

13   parents of a child, they ingratiate themselves, they kind of

14   get to know the child, maybe they persuade the parents to allow

11:56:16 15   babysitting and so on.  But it's basically a seductive process

16   where someone who wants to have sex with a child tries to make

17   it easier to accomplish by -- to use the everyday English word,

18   setting up where this child can be more easily seduced.

19        In this case, if that's what you're asking about, it makes

11:56:39 20   no sense.  This is a child saying, "I want to have sex with

21   someone who's older."  Well, what do you mean, he gets seduced.

22   This isn't a child that needs to be seduced, if you even

23   believe that it's a child in the first place.

24   **Q.**   Does grooming typically or ever take place in the course

11:56:58 25   of one evening?

73

11:57:00   1   **A.**   Grooming is usually used to define a process that occurs

2   over a reasonably sustained period of time.

3   **Q.**   All right.  I think we're getting close here.  Let's see.

4   So the government mentions in their memorandum that there

11:57:27   5   were certain tests that you did not perform that they felt

6   would have been appropriate.  I think particularly, the Hare

7   test, the Minnesota Static Test-99.

8   Can you just address why you didn't perform those tests

9   and if you think that's significant or those tests should be

11:57:44   10   performed?

11   **A.**   Well, again, I was seeing him at a time where he hadn't

12   been convicted.  All of those tests are intended for people who

13   have been.  Well, let me change that.

14   I'll talk about the Hare in a moment.  The other tests are

11:57:58   15   intended for people who have been convicted.  Part of the

16   scoring depends on the age of the conviction or the number of

17   the convictions and so on.  So it simply wasn't appropriate.

18   Most of these tests, like the Static-99, are what are

19   called actuarial tests.  They're kind of the types of tests an

11:58:21   20   insurance company uses to determine the risk of one group as

21   opposed to the risk of another group.

22   In other words, the insurance company can say more people

23   in this high risk group are likely to have a heart attack than

24   someone in this other group who is nonsmokers, nonobese, in

11:58:40   25   good health and so on.  But these tests, these actuarial tests,

11:58:46  1    can say the risk of a specific individual within a so-called

          2    high risk group.

          3        So these are not even tests in my judgment that can say

          4    anything meaningful about a specific individual.  And here

11:58:59  5    we're talking about predicting the risk of a specific

          6    individual; i.e, Mr. Westmoreland.  So I didn't think they were

          7    appropriate.  I still don't think they are.  I can discuss them

          8    further, but that's my first response.

          9        The Hare is called a Hare Psychopathy Checklist.  It's

11:59:17 10    really to look at whether or not someone's sociopathic.  It's

      11    often used in a criminal setting -- I'm sorry, in a prison

      12    setting or where there's already a pretty strong reason to

      13    believe that someone is antisocial.  There's just nothing in

      14    his history that would suggest that that would be important to

11:59:39 15    do.

      16        You know, there's an old test that we're -- an old adage

      17    we're taught as physicians, to treat the patient and not the

      18    lab values.  So had this been somebody with a long history of

      19    antisocial behavior, the Hare Psychopathy Checklist could maybe

11:59:56 20    show gradations of concern about how sociopathic he is, but

      21    there was just no reason to do it in this instance.

      22        So I hope I'm not getting too long winded, but that's --

      23    or on a tangent here, but that's why I didn't use it.  There's

      24    no reason to use it in this instance.

12:00:16 25    **Q.**  Do you feel any differently about that now that he's pled

12:00:19   1    guilty?

2    **A.**   No.  Again, talk about the Static-99.  I mean it would

3    talk about, you know, his age at the release -- at his release

4    from prison.  That would be a meaningless thing on the

12:00:32   5    Static-99.

6         Some of the scores have to do with prior convictions or

7    other kinds of convictions.  I know he already doesn't have

8    those.  Those are scoring pretty low on the Static-99.  The

9    Static-99 does talk about whether there's a male victim,

12:00:49  10    whether it's a stranger, whether it's unrelated.  So he picked

11    up some points there, but again, that's almost redundant.

12         And it would be giving the illusion -- we're giving a test

13    that's giving a score.  It wouldn't be telling us anything more

14    than I've been able to describe by talking about what he's

12:01:07  15    done, what he hasn't done, what evidence exists and so on.  So,

16    you know, if we did the Static-99, he'd score in either the low

17    or maybe what they'd call the low moderate range.

18         And by the way, let's say worst possible scenario, a score

19    on the Static-99 is low moderate risk.  The majority of people

12:01:29  20    with that low moderate risk are still not going to recidivate.

21    So again, it could be a very misleading term.  It's not

22    suggesting a high likelihood that he's going to do that, but I

23    think I've said enough about that.

24    **Q.**   But if you were to score that test, even now that he's

12:01:45  25    been convicted, worst case is he'd fall in a low moderate risk?

12:01:49   1   **A.**   I looked at it.  If we -- it almost seems unfair, to be

2   redundant, that this was -- the victim was a male, he'd get a

3   point for that; a stranger, he'd get a point for that; an

4   unrelated, he'd get a point for that.  There's another part of

12:02:07   5   the scale where he gets a minus, which reduces it by one point.

6         So worst possible scenario, he would score a three, which

7   puts him in what they call the low moderate risk.  As I said

8   earlier, even in that worst possible scenario, most people with

9   that score on the Static-99 do not recidivate.

12:02:30  10   **Q.**   All right.  In the memorandum the government also states

11   that --

12         **THE COURT:**  Ms. Lewis, before you continue, let me

13   just ask, about how much longer do you have?  We're just --

14         **MS. LEWIS:**  I have two or three more questions.

12:02:43  15         **THE COURT:**  Okay.  So just a few more minutes then?

16         **MS. LEWIS:**  About five minutes maybe.

17         **THE COURT:**  Okay.  Let's finish before we break for

18   lunch then with the direct.

19   **BY MS. LEWIS:**

12:02:52  20   **Q.**   So the government states that -- and I'm quoting from

21   their brief, so, "No incidents of abuse have been reported.

22   Mr. Westmoreland's work around hundreds of children does raise

23   concerns that he may have a sexual interest in children."

24         In your opinion, the fact that he's worked around hundreds

12:03:08  25   of children, does that raise your concerns or change your

12:03:10   1    concerns?

       2    **A.**  I -- I respectfully disagree with the government.  I mean

       3    every male teacher, you know, is he at risk?  Every father

       4    who's coached his son's little league team?  And I could go

12:03:28   5    right on down the line.  To me, it's exactly the opposite.  I

       6    mean we know he's been involved over the years with many

       7    children.  He -- I'm sorry, with many -- in many situations

       8    where there were children, and he's gotten publicity.  People

       9    know about this.  I mentioned he has his own children.

12:03:48  10        The fact that he's been around so many children and

     11    nobody, none of these children have ever accused him, I don't

     12    know how to term that positive in terms of him into a negative.

     13    That's a big plus.  We know he's been around these kids.  It

     14    supports the idea this was an isolated incident, just a really

12:04:08  15    dumb thing he did one particular day in response to this

     16    advertisement that he responded to.

     17        No, I very -- I'm trying not to talk fast because I kind

     18    of feel passionate about this.

     19        I don't want to say that people who spend a lot of time

12:04:22  20    around children and have never been accused of a sexual

     21    offense, that somehow we ought to be worried about them having

     22    some sort of other deviant motive.  I just -- I just think

     23    that's very wrong, in my opinion.

     24    **Q.**  It could be a negative for someone who has a history;

12:04:40  25    correct?  That they're putting themselves out --

12:04:43  1   **A.**    I would say very negative, because someone with that

2   history and other people find out about it, it's like the

3   beginning of the me-too movement.  That person would be at

4   great risk, but now these other people hear about it, I'm not

12:04:57  5   the only person, I now have permission to raise my hand and

6   say, "That happened with me as well."  That would be very much

7   at risk for the reasons that I just described.

8   **Q.**    But in this situation, it seems to support the fact that

9   he was not appropriately --

12:05:10  10  **A.**    In this situation, it's helpful, in my judgment, to

11  Mr. Westmoreland, not helpful to the idea that he's had a

12  pattern of being involved sexually with kids and nobody happens

13  to know about it.

14  **Q.**    All right.  They also indicate in their memorandum that --

12:05:26  15  you state that, "Published recidivism rates have been low for

16  sex offenders in general, particularly nonproduction sex

17  offenders."

18      And you didn't state where you got that information from.

19  Can you tell us where that came from?

12:05:40  20  **A.**    Well, first of all, that's in the last paragraph of my

21  report where I'm talking about our clinic, so it wasn't talking

22  in general.  There are a lot of studies that say that in sex

23  offenders, recidivism is way lower than people think.  But that

24  was just to talk about published recidivism rates from our

12:05:58  25  clinic.

12:05:59   1          You know, we want to have the outcome, we want

       2   evidence-based treatment.  Is what we're doing really working?

       3   So you can find it in my vita, the exact reference, but we

       4   published a study.  In over 600 men we've had in treatment,

12:06:14   5   over 100 of them had actually had a diagnosis of pedophilia.

       6   These were many cases people had actually had hands-on offenses

       7   and the published recidivism rate for people treated in our

       8   clinic was extremely low.

       9          And in fact, I'd make the point, if I may, that I've been

12:06:31  10   doing this for over 40 years.  I don't think I'd still be doing

      11   this at Johns Hopkins if most of the people or significant

      12   numbers of the people we were treating were going back in the

      13   community and creating problems.  But that reference is there,

      14   it's a study we published.  And it showed that at least in

12:06:46  15   terms of people we were treating, at the time of follow-up, the

      16   overwhelming majority were not recidivating, they were doing

      17   very, very well in the community.

      18   **Q.**   So your clinic has had great success in treating people

      19   that do have these kind of disorders; is that fair to say?

12:07:04  20   **A.**   Yes.  I mean I'm not here to talk about my clinic, but in

      21   response to your question, I'm very proud of the work we've

      22   done.  We're not just helping the men we're treating, we want

      23   to do that, but to the extent that we're successful and are

      24   preventing victimization, which is what one would want to --

12:07:21  25   think it's the best thing you can do with any victim.  I'm very

12:07:25  1    proud of the fact that that success level suggests that we are

2    also preventing bad things from happening in the community,

3    whenever we have a person who's been successfully treated.

4    **Q.**    I think this is the last question.

12:07:36  5        Have you looked at the status report that was filed by

6    Pretrial in this case?

7    **A.**    I have, to answer your question.

8    **Q.**    And you saw in there that there had been a couple of

9    issues regarding supervision.  And I'm just wondering if those

12:07:50  10   issues change your conclusions in any way.

11   **A.**    No.  I also saw, because I don't want to not acknowledge

12   it, there was something about whether he had done some sexual

13   harassing and that he should get some education about that.

14   That's a big contemporary issue.  All of us, you know, on staff

12:08:11  15   at Hopkins regularly are mandated to take courses and learn

16   about sexual harassment.

17       We live in a very different world today.  When I was a

18   young doctor, you know, sometimes the nurses flirted with the

19   doctors, the doctors flirted with the nurses.  You can't do

12:08:29  20   that anymore.  So people do need to be educated.  You can't ask

21   personal questions about people you work with in the way that

22   you used to be.

23       Also, just to stick to your question, I did see in that

24   report that, you know, he'd recently had a major period of

12:08:46  25   depression.  He'd lost weight.  There had been a recommendation

12:08:48  1   of medication, there'd been thoughts of suicide.  And as I said

2   earlier, I was very worried.  I want to make sure whatever

3   happens today, wherever he is, that he gets proper treatment,

4   because I don't want him to end up the way his father ended up,

12:09:02  5   in almost similar circumstances, as death by suicide.

6         Again, I want to underline, I don't believe it's a risk if

7   he walks out the door that he's going to do that today.  We

8   talked about that earlier.  But in terms of his longterm mental

9   well-being, he needs ongoing psychiatric support for his own

12:09:24  10  sake, to make sure that he doesn't again become a significant

11  risk to himself in terms of suicide.

12         **MS. LEWIS:**  I have nothing further.

13         **THE COURT:**  All right.

14         Thank you, Dr. Berlin.

12:09:35  15         Thank you, Ms. Lewis.

16         I think we will take a break for lunch at this point

17  before we move to cross-examination, if that's all right.

18         **MS. FOJTIK:**  Your Honor, if I could just -- I don't

19  know what our timing is.  I happen to have a 2:30 hearing

12:09:48  20  that's contested.  I don't know if we'll go that late, but if

21  we could shoot to wrap up by 2:00.

22         **THE COURT:**  We can try.  You were ambitious setting

23  that 2:30 hearing.

24         **MS. FOJTIK:**  Yeah.  Okay.  All right.

12:10:02  25         **MS. LEWIS:**  I don't think we're going to be done by

12:10:03  1   2:30 if we're going to take a lunch break.

2        **MS. FOJTIK:**  How long are you anticipating,

3   Your Honor?

4        **THE COURT:**  For the hearing or for --

12:10:10  5        **MS. FOJTIK:**  For a lunch break.

6        **THE COURT:**  I don't know.  I mean how much more time

7   do you feel like you have, Ms. Lewis?

8        **MS. LEWIS:**  Well, our second witness will only be

9   about ten minutes, I think.  And then argument.  I don't know.

12:10:22  10  It will probably be a little more than we typically see in

11  sentencing.  It's hard to gauge.

12       **MS. FOJTIK:**  Well, I anticipate cross-examining.

13       **THE COURT:**  Right.  And how long do you anticipate

14  for that?

12:10:32  15       **MS. LEWIS:**  I think we'll be more than another hour,

16  most definitely.

17       **MS. FOJTIK:**  I think half hour or 45 minutes for

18  cross.  I'll try to keep it to a half hour, but there's a lot

19  of topics we need to cover.

12:10:46  20       **THE COURT:**  There are.

21       **MS. FOJTIK:**  All right.

22       **THE COURT:**  Just a minute.  Honestly, I'm not

23  inclined to just keep going without a lunch break given how

24  much additional material we have to cover.  And I think just

12:11:00  25  based on what you've told me now, I'm just -- you know, I'm an

12:11:05  1    attorney, I'm not super good with numbers, but it sounds like

2    best case scenario, we probably are bumping right up against

3    2:30 or so.

4         **MS. FOJTIK:**  I'll have to make other arrangements,

12:11:17  5    Your Honor.  Thank you.

6         **THE COURT:**  Yeah.  But I think -- given that I don't

7    think -- unless we were just to take, you know, a five-minute

8    break or something, I don't think I could safely guarantee your

9    2:30 hearing anyway.  I'm inclined to just to take an ordinary

12:11:31  10   lunch break and come back maybe at 1:00, if that's all right.

11   And I think there's a pretty good chance we'll be done by

12   2:30 but I don't think that's anything we could guarantee.

13        And I think -- I want to make sure that Ms. Lewis

14   has, you know, whatever time she thinks she needs to make the

12:11:48  15   case she has.  I mean that's the most important thing on the

16   agenda today, is to make sure Ms. Lewis, and also you,

17   Ms. Fojtik, have the opportunity to make all the arguments that

18   you think are necessary.  This is an important matter and we

19   need to do the best we can with it.

12:12:04  20        But with that, I think we will recess until 1:00 for

21   lunch, and then we will come back then.

22        Dr. Berlin, thank you for your testimony.  You'll

23   remain under oath.  After you come back, there will be some

24   cross-examination from the government and possibly some

12:12:19  25   redirect from Ms. Lewis.

84

12:12:23   1          **THE WITNESS:**  Yes, Your Honor.  Thank you.

2          **THE COURT:**  All right.  Thank you.

3          All right.  We will now recess until 1:00.

4          (A recess was taken until 1:00.)

12:49:21   5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              (1:02 p.m.)

 2              MS. LEWIS:  Your Honor.

 3              THE COURT:  Yes.

 4              MS. LEWIS:  Our other witness has a plane to

 5    catch.  I have spoken with the government, and if it is all

 6    right, we would like to, he'll be very brief, we would like

 7    to handle him before the cross-examination of Dr. Berlin.

 8              THE COURT:  All right.  Ms. Fojtik, you have no

 9    objection?

10              MS. FOJTIK:  No objection.

11              THE COURT:  All right.  Why don't you call your

12    next witness then.

13              MR. BRIDGE:  We call Mitchell Stubbs.

14              THE COURT:  All right.  What was the name again?

15              MR. BRIDGE:  Mitchell Stubbs.

16              THE COURT:  Let's have Mr. Stubbs come forward

17    and be sworn.

18              THE CLERK:  Please raise your right hand.

19                          MITCHELL STUBBS,

20        called as a witness at the request of the Defendant,

21            having been first duly sworn, was examined

22                    and testified as follows:

23              THE WITNESS:  I do.

24              THE CLERK:  Please have a seat.  Please state

25    your name and spell it for the record.
```

1          THE WITNESS:  Mitchell Stubbs, M-I-T-C-H-E-L-L,

2     last name is Stubbs, S-T-U-B-B, bird-bird, S.

3                    **DIRECT EXAMINATION**

4     BY MR. BRIDGE:

01:03:26  5     Q.   Good afternoon, Mr. Stubbs.  Could you tell us where

6     you're joining us from today?

7     A.   I live in Los Angeles.

8     Q.   And what do you do for work, Mr. Stubbs?

9     A.   I'm a talent agent.

01:03:39 10     Q.   And what is a talent agent exactly?

11     A.   A talent agent is basically I'm an employment person

12     specifically for actors.  A lot of employment agencies are

13     administrative, secretarial, attorneys.  I specifically deal

14     with actors.

01:03:59 15     Q.   Can anyone be a talent agent?

16     A.   I'm sorry?

17     Q.   Can anyone be a talent agent or are there --

18     A.   Well, if you get licensed and bonded and give your

19     fingerprints to the FBI in the State of California you can

01:04:11 20     be.

21     Q.   All right.  And how long have you been in that

22     industry, sir?

23     A.   32 years.

24     Q.   And how many actors do you currently represent?

01:04:17 25     A.   About 45.

1    Q.    How long have you known Mr. Westmoreland?

2    A.    21 years.

3    Q.    And how did you all become acquainted?

4    A.    September of 2001, an agency that I used to work with

01:04:34  5    closed and became a management company and I hired one of

6    their agents to come over to my company to be my

7    vice-president.  She brought with her 25 clients and Stoney

8    was one of the 25 she brought with her to my company.

9    Q.    Have you represented Mr. Westmoreland continuously

01:04:51  10   since that time?

11   A.    Yes.

12   Q.    Does Mr. Westmoreland, to your knowledge, have any

13   other forms of professional representation?

14   A.    Well, at some point he had commercial representation.

01:05:05  15   I personally deal with the film, televisions, theater.  I

16   have a commercial department but not all of my clients does

17   my company represent commercially.  At one point, Stoney had

18   a commercial agency that did all of his commercial work and

19   then over the 21 years he has had two managers, I think.

01:05:29  20   Q.    Can you just briefly explain what the difference

21   between those forms of work is?

22   A.    Well, I am considered a theatrical agent meaning I put

23   people in film and television and theater.  A commercial

24   agent does strictly commercials.  And then a manager, a lot

01:05:49  25   of actors have a manager and the way I hear them described

1    is they're kind of the conductor of an actor's career.  I'm

2    in charge -- I'm tasked with finding work for them, finding

3    employment for them, and then the manager then finds a

4    publicist for them or an attorney for them or a brand

01:06:11  5    marketing person for them so -- but I'm the agent.

6    Q.   Gotcha.  Could you describe for us the type of acting

7    that Mr. Westmoreland does?

8    A.   Stoney, he has -- he went to theater school.  He

9    graduated from North Carolina School of the Arts in

01:06:36  10   Winston-Salem which is a really reputable, probably one of

11   the top 10, 15 theater schools in the country.  He spent 25

12   years plus being a professional actor.  And Stoney's what in

13   our business we call a character actor.  He is not the

14   leading man, he is not the leading lady, but he does all of

01:06:56  15   the character work.  He is the father, he is the shop

16   foreman, he is the attorney, he is the doctor, he is the PE

17   teacher, the coach.  So without, you know, I don't have too

18   many stars on my list, but my company is pretty much made up

19   with wonderful journeyman actors, character actors because

01:07:15  20   you can't have, unless you do the Tom Hanks movie with the

21   volleyball you really need other actors around to make the

22   leading people look good.

23   Q.   Can you give us some examples of work that

24   Mr. Westmoreland has done that we might all be familiar

01:07:32  25   with?

A.    He has done movies, he did a movie called *World Trade Center* that Oliver Stone directed, played a fireman in that. He's worked with Roland Emmerich, whose major film.  He has recurred on four or five television series, S.W.A.T. being one of them, Andi Mack, a series that he was filming here, he has guest starred on NCIS Los Angeles, he has guest starred on CSI Miami, he has guest starred on Better Call Saul, he has guest starred on Breaking Bad, he has guest starred on the Gilmore Girls.  So just all kinds of a range of shows that he has been on.  And he has worked with Sir Peter Hall who is very famous British west end director doing Shakespeare at Mark Taper Forum in Los Angeles which is one of our biggest theaters in Los Angeles.

Q.    And so among character actors like Mr. Westmoreland, how competitive is it for individual roles?

A.    Well, Hollywood is competitive at all levels and definitely for, you know, to -- Stoney's work is what we would -- he is not called -- he is not a name out in the hinterlands, you know, he wouldn't -- but in our business he is considered a name.  If I called any casting director, if I call any studio exec, if I called any producer and say so what about Stoney for this role, they knew who I am talking about and they'll go gosh, that's a great idea, let's give him an appointment or no, I don't see him in this role.

Q.    Is Mr. Westmoreland a member of any unions or

1    professional acting organizations?

2    A.    Screen Actors Guild and the American Federation of

3    Television and Recording Artists which is now all merged

4    into one that is called SAG Actor.

01:09:28    5    Q.    Can you give us, the court, a sense of how actors like

6    Mr. Westmoreland are paid?

7    A.    Well, if -- generally if you -- if you do like a one

8    off guest spot on a television show you will probably make

9    about 9,000, $9,500 for the week.  If you recur on that show

01:09:50    10   then you can get a little more than that.  If you become a

11   series regular, which he has not been a series regular yet,

12   but he is the type of actor that can work two weeks and then

13   go three months without working.  I think in a -- an actor,

14   in a similar capacity, you know, probably a rough year might

01:10:20    15   be considered $50,000 for someone at his level.

16   Q.    And how about a good year?

17   A.    A good year could be half a million dollars at someone

18   at his level.

19   Q.    And did Mr. Westmoreland have a sustained period of

01:10:36    20   good and bad years over that 21 year period or what are we

21   talking about for his --

22   A.    For the most part things were really, really good over

23   the last 21 years.

24   Q.    Now, give me a sense of -- you have defined for me

01:10:51    25   something called residuals.  What are residuals?

1    A.    Residuals through the -- through the screen actors

2    guild and the unions, a residual is a form of payment.  When

3    an actor goes to work on a set, they get paid for that week

4    of work.  Then once that work is shown, it's broadcast, then

01:11:16  5    once after its initial run, then once it's broadcast again

6    and again and again and again, there is a residual revenue

7    stream from that.  So that's why it's called a residual.

8    And there is a -- there is a decrescendo of residuals.  I

9    have clients that literally get a check for three cents.

01:11:38  10    Q.    And in terms of the 21 year history of

11    Mr. Westmoreland's acting professionally with you, is there

12    a point at which he kind of broke through as an actor, has

13    he always struggled, how would you characterize his career?

14    A.    No, I would like to think it is because he came to my

01:12:00  15    company, but he has had a really -- he has had a really good

16    run theatrically for the last 21 years.  He -- I did not

17    represent him commercially, so I can't speak to his

18    commercial work other than to say there was a time where his

19    commercial work was so great that it allowed -- it gave me

01:12:24  20    the benefit of doing what I like to do as an agent is to

21    kind of be real picky and pick and choose what type of work

22    he wants to do theatrically because he is generating the

23    bulk of his revenue through the commercial work.

24    Q.    So what -- I think you mentioned the role he had at the

01:12:45  25    time of his arrest.  Can you tell us what that was again?

92

1    A.    He was -- I think this was the season he recurred on

2    Andi Mack which was a Disney Channel series that was

3    shooting here in Salt Lake City.  I think he did 38 episodes

4    over a three season period.

01:13:03  5    Q.    And you described him as being relatively well known in

6    the industry at that point?

7    A.    Well, after this happened, and I received many phone

8    calls, texts, and e-mails of empathy maybe is the right word

9    to please communicate to Stoney from people who had worked

01:13:24 10    with him who knew him but not well enough to call him

11    directly just to lend their support to him.  And he was very

12    well -- always been very well liked on the set.  Trust me, I

13    have had a lot of people that I get phone calls and he has

14    always been very well respected on set.

01:13:44 15    Q.    So these people that you're mentioning have expressed

16    condolences or support for Mr. Westmoreland, would they hire

17    him again?

18    A.    No.

19    Q.    Why is that, in your opinion?

01:13:56 20    A.    It's a very visual business.  And as an actor, he was

21    well known on our end of the business, but he was not -- I

22    don't want to mention any names but he was not let's just

23    say he was not a world renowned movie star.  So, um, when

24    people go to cast projects, and this is virtually every

01:14:24 25    single role in the project, as soon as they start getting

93

1    close to an actor they want to hire, they start doing the

2    old Google search.  They will Google their name, they will

3    see what type of stuff is on the internet, they will scour

4    their social media pages and then that has become, in the

5    21st Century part, of how an actor gets hired in a project

6    is because all of the stuff that we never you know 30 years

7    ago we didn't exist, that had nothing to do with how someone

8    gets hired.  And now the very first thing they do is they

9    Google an actor and they want to see what is up and he

10   hasn't had a job since this happened.

11   Q.   So if this hadn't happened, this arrest hadn't

12   happened, can you give us a sense of what Mr. Westmoreland's

13   career could have looked like going forward?  How long it

14   would have lasted him?

15   A.   Well, the beauty of being a character actor as opposed

16   to a leading man or a leading lady is as you age, if you're

17   a leading man and a leading lady, the roles start drying up,

18   you know.  As a character actor, the older you get, the more

19   you weigh, the more wrinkles you get, the more gray hair you

20   have, the more employable you become.  And character actors

21   generally work until they either say I am done or some other

22   reason.

23   Q.   And it sounds like there were some immediate

24   consequences for just having the arrest itself on

25   Mr. Westmoreland's career?

1    A.    Absolutely.

2    Q.    Now that he stands convicted of this offense and will

3    be sentenced, what can you say about the impact of that?

4    A.    He -- I don't see him being an on-camera actor again.

01:16:18  5    I think that career is over.

6              MR. BRIDGE:  Thank you, Mr. Stubbs.  That's all

7    of the questions I have.

8              THE COURT:  All right.  Thank you.  Ms. Fojtik or

9    Mr. Hirata, do you have any questions for the witness?

01:16:38 10              MS. FOJTIK:  No, Your Honor, we have no

11    questions.

12              THE COURT:  All right.  So we're done with

13    Mr. Stubbs.  All right.  Thank you for your testimony.  We

14    appreciate it and you're dismissed.  Or you're excused,

01:16:47 15    rather.

16              THE WITNESS:  Thank you, Your Honor.

17              THE COURT:  All right.  Are we ready to bring

18    Dr. Berlin back?  All right.  Dr. Berlin, why don't you come

19    back to the witness stand.  While you're coming, we're not

01:17:15 20    going to swear you in again, but you remain under oath from

21    earlier today.

22              THE WITNESS:  Yes, sir.

23                         **CROSS-EXAMINATION**

24    BY MS. FOJTIK:

01:17:38 25    Q.    So strange.  Hope you can see me okay.

A.    Yes, ma'am, I can.

Q.    Okay.  Thank you.  Good afternoon, Dr. Berlin.

A.    Good afternoon.

Q.    You're not exactly sure what Mr. Westmoreland pled guilty to; is that correct?

A.    I have re-read it.  It is something about transmitting information about a child so I am not sure in what way he did that but you know that's --

Q.    I'm going to read you exactly --

A.    Okay.

Q.    -- what he pled to.  It says, "On December 13th in 2018, in the Central Division of the District of Utah, using a facility of interstate commerce, the internet, he knowingly transmitted the name of a minor across state lines in an attempt to induce, entice, encourage, offer or solicit any person to engage in sexual activity for which he could be charged with a criminal offense."  So does that help understand --

A.    I am still, and again I'm not trying to be difficult, I'm not sure what information or what name of a minor he transmitted in that way.  I just --

Q.    So he would have transmitted the name of the minor in the chat.  So he believed he attempted to, and remember it is an attempt crime, he believed he was attempting to send the name of a minor to induce, entice, encourage, offer, or

1    solicit to engage in sexual activity for which he could be

2    charged with a criminal offense.  So he sent the name of a

3    minor to induce, encourage, offer, solicit, someone to

4    engage in sexual activity?

01:19:26  5    A.   Yes.

6    Q.   He knowingly did that.

7    A.   I understand the whole last part.  And again, I defer

8    to you, but I don't remember reading something where he

9    sends a minor's name.  That's the only point I'm not clear

01:19:37 10    about.

11    Q.   Accepting his guilty plea in that regard, this is no

12    longer a fantasy.  He admitted beyond a reasonable doubt

13    that he sent that communication.  We're not in a fantasy any

14    more, right?

01:19:51 15    A.   I understand what you're saying.  Yes, if he has pled

16    guilty then he has pled guilty.  That's a fact.

17    Q.   And he is not role playing any more.  He admitted that

18    he sent this name and he knew illegal sexual contact was

19    involved with a minor.  That's not role playing any more?

01:20:08 20    A.   No, I would agree with that.  That is not role playing

21    any more.

22    Q.   And with that background, that changes the evaluation

23    that you have -- that you conducted in some ways, correct?

24    A.   How do I get into this.  I mean people -- I'm not a

01:20:27 25    lawyer, but people plead guilty for different reasons.

1    Sometimes they're just afraid to risk what's going to happen

2    in court.  I think he would have had a minimum mandatory

3    ten-year sentence so --

4    Q.   With all due respect, that's not the question I asked

01:20:39  5    and I don't mean to -- I apologize.

6    A.   That's fine.  I'm not trying --

7    Q.   The question I asked is if you knew, when you were

8    conducting this evaluation, that he was going to admit this

9    is not fantasy, this is not role play, that would have

01:20:54  10   changed your evaluation?

11   A.   That would have led me to believe, because he is

12   admitting it, that he was intending to have sex with a

13   child.  It wouldn't have changed my opinion about whether

14   this was an isolated incident out of character, it wouldn't

01:21:07  15   have changed my opinion about pedophilia and so on.  So I

16   hope that's clear answer to your question.

17   Q.   I appreciate that.  Let me talk about that.  You

18   mentioned pedophilia for a little bit.  Many people who have

19   no diagnosis of pedophilia commit sexual acts against

01:21:24  20   children?

21   A.   Absolutely.

22   Q.   And, in fact, because of the sustained nature of the

23   diagnosis of pedophilia, it is very common for people who

24   don't have this diagnosis to commit acts of sexual abuse on

01:21:38  25   children?

1   A.   Yeah, I don't want to quibble about words I know what

2   common means, it happens a lot.

3   Q.   Okay.  And you mentioned, I think you acknowledged the

4   term six months is somewhat arbitrary in terms of

01:21:54  5   persistence, but there was indications that Mr. Westmoreland

6   did have some repetitive conduct.  Accepting your

7   discussions earlier about him merely clicking on the link

8   regarding a trailer park boy, now that we know he has pled

9   guilty, now that we know he has accepted responsibility and

01:22:12 10   he is not role playing, clicking on a link to a story about

11   having sex with a minor just based on its title, that would

12   be something if it happened over a period of months that

13   could be indicative of a potential diagnosis of pedophilia?

14   A.   Well, it could be, yes.  But I would want to know how

01:22:35 15   many times, how many other links like this, what percentage

16   of links did this represent.  Did he truly seek out the link

17   because sometimes you get directed to a link.  I would need

18   all of that information.

19   Q.   And you're also aware in his collection he had a large

01:22:49 20   collection of adult pornography, correct?

21   A.   Oh, absolutely.

22   Q.   And within that collection he also had titles, again

23   the links, indicative of a sexual interest in high school

24   aged children and some sexual interest in incest based

01:23:03 25   pornography.  Were you aware of that?

A.   I am aware that he had a lot of adult pornography.  I
don't recall being aware -- maybe if you explained it to me
I could respond better, but I'm not sure what you're saying
whether that is an interpretation or whether that's actually
something that is factually established.

Q.   So the link, let's say, for example, the link said,
here's what happened in my high school locker room.  That
would be something that was indication maybe of hebephilia
but it would certainly an indication of someone with a
sexual interest in minors?

A.   Again, we're talking hypotheticals.  At the same time I
don't want to be argumentative.  I mean if it is just that
might that be an indication?  Yes.  Is it definitely an
indication?  I would have to have much more information.

Q.   Okay.  So we have someone who admits they're now
they're chatting and sending a message to a minor regarding
sexual activity.  We have a link that's indicative of a
trailer park sexual story.  We have some links indicative of
interest in at least in the titles, to your point, a fair
point, we don't know the contents but the link in the title
of the pornography was high school, so underage presumably
in its content.  Those are some indications of someone who
might have leanings towards pedophilia or hebephilia to use
your terms?

A.   Well, I -- I understand the argument that you're making

1    and how that argument could legitimately be made.  Um, given

2    the whole context of what I know here it's not going to

3    change my opinion.

4    Q.    Okay.  Sexual offenders are -- they have and I think

01:24:41  5    you discussed this, they have kind of different motivational

6    pathways.  They have different reasons they might engage in

7    conduct on a particular day, right?

8    A.    That's correct.

9    Q.    And opportunity is a motivator?

01:24:54 10    A.    It certainly can be.

11    Q.    And this is a situation where Mr. Westmoreland had an

12    opportunity right in front -- literally on the phone right

13    in front of him that evening, correct?

14    A.    That's correct.

01:25:08 15    Q.    And that can be a motivation to engage in sexual

16    activity?

17    A.    It can be although I don't know that I have ever seen a

18    case where that was done once never before and never again.

19    Opportunistic is usually the stepfather, he is in the home

01:25:23 20    with this child over a long period of time.  He doesn't have

21    pedophilia, but he begins to treat the child more like an

22    adult, takes advantage of the opportunity because he is

23    there in the circumstance.  So it does happen.  May it have

24    happened here?  I hear your argument, it's a possibility.

01:25:38 25    But this is not anything I have seen in 40 years of practice

1    in my work.

2    Q.   In your report, I think I am going to paraphrase, I

3    think you said something to the effect of "he just wanted to

4    engage in sex that night." He just was interested in having

01:25:54  5    sex that night?

6    A.   Well, that's very clear. I mean he was looking for

7    sex. I think one other man had shown up, another man he had

8    contacted didn't show up, he was very interested in having

9    sex that night, absolutely.

01:26:04  10    Q.   And the opportunity that presented himself that he has

11    now pled guilty to, was to engage in sexual activity with a

12    13 year old?

13    A.   I take your point. If we're going to go by the fact

14    that he pled guilty, then he has pled guilty to intending to

01:26:19  15    have sex with a 13-year old. I'm not going to argue with

16    you about it.

17    Q.   And then you discussed a little bit earlier that the

18    testing that you had conducted, I think it's the PAI and the

19    MSI were the two tests that were conducted?

01:26:31  20    A.   Yes.

21    Q.   A large portion of those tests are based on responses

22    to questions by the test subject?

23    A.   Yes, they're self reports that people, you know, pen

24    and pencil and they fill in the blanks.

01:26:44  25    Q.   In fact, the bulk of those tests are based on self

1    report?

2    A.    Absolutely.  They have some scales they try to look at

3    whether someone is malingering or presenting in more or less

4    positive light than they should.  But you're absolutely

5    right, they are self report tests.

6    Q.    And at the time that he took these tests, this was two

7    years ago now I think you said January or February when he

8    took those tests, he hadn't pled guilty?

9    A.    That's correct.

10   Q.    So the self report would necessarily be problematic

11   today because the facts have changed compared to what he

12   responded to those test results?

13   A.    Well, on the PSI, I don't have any reason to think the

14   results would be any different.  They don't really ask

15   questions about sexual activity.  The version of the MSI

16   that he was given was not appropriate for someone who hasn't

17   been convicted.  Now that he is convicted, it could be

18   redone.  Whether it would change much, I don't know.  I mean

19   if he is going to take the MSI and still in spite of the

20   guilty plea say that he feels that this -- he felt it was

21   fantasy at the time, which I think he still feels, then on

22   the MSI it is going to look like he is minimizing or I'm

23   paraphrasing, but it will look like he is not being

24   completely candid about this.

25   Q.    And so is it fair to say then that because those self

103

1    reports were based on his statements prior to his admission

2    of guilty today, that those in particular the MSI as you

3    just mentioned, those testing results would need to be

4    redone, they're not valid in light of what the new

01:28:16  5    information as we have before us now?

6    A.    Yes.  And they always have to be put in the context.  I

7    mean we don't just give a test and put it out there and

8    that's it.  It has to be interpreted.  Does it make sense in

9    terms of what we already know.  So I would agree with you

01:28:29  10    that if he took it today his answers might be different but

11    I might have a different understanding as well about why

12    those answers are different.

13    Q.    Okay.  And I know you talked a lot about fantasy and I

14    think we all agree that it has never been easier to engage

01:28:45  15    in fantasy then since the creation of the internet whenever

16    Al Gore did it all those years ago, correct?

17    A.    Yes.

18    Q.    But it's also, the counter of that is it has never been

19    easier to disengage from fantasy.  You can close your

01:29:01  20    laptop, you can turn off your phone and you are removed from

21    that fantasy that has been created on the internet.

22    A.    Yeah.  You would have to have a reason or want to

23    disengage, but I take your point.

24    Q.    It's very easy.  It's just a push of a button, not even

01:29:15  25    a button any more, right, it's the touch of a screen?

1    A.    No, I can't argue with that.

2    Q.    And in the context of your diagnosis of pedophilia and

3    in the context of talking about fantasy, behavior is always

4    a better signal as to what someone is going to do or predict

01:29:31  5    they're going to do than just merely reporting their

6    thoughts.  Is that -- is that a fair statement?

7    A.    Yeah, we look at the big picture but, you know,

8    behavior says a lot.

9    Q.    Okay.  And so Mr. Westmoreland's behavior of, you know,

01:29:45  10    he is sitting in a comfortable hotel room in downtown Salt

11    Lake and he takes a step and he orders the Uber.  And then

12    he takes a second step and he gets in the Uber to go to the

13    location to meet the minor which he has agreed to.  That's

14    behavior that is different than someone who is merely

01:30:04  15    engaged in fantasy?  That's taking it into action versus

16    just being on the internet.  Is that a fair --

17    A.    That is.  Although I wouldn't have any way of knowing

18    at that point whether his motivation was to meet the child,

19    I'm talking about before he has made the guilty plea,

01:30:20  20    whether his motivation was to meet a child or whether his

21    motivation was I think this is a guy pretending to be a

22    child and I am going to have sex with him and I want to do

23    that.

24    Q.    But you made an important point there.  Now that he has

01:30:29  25    pled guilty, does it change the context of that behavior?

1    A.    If we make the assumption that he indeed was going to

2    have sex with a child, then I would conclude that by

3    definition he said he was going to have sex with a child.

4    Q.    And that puts into context, and you mentioned this

01:30:44    5    earlier, his statement about, to the Uber driver, about I'm

6    going to go check on my friend's kid.  When you add that to

7    the guilty plea, the getting in the Uber, the chats, doesn't

8    that add additional context to what he intended to do that

9    evening?

01:31:00    10    A.    Again, we're talking about how to interpret his

11    actions.  I mentioned earlier, I think when the side of the

12    ledger that perhaps even before the guilty plea perhaps he

13    was expecting a child on that side of the ledger.  Now

14    again, he didn't tell the Uber child I'm going to be coming

01:31:17    15    back with a child, that could have been a better cover

16    story, but I take your point.

17    Q.    And he didn't have to tell the Uber driver anything.

18    He could have just sat there quietly like many people do.

19    A.    I agree.

01:31:30    20    Q.    In terms of, and you have a great deal of experience

21    with working with these offenders, in terms of

22    Mr. Westmoreland's personal background, he looks exactly

23    like a lot of other offenders in this particular space in

24    terms of his ethnicity, his age, and his lack of criminal

01:31:53    25    history.  This is a crime generally that tends to involve

1    middle age white men; isn't that correct?

2    A.   I want to make sure I understand the question.  There

3    certainly are a lot of middle aged white men who get

4    arrested for this kind of behavior so I would say yes to

01:32:10  5    that.

6    Q.   Okay.  And you looked at -- you mentioned that you had

7    looked at Mr. Westmoreland's statement.  And when he met

8    with law enforcement that night, and again in the context of

9    a guilty plea now, and I apologize I'm going to use

01:32:28  10   profanity but I want to quote exactly, Mr. Westmoreland

11   said, "I kind of fucked up tonight," and so I apologize for

12   the language, but with the background of the plea, does that

13   also give you insight that his intention was to be with a

14   minor that evening?

01:32:42  15   A.   Well, you know, the situation here is if you say I have

16   to -- I have to -- that he has pled guilty so that's simply

17   a fact.  In terms of my trying to understand what he was

18   saying at the time he was arrested, I mean there were two

19   general possibilities.  One is that he was trying to absolve

01:33:00  20   himself of responsibility and just say, you know, I really

21   didn't believe this was a child.  That's possible.  The

22   other was that he did think it was somebody role playing and

23   certainly putting aside just for the sake of discussion his

24   guilty plea, I wouldn't have been able to conclude with

01:33:15  25   reasonable medical certainty that he did believe it was a

child.  I take your point that at this point he has pled

guilty to that.

Q.   Okay.  And you mentioned that he has been consistent in

his story when he spoke with you, but he had already spoken

01:33:30  with law enforcement before he came and told that story to

you, correct?

A.   He has been consistent from beginning to end with me,

with law enforcement, just right across the board, that he

thought it was very likely that he was conversing with an

01:33:45  adult role playing being a child.

Now I take it where he isn't consistent is that

he has now pled guilty.  But otherwise, he had been

consistent right across the board.

Q.   But he also he gave that story to law enforcement

01:33:59  first.  That was the first time he told that story that I

was engaged in role playing fantasy on the night of his

arrest.

A.   Well, that would have been the first time that anyone

would have been in a position to ask him about it, so yes,

01:34:09  that is certainly true.

Q.   Okay.  And we talked a little bit about -- you talked a

little bit about just again some additional characteristics

of pedophilia and those who are involved in it.  It is, and

I understand your diagnosis, but is one of the factors that

01:34:27  does usually go into looking to create this diagnosis

1    someone who is around a lot of children?

2    A.   Well, again, I really want to be careful.  I don't mean

3    this with any disrespect.

4    Q.   No, no, it's all good.

01:34:40    5    A.   There are so many people who are in that position.  If

6    we are going to say that is marker or risk factor, I just

7    respectfully would disagree with you.

8    Q.   And I understand that.  But how many people in that

9    position, and you mentioned there are plenty of male

01:34:52    10   teachers and male coaches that never are in that situation,

11   but how many people are in that situation and then are

12   arrested after chatting online with someone that they're

13   told is a 13-year old?

14   A.   That is an extremely tiny percentage.

01:35:04    15   Q.   Correct.  So only a small percentage cross that border

16   into that acting behavior on interest in children?

17   A.   I understand your point.  Could he be one of those

18   persons that crossed.  But again, others cross and we find

19   out it just opens up the doors where a lot of other people

01:35:22    20   come forward.  Kevin Spacey was an example.  I -- well I

21   don't want to start naming people I think that may be

22   unfair, but there are numerous examples where it has become

23   public knowledge with what seemed to be the first event

24   other people hear about it and folks just come out of the

01:35:42    25   woodwork.  That didn't happen here.

1    Q.   And in the course of your practice you have worked with

2    folks who have been victimized, correct?

3    A.   Yes.  In fact, as I said earlier, many of the men who

4    have been arrested and who have pedophilia, also had been a

01:35:56  5    victim of child sexual abuse.  And as part of their therapy,

6    we also need to deal with that issue.

7    Q.   And one of the common characteristics of folks who have

8    been -- and you and I share a goal, we want to prevent the

9    sexual abuse of children, we share that goal.  Since you

01:36:13  10   have worked with victims, I know I cited one study in my

11   report which said as few as one in 20 victims come forward

12   publicly or come forward to law enforcement to disclose that

13   abuse.  Is that consistent with what you have seen in your

14   practice?

01:36:28  15   A.   It is although in terms of what we're discussing now,

16   it seems that there is a much more receptive environment in

17   which victims can come forward.  So absolutely what you said

18   is true historically.  I would like to believe and you would

19   probably like to believe, too, it is changing at this point

01:36:44  20   and the victims feel more comfortable in coming forward.

21   Q.   I certainly agree.  But you could also, isn't it

22   possible, too, that someone might be concerned about the

23   notoriety or the attention the that might come to them if

24   they disclosed abuse maybe that happened a while ago and

01:36:59  25   they don't want to bring that issue up and they don't want

1    the light of day on them.  That is a perfectly acceptable

2    response from victims as well?

3    A.    Sure.  People should be making up their own minds about

4    these issues and we ought to respect the right to do so.

01:37:11    5    And if someone, for whatever reason, doesn't want to come

6    forward I think that that's fine.

7    Q.    Okay.  And because of that, because sometimes that

8    hesitance to disclose abuse, recidivism numbers are just

9    always difficult to measure in this particular crime?

01:37:28    10    A.    Well, in this crime but there are many other crimes

11    where that is difficult as well.  But yes, I wouldn't

12    quibble with you over that point.

13    Q.    There is more reluctance for victims to come forward

14    than you would see necessarily someone who is a victim of a

01:37:40    15    bank robbery?

16    A.    Yeah, I think that's fair.

17    Q.    Okay.  And almost all of the data we have on this base

18    is to due to individuals who have been arrested or charged

19    that they have had legal interventions, that's how we're

01:37:53    20    learning about generally the majority is people who have had

21    legal interventions from the court system?

22    A.    Well, much of that.  But there is some organizations

23    now of people on the internet who are offended by the idea

24    that most of the public thinks that pedophilia is synonymous

01:38:09    25    with child molestation.  And they're doing surveys.  How

1    many people who are attracted to children haven't acted on

2    it.  They're interested in making it possible for that

3    17-year old boy who privately knows he is attracted to

4    eight-year olds to raise his hand and come forward.  So

01:38:23  5    historically what you said is true, but in recent times we

6    are beginning to get data on folks who are out there who

7    have not been arrested.

8    Q.   Would it be fair to say though that the number of

9    offenders who are sexually attracted to children are not

01:38:36  10    voluntarily entering treatment as for example in comparison

11    to somebody who has maybe got a substance abuse problem?

12    A.   Yes.  And it's particularly complicated by the fact of

13    mandatory reporting.  I have actually published a paper on

14    that of people who call want to come in and talk with me,

01:38:52  15    but they want to know, you know, am I mandated to report.

16    And I tell them I am.  I say if they're not sure they should

17    contact a lawyer.  I'm not going to give them legal advice.

18    And tragically a law that is intended to protect children is

19    deterring unidentified people from coming forward to get the

01:39:09  20    very help that might make the community safer.  It's really

21    an important issue that I think requires further

22    consideration.

23    Q.   So you don't think that folks should be required to

24    report when someone has disclosed to them a child has been

01:39:21  25    sexually abused?

A.   I had a discussion with a prosecutor on this issue where the arrangement we thought we could have made was they would be reported to the prosecution, they would be able to get treatment, they would defer prosecuting as long as the person is cooperative with treatment.  But as the prosecutor said, I'm in an elected position and the next person might not agree so we couldn't -- we couldn't do that.

I -- there is a number of people in our profession now.  Everybody wants to do what's best to protect children.  Nobody is asking for amnesty for people who have been identified.  But if there is somebody out there who is molesting a child and we're deterring them from coming forward so we can identify the child, help the child stop that person, is that really the best possible policy?  There are nuances here that I think need to be explored.  And the idea well if you're for mandatory reporting you must care about children if you think it is more nuanced that means you're not concerned enough about children I don't buy that.

Q.   I understand but you understand that it's the law?

A.   Yeah.

Q.   In I believe in all 50 states at this point in time?

A.   And we obey the law.  I tell the people I am a mandated reporter.  An interesting example, if I can take one second, in California, mental health people are mandated to report

1    people looking at child pornography.  They're actually

2    trying to fight that out there.  But the point is people

3    don't come in in California and say they're looking at it.

4    We're not mandated to report that in Maryland.  And in

01:40:47  5    recent years we have had a number of people who come in on

6    their own and maybe the family encouraged them to come in

7    who report they have been looking at child pornography, they

8    don't want to get in trouble, they want help and we help

9    them.  So it's an example where in one state mandatory

01:41:02  10   reporting is not letting these people get help and in

11   another state, because we're not mandated, they're actually

12   getting some assistance.

13   Q.   But merely viewing child pornography or even trying to

14   access you understand is a criminal violation in the entire

01:41:15  15   country?

16   A.   I obey the law even in situations I express concern

17   about the current law but I'm going to obey it.  If it gets

18   changed, fine.  But I don't disobey any laws.

19   Q.   And I cited, I think in my report or in my pleading, I

01:41:29  20   cited one study that said, you know, as few as seven percent

21   of sexual offenders are exclusively attracted to children.

22   These offenders often are attracted to adults as well as

23   children; isn't that correct?

24   A.   Yes.  As you know, pedophilia, just talking about that

01:41:47  25   right now, I think you are too, there is the exclusive and

114

1    the nonexclusive form.  But by definition the non-exclusive

2    person is attracted to adults but it doesn't erase the fact

3    they're strongly tempted to children and may still need some

4    help in not giving into that kind of a temptation.

01:42:05  5         There is other people, where life is even more

6    difficult for them, who through no fault of their own are

7    not aroused by the idea of being sexual with an adult, have

8    recurrent sexual fantasies and urges about children and

9    again, those are people, you know, we need to help them.  We

01:42:19 10   can't punish that away or legislate it away.  As we both

11   agree, if we can figure out a way to help these people and

12   prevent them from causing child sexual abuse all of us are

13   going to be for that.

14   Q.   Thank you.  Turning specifically to Mr. Westmoreland

01:42:32 15   though the indicia in his background personally he has

16   indicated his bisexuality, he has indicated that -- not

17   indicated as you noted the electronic showed he had both

18   adult and these, you know, links to high school titles and

19   stories about underage kids, so if he met the diagnosis or

01:42:52 20   at a minimum he has some of the characteristics of someone

21   who would be nonexclusive type of pedophile, who is

22   interested in multiple ages and multiple genders?

23   A.   Again, you're asking a hypothetical.  If he has

24   pedophilia, and I'm suggesting I don't believe he does, but

01:43:07 25   if he would be -- would have been diagnosed with pedophilia,

1    clearly it would be with the nonexclusive type.  He also is

2    attracted and has been very active sexually with adults for

3    his entire life.

4    Q.    And coming back, in this case, his actions, his actions

01:43:25  5    and his plea of guilty, so he pleads guilty, he admits he is

6    going to meet a minor, he gets in the Uber, he talked to the

7    Uber driver, he gets out of the Uber before he is arrested,

8    his actions were reflective of someone who was going to meet

9    a child that night?

01:43:43 10    A.    Again, that is certainly an argument that can be made.

11    I have talked about how I looked at it from both sides.

12    What would be something that I would not be able to debate

13    is if he is acknowledging through a guilty plea that that

14    was his intent, then I have to say that that was his intent.

01:44:04 15    Now, I got into it earlier that there are lots of reasons

16    why people plead, but I won't go down that trail right now.

17            MS. FOJTIK:  Okay.  Could I have just a moment,

18    Your Honor?

19            THE COURT:  You may.

01:44:16 20            MS. FOJTIK:  Okay.  We have nothing further, Your

21    Honor.  Thank you.

22            THE WITNESS:  Thank you.

23            THE COURT:  All right.  Thank you, Ms. Fojtik.

24    Ms. Lewis, do you have some -- you can have a minute as

01:44:29 25    well.  I think Ms. Lewis may have some questions for you.

1            THE WITNESS:  I wasn't sure what was happening.

2            THE COURT:  Just wait for a moment.

3            MS. LEWIS:  Just a couple of questions.

4            THE COURT:  All right.  You may proceed,

01:45:40  5    Ms. Lewis.

6                    **REDIRECT EXAMINATION**

7    BY MS. LEWIS:

8    Q.   Dr. Berlin, the government pointed out that physically

9    Mr. Westmoreland looks a lot like the majority of people

01:45:55 10   that are charged with this crime, a middle aged white man,

11   correct?

12   A.   Yes.  I agree that's what was said.

13   Q.   Tell me though, when you are looking at people charged

14   with this crime, there are other things though that they

01:46:12 15   have in common besides being middle aged white men most of

16   the time?

17   A.   Absolutely.  I mean that's in a sense, and I don't mean

18   this with disrespect, that is kind of a profiling.  That's

19   not how we go about doing that.  We look at each individual

01:46:25 20   in their own right, there's a tremendous spectrum that we

21   see in terms of people who have pedophilia in terms of

22   people who've committed different kinds of crime.  So the

23   fact that a person is white or a certain age or whatever,

24   that's not really something that I am looking at when I'm

01:46:40 25   doing an evaluation.

1   Q.   But you say in your experience it is -- is it unusual

2   that someone charged with this crime or convicted had

3   absolutely no child pornography on any of their devices or

4   accessible to them that you know of?

01:46:55   5   A.   I mean not to mislead, it is not that it never happens

6   but it is very, very unusual for that to happen.  And again,

7   I wouldn't just look at that out of context but was there

8   other chats, was there anything else there that I might have

9   expected to see.  But to find a person who is arrested in

01:47:12   10   this kind of a situation with no evidence of any other

11   attempts to meet children, no evidence of child pornography,

12   that's extremely unusual.

13   Q.   All right.  And then even though it's true that not

14   everyone wants to come forward if they have been abused or

01:47:28   15   sexually assaulted as a child, is it unusual that nobody

16   would come forward given his reputation in the community,

17   given how people -- how well people know him and the years

18   of being around children that he has had?

19   A.   Again, I can only look to sort of evidence that is out

01:47:48   20   there and to people like Bill Cosby and people, you know, I

21   mentioned Kevin Spacey, where there has been a lot of

22   publicity, certainly in recent years, what seemed to happen

23   quite a bit, I don't want to make it more precise than it

24   is, but it seems to happen quite a bit that lots of other

01:48:06   25   people have come forward under these kinds of circumstances.

1           MS. LEWIS:  All right.  I don't have anything

2      further.

3           THE COURT:  All right.  Thank you.

4           Ms. Lewis, Ms. Fojtik, did you have any --

01:48:16  5      anything else?

6           MS. FOJTIK:  No, Your Honor, I think we can stop

7      there.

8           THE COURT:  All right.  Dr. Berlin, I think we

9      have finished.  We appreciate your testimony, it has been

01:48:23 10      very helpful, and you're now excused.

11           THE WITNESS:  Thank you, Your Honor.

12           THE COURT:  All right.  Now those were your two

13      witnesses, correct, Ms. Lewis?

14           MS. LEWIS:  I'm sorry, Your Honor.  What was

01:48:45 15      that?

16           THE COURT:  Those were your two witnesses,

17      correct?

18           MS. LEWIS:  Yes.

19           THE COURT:  All right.  So at this point it

01:48:49 20      probably makes sense to have argument about the appropriate

21      sentence and sentencing factors.  I think as I usually do at

22      sentencing I'll let the United States start.

23           My understanding is you have proposed 24 months

24      imprisonment plus supervised release for life.  And I read

01:49:11 25      your sentencing memorandum so you don't need to repeat

1   everything, but, you know, highlight what you think is

2   important and address the testimony and tell me why you

3   think that's the correct sentence here.

4   MS. FOJTIK:  Thank you, Your Honor.  The United

01:49:24  5   States has proposed a sentence of 24 months incarceration.

6   Starting with the nature and circumstances of this offense,

7   we are coming from a point where Mr. Westmoreland has pled

8   guilty.  This is not a point where we are debating what his

9   intent was or what occurred that evening.  Mr. Westmoreland

01:49:44  10   has pled guilty.  And he has pled guilty to attempting to

11   entice a minor or sending the name of a minor to encourage

12   illegal sexual activity.  I think that is the context we

13   have to look at this sentencing argument.

14   Mr. Westmoreland is no different than any other

01:50:02  15   offenders that have been before Your Honor.  In fact, in

16   many ways he stands in a better situation than others.  This

17   is an unusual recommendation on the United States part for a

18   sentence of this range and we give it and we make it in

19   acknowledgment of he has done some of the work.  24 months

01:50:22  20   is a reasonable recommendation in light of where the

21   guideline range is and we start at that point instead of 46

22   because he has done some of the work.  And my understanding

23   and Dr. Berlin highlighted this and Your Honor is very

24   familiar with this, a lot of the work that has been done is

01:50:38  25   related to depression which is a very important

1    co-occurrence that sometimes occurs with these offenses.  So

2    that's how we get to the starting point.

3            In terms of the nature and circumstances, we've

4    talked about those extensively.  I do think it is

01:50:53  5    significant and the United States thinks it is significant.

6    He portrayed himself as a federal law enforcement officer.

7    That's why we're standing here.  This is something that he

8    said he was in from HSI.  Law enforcement that night went

9    looking around for who in HSI was in Salt Lake doing

01:51:09 10    training.  He portrayed himself as a federal law enforcement

11    officer.  And whatever his motivations for doing it were, at

12    this point he has pled guilty.  And at this point, looking

13    at it in the context of the chat, as I mentioned earlier, we

14    think he did this to make the child involved in the chat

01:51:26 15    feel safe, feel secure, and I think that's of some

16    significance and I think it is of aggravating significance.

17            I also think it's worth noting, and you know

18    there has been much made of the fact that he didn't have

19    child pornography on his computer but if you look at the

01:51:41 20    context of the chat, he is repeatedly asking for sexually

21    explicit images of a minor.  And in particular, that phone

22    call he is aggressive, he is, I would say, he is borderline

23    angry, but his tone is firm and it changes.  I need an

24    explicit picture of you because I could go to jail for this.

01:52:01 25            So that's not someone who is chatting with anyone

1       he thinks is a minor.  That is someone worried about being

2       arrested who knows he is talking to a child.

3               The last thing that -- the other thing that I

4       would say, and I don't want to get into the terms of service

01:52:18   5    on Grinder, but what I do want to say is it was really easy

6       for Mr. Westmoreland not to be here.  The circumstances of

7       this offense are Grinder has a button right, and I keep

8       saying button, you know, I should say a touchscreen marker,

9       on every chat where you can block someone.  And law

01:52:35  10    enforcement, they get blocked all of the time.  The minute

11      they say they're 13 years old on Grinder they get blocked

12      routinely.  And Mr. Westmoreland made a knowing choice not

13      to block, to seek sexually explicit images, to leave his

14      hotel room, to get in an Uber, tell the Uber driver he was

01:52:53  15    going to meet a kid, laying the runway for when he showed up

16      back in the car for what might be a minor, his actions speak

17      louder than his words.  He took every step indicating that

18      he was going to meet a minor.  That's worth a 24 month term

19      of incarceration.

01:53:08  20              He was motivated by sex, by Dr. Berlin's own

21      terms, he was motivated to have sex that night and the

22      opportunity arose to have sex with a 13 year old.  And

23      that's why the nature and circumstances support the

24      imposition of this.

01:53:22  25              As to the characteristics of Mr. Westmoreland, we

1    don't have any reason to dispute, I am confident that

2    everyone who has written kind things about him is saying the

3    truth.  I don't dispute that.  But I am also confident that

4    there are two sides to many people.  And unfortunately for

5    Mr. Westmoreland, the other side of him is someone that was

6    willing to engage in sexual activity with a minor.  I'm very

7    sorry about that abuse that occurred to him.  And Dr. Berlin

8    testified about this, Mr. Westmoreland minimized it, but

9    trauma is trauma, and I do think that impacted him.  And I

10   hope he will get therapy to address what happened to him.

11        But in spite of that trauma, he did what many

12   victims do.  He went on to live a law abiding life, he had a

13   successful career, he showed great resiliency with all that

14   had been thrown at him except he has this predatory streak.

15   And that predatory streak is what put him in the car to meet

16   that minor that night.

17        I don't know, you know, Dr. Berlin says he is not

18   a pedophile.  But as even Dr. Berlin said, many people who

19   are not diagnosed as a pedophile engage in criminal conduct.

20   And that's what happened in this particular case assuming

21   that diagnosis is correct.

22        As to deterrence, we -- and we talked about this

23   as well, a large number of sexual abuse incidents are

24   unreported.  Even the U.S. Sentencing Commission, in its

25   most recent report, acknowledges a large number of sexual

1    abuse are underreported.  And so recidivism and measuring

2    recidivism and predicting the future with these offenders is

3    particularly difficult.  And that's why general deterrence

4    remains a priority for congress.  This is a crime they want

5    generally deterred and they want the community to know if

6    you engage in anything in the zip code of these offenses you

7    will have penalties.

8            As to specific deterrence, we have concerns

9    Mr. Westmoreland continues to minimize.  Oh, this was a

10   fantasy, oh, this was role play, and he is not delving into

11   why.  And the only answer we heard today about why we're

12   here, was Dr. Berlin suggested it was law enforcement's

13   fault, because law enforcement said they were 13 years old

14   that's why he engaged in the fantasy.  And I submit that's

15   just preposterous.  Mr. Westmoreland is a grown man with a

16   college degree that is fully capable of turning off his

17   phone and not going to meet a 13 year old child.  We don't

18   know why he is here and that's why I think a period of

19   incarceration is warranted because he does need to be

20   specifically deterred.  We don't have an answer.

21           I posit to Your Honor if this happened today and

22   he had not been arrested and he was sitting at Little

23   America again and he had all of the opportunities on Grinder

24   again, would the exact same conduct occur even though he has

25   had some progress with some movement in therapy would the

1        same conduct occur?  And I think it would.  And I think a 24

2        month sentence is a reasonable small sentence that would

3        send a specific deterrence message to Mr. Westmoreland.

4               Mr. Westmoreland's actions speak louder than his

01:56:30  5        thoughts.  And his actions today, and his own admissions

6        are, that he intended and he desired to engage in sexual

7        activity and that would cause harm and trauma to a minor.

8        With that, we'll submit, Your Honor.

9               THE COURT:  All right.  Thank you, Ms. Fojtik.

01:56:44 10               Ms. Lewis, would you like to address the

11        sentencing factors and explain why I should accept the plea

12        agreement and also why you believe that probation is the

13        appropriate sentence?

14               MS. LEWIS:  Yes, Your Honor.  One moment.

01:57:35 15               Your Honor, Mr. Westmoreland is a 52 year old man

16        who has never been engaged in any illegal conduct prior to

17        this offense or in the three, almost three and a half years,

18        since this offense.  He has been out on release for 39

19        months now.  And during that time, he has been under some

01:58:00 20        very, very strict conditions.  He has, initially when he was

21        released, he was on home arrest.  He wasn't allowed to go

22        anywhere.  We had -- it was difficult working with an

23        out-of-state probation office but there was a lot of back

24        and forth on what he was allowed to do in terms of even

01:58:21 25        going to the grocery store.  This was not just out doing

1    whatever he wants for the last three and a half years.  Very

2    strict conditions.  On GPS monitoring.  He has had a GPS

3    monitor on his ankle for 39 months.

4           Eventually, this was moved to a more traditional

5    home confinement where he was allowed some time out of the

6    house.  And ultimately, after over two years, I believe,

7    finally he was placed on a curfew where he was allowed more

8    time out of the house.  The reason these conditions loosened

9    up was because of how he was doing and that he wasn't

10   engaging in criminal conduct, he wasn't causing any

11   problems.  I know we had a few things up front that were

12   technical issues, but as time went on, he was doing very

13   well and was allowed more and more opportunities because of

14   that.  And I'm going to get back to that, but I do think

15   that's important to note that he has been in a situation

16   where over the last three years he has been punished for his

17   conduct.  And if he is on probation for the next five years

18   he will continue to be punished for that conduct.

19          Being on probation it's not easy, it's difficult

20   for anyone, I think, to have to always be under the watch of

21   someone else.  It would be inaccurate to say that that's not

22   a punishment, that being on probation for five years is not

23   a punishment, it's a punishment, and it's a very difficult

24   punishment.

25          In addition to that, you heard Mr. Stubbs

1    speaking about the consequences that are going to follow

2    Mr. Westmoreland for the rest of his life due to this

3    conviction.  Primarily, his career is over.  It really is

4    over.  I know we were allowed to -- or he was allowed to

02:00:12  5    direct a movie while the charges were pending.  And even

6    though he hadn't been convicted at that point,

7    the filmmakers ultimately decided to just take his name off

8    that movie even though he was the director because they

9    didn't want to risk where that could go in terms of the

02:00:30  10   success or failure of the film.  That was before he was even

11   convicted.  And that's the only opportunity that he has had

12   to work since the charges in this case and no opportunity

13   since then.

14         And he is now working at Whole Foods.

02:00:47  15   Fortunately, he is enjoying that job.  He really felt for a

16   long time that he -- there was nothing he would be able to

17   do.  He was an actor.  He said he didn't have any other

18   skills.  He had been acting since he was in his 20s.  He

19   didn't knows what he was going to do.  And he has found a

02:01:03  20   job that he is good at and that he is happy with which is

21   not going to be there if he goes to prison for two years.

22   There is no way.  I mean how he is going to be able to be

23   employed by the time he is 54, with two years in prison, is

24   -- I think it's highly unlikely he will be able to engage in

02:01:24  25   any kind of employment at that point.  And right now, he

1    does have work and he is making success of that work and he

2    is happier than he has been in a very, very long time.  He

3    sees that his skills have transferred over to this job, he

4    gets lots of compliments at this job, people are constantly

02:01:45  5    saying what a pleasure it is when they check out with him.

6    And I think for the first time in three and a half years he

7    is starting to fill good about himself.

8         I will mention, I didn't know how important this

9    was, but I did see in the pretrial report the update that

02:02:00 10    there was a sexual harassment issue at the job, so I'll just

11    addressed that real quickly.  That was, we discovered, what

12    it was was a number of people on-the-job were having

13    conversations with sexual annotations to them, that -- an

14    individual came up to Mr. Westmoreland and he --

02:02:24 15    Mr. Westmoreland had introduced his partner to people at

16    work, so a man who worked at the store said, "hey, you're

17    gay?  I am too."  Or, "you're bisexual, I am too."  And

18    there was some talk that was probably inappropriate for the

19    workplace.  There was some other talk that had nothing to do

02:02:39 20    with Mr. Westmoreland that was inappropriate for the

21    workplace, separate completely, and management has required

22    a number of people to go to sexual harassment training.  He

23    wasn't disciplined, he wasn't let go, he wasn't suspended,

24    nothing, and I felt that the report made that a little bit

02:02:56 25    more than it actually was.

1          THE COURT:  So just to be clear, it wasn't really

2     specifically directed to Mr. Westmoreland as opposed to sort

3     of the workplace generally?  Is that your position?

4          MS. LEWIS:  Yes, exactly.

02:03:07  5          THE COURT:  All right.  Thank you.

6          MS. LEWIS:  I want to talk about, before I go to

7     the 3553(a) factors, I want to talk about the plea itself

8     because that has been a little bit of an issue today.

9          I think that none of us are so naive here to not

02:03:21  10    acknowledge the fact that people do plead guilty for a lot

11    of reasons like Dr. Berlin stated.  And Mr. Westmoreland has

12    accepted responsibility.  I think he can do that and still

13    say that he initially did not believe that he was speaking

14    with a child, that he wasn't certain he was speaking with a

02:03:42  15    child.  Both sides in this case had an interest in a plea

16    agreement.

17          Mr. Westmoreland was very concerned that he would

18    be found guilty of solicitation at a trial.  And I think

19    that the government was concerned that he might not be.  And

02:04:01  20    we reached a plea agreement and I know that there was a lot

21    of talk about there wasn't a perfect fit, a statute that was

22    a perfect fit for the conduct here, but Mr. Westmoreland

23    admitted that he very well could have been speaking to a

24    13-year old, he treated the person as if they were a 13-year

02:04:20  25    old in those conversations, and what he did was reckless, it

1    was stupid, it was illegal, and he is taking responsibility

2    for that.  I don't think it's counter to that to say that

3    since he did not plead to solicitation that had he shown up

4    and had there been a child there that he would have walked

02:04:43    5    away.  I think those two things can be said at the same

6    time.

7             THE COURT:  And let me ask you that, Ms. Lewis,

8    because I mean just as a legal matter I'm not -- I

9    understand the realities that you're saying about plea

02:04:56    10    agreements.  I am not sure I really can acknowledge them per

11    se, you know.  I asked Mr. Westmoreland under oath I'm sure

12    you know are you pleading -- you shouldn't plead to this

13    unless you feel like you're guilty.  But are you saying that

14    this crime could be supported by a mens rea of recklessness

02:05:16    15    as opposed to specific intent?

16             MS. LEWIS:  Under the statute it says that they

17    knowingly transmitted information of someone under the age

18    of 16.

19             THE COURT:  Right.

02:05:24    20             MS. LEWIS:  I -- I don't think -- I think it is

21    absolutely clear from the chat that Mr. Westmoreland did not

22    know how old this person was particularly given when asked

23    of a birth date the person said they were 15 or 16.  And he

24    did plead and he acknowledges that he was talking to someone

02:05:45    25    who, and this is difficult, it is, he didn't -- how can we

1    ever know for sure in this kind of situation if the person

2    is under age or not.  We can't.  No one could have known for

3    sure.  And he didn't know for sure.  But yes, he went -- he

4    kept going.  And he didn't press off on the computer, he

02:06:04  5    didn't shut it, he didn't block them, which he should have.

6    So I see that we're on a fine line here, I understand that,

7    and this has been a very, very difficult case in part for

8    that reason.  And he, I think, will speak to that a little

9    bit when he addresses the court.  But he is taking

02:06:22  10   responsibility because he knew that the person said they

11   were 13, he had reasons to think maybe that wasn't true but

12   he still went forward and transmitted information based on

13   the face of what he had in front of him which was that he

14   was talking to a 13-year old.  He knows that that was wrong

02:06:43  15   and he is willing to accept responsibility for that.

16        I don't think, since he didn't plead to

17   solicitation, that means that it isn't important at least as

18   a mitigator to look at would he have actually had sex with

19   this individual.  When push came to shove, when he showed up

02:06:58  20   and a 13-year old walked out of the room, or out of the

21   home, to the car, or would he have done it.  And I -- I

22   don't see any problem with him maintaining his position that

23   he wouldn't have, that he wouldn't have had sex with a

24   child.  I don't -- I think we can say both of those things.

02:07:20  25   I know we don't often do that, but I don't think that that

1    is an issue because of what he pled to is different than

2    what he was originally charged with.

3            Turning to the nature and the circumstances of

4    the offense, this is the factor that the government wants

02:07:35  5    you to focus on.  They want you to focus on the chat.  And

6    that's because that is the only thing that really works in

7    their favor under the 3553(a) factors.  The chat isn't good,

8    it is bad.  We acknowledge that.  We don't know exactly what

9    was in his mind.  And what we do know about him and about

02:08:01  10    the chat is very, very different from what we see typically

11    in these cases.  He is not a typical offender, he is just

12    not.  This is a chat that took place over a couple of hours.

13    It's a very, very short chat.  That's unusual.  Usually, in

14    people that are charged with solicitation, the chats go on

02:08:22  15    for, not always, but more often than not, they are chats

16    that took place over a number of weeks, at least a number of

17    days, sometimes weeks, sometimes months, where an individual

18    is chatting with someone they believe to be a child.  This

19    was a crime of opportunity which the court can look at how

02:08:41  20    the government has presented it or how Dr. Berlin presented

21    it, but it was there in front of him and it was a one time

22    chat.

23            It's unusual that he was also trying to meet up

24    with an adult at the same time.  I've done this a long time,

02:08:57  25    I have had many, many of these cases.  I have never seen an

132

1    individual simultaneously trying to meet with a child and

2    trying to meet with an adult.  His interest is in adults,

3    it's not in children.  And even if he would have followed

4    through with this, which I know is the government's

02:09:13  5    position, his interest is not in children and that's --

6    that's unusual.  There was absolutely no child pornography

7    on his device.  We've said that, on any of his devices, this

8    is unusual.  It is very rare we see someone charged with

9    this crime who has nothing on their devices that is

02:09:31  10   considered child pornography.

11           In fact, he didn't have adult pornography on his

12   devices.  He had stories.  He had erotica on his phone and

13   maybe his computer, I'm not sure.  The only photos that I'm

14   aware of, and I haven't seen anything different from the

02:09:49  15   government at this point, were some sexually explicit photos

16   of his partner.  He did not have a collection of

17   pornography, adult or otherwise.  He did have a number of

18   stories on his computer that were erotic stories and there

19   has been a lot made about the one story that dealt with a

02:10:08  20   minor.  There was apparently it looked like a link to maybe

21   a second story that deals with a minor, but I don't think

22   that that in and of itself shows that he has an interest in

23   children.  You heard Dr. Berlin say that most adults will be

24   able to see attractiveness and maybe even be sexually

02:10:32  25   attractive to older adolescents, to teenagers.  He looked at

1    a story, which again not pictures, a story, maybe, we don't

2    have the story, it looked like there was a link to high

3    school locker room story.  The fact that someone maybe reads

4    a story about that, if he even read it, I mean he is looking

02:10:51    5    at a number of stories, you click on them, you open them up,

6    you look at the first paragraph, yeah, that's not my

7    interest, move on to the next one.  So I don't know which of

8    these stories he read the whole way through or which he

9    didn't.  But we're talking about a large collection of

02:11:04    10    stories and one, maybe two, that had to deal with -- had to

11    do with a minor or someone in high school.

12           And I know when diagnosing pedophilia and also

13    looking at future risk, it is very, very important to look

14    at the percentage of and usually we see this more in

02:11:20    15    possession of child pornography cases, but if someone has a

16    very, very large collection of adult pornography and a small

17    collection of child pornography, that's a factor that is --

18    that lowers their risk, because that's a small interest they

19    have as opposed to this bigger interest.

02:11:39    20           With him we didn't have pictures but we had a

21    very large collection of stories with two or three that

22    maybe dealt with only one that we have seen, that dealt with

23    a nine year old girl, the other two we don't even have the

24    stories.  But the percentage is so small, I don't think that

02:11:56    25    really says anything about what his future risk is to the

1      community.

2              The government has talked about the Uber driver

3      and how he said multiple times during that drive, I'm going

4      to go check on a kid, I'm going to go see if this friend of

02:12:19   5      mine if his kid is having a party.  He used the term kid.

6              Again, I don't know that that tells us for sure

7      what age he thought he was meeting up with.  I certainly

8      know the older I get the older kids get in my view

9      especially when you have children who are in their 20s you

02:12:39  10      can easily be talking about someone in their 20s and now I

11      find the same with people in their 30s I refer to them as

12      kids.  So I just think that a lot has been made of that,

13      it's not really a very significant factor.

14              I also don't think it's a very significant factor

02:12:53  15      that he was posing as law enforcement.  This was a persona

16      that he created before he ever was in Utah and it was a

17      persona he used online for his own safety.  And, you know, I

18      know the government says that he was using that to entice a

19      child, but honestly I think if he had just come up with that

02:13:11  20      at that moment that might bear some weight, but the fact

21      that this was just a persona he used online to protect his

22      identity, I just don't think that has really any bearing at

23      all or any significance in this case.  Give me a moment

24      here.

02:13:33  25              I want to talk a little bit more about his

135

1    history and characteristics.  I think you see from all of

2    the letters and from what you heard Mr. Stubbs testify to is

3    Stoney has a good reputation in the community.  Even with

4    these charges, he has -- people have expressed sympathy and

5    empathy towards him because people don't feel this is who he

6    is.  And in Hollywood, I think the fact that nothing else

7    has come out about him I think is highly significant.  I --

8    yeah the government is right not everybody wants to report

9    this kind of conduct, but right now, over the last couple of

10   years in Hollywood, people are reporting this conduct very,

11   very regularly.  I'm sure if he had a history maybe not

12   every single person would have come forward.  But the fact

13   that nobody ever came forward and he has worked with

14   multiple children over the years.  I'm a little frustrated

15   that the government is saying that that is a sign now of a

16   proclivity towards children.  It is a little bit putting the

17   and before the if.  But he worked with children because he

18   had children, because he wanted to be involved in his

19   children's life, because he wanted to do good in the

20   community.  Many, many individuals do that.  That's why

21   people become teachers, that's why people become coaches.

22   And yes, when you look at some people who have some serious

23   -- had pedophilia, you sometimes see that they put

24   themselves in a position where they can be around children.

25   But to say that that's what is happening here, I think that

1    would be setting a bad precedent to say that someone needs

2    to be nervous about working around children.

3           Now, I know the flip side of that is they don't

4    need to be nervous if they're never going to try to have sex

02:15:23   5    with children or with a child, but had there been any

6    problems, had there been any difficulties, had there been

7    any inappropriate behavior, we would have seen it.  The

8    doctor mentioned Kevin Spacey, one person came forward,

9    multiple people came forward.  And Stoney worked with people

02:15:40   10   that are now adults.  He worked with them as children and

11   they're now adults.  So it's not that we're expecting

12   children to come forward, which is more difficult, I mean he

13   has been working with children for enough years that these

14   people are now older.

02:15:48   15          And I wanted to draw the court's attention

16   particularly to one of the letters that we received which

17   was from a Joshua Call who has known Stoney since he was 14

18   because he was a friend of Stoney's son Tennessee.  And I

19   think -- and I'm not going to read the letter, you have it

02:16:04   20   there, but I do think that it really gives a good picture of

21   what Stoney is like when he is working with children and

22   that he is there to help them, not hurt them.  And that has

23   been what he has done since he was a very young man.  It's

24   unfortunate because he probably won't be able to do those

02:16:21   25   things any more no matter what and I think he gave a lot

1    back to the community in working with children.  And, you

2    know, also I just want to say, I mean he was working on a

3    Disney show when he was here.  And I think again a lot has

4    been made of that case because he happened to be on a show

02:16:39  5    that had children in it which really is not something he

6    typically did, this might have been the only show he worked

7    on that was a children's show.  But if you don't think that

8    Disney didn't come forward and talk to the people on that

9    show when he is arrested on the set of that show, and a show

02:16:56  10   that has teenagers on it, if you don't think that the Disney

11   Corporation came forth and interviewed the people that were

12   involved with him on that show to see if there had been any

13   problems, I mean I think it would be crazy that they would

14   not have done that.  And had there been any concerns about

02:17:11  15   him working with the kids on that show, had the kids ever

16   come forward and said that he was inappropriate or creepy,

17   we would have heard about it, it would have come forward.

18   But he was nothing but professional.  And that has been

19   everything we know about him that's what we know.  He was

02:17:27  20   always extremely professional in his workplace and never

21   ever inappropriate.

22        I've pretty much talked about specific

23   deterrence.  I don't think -- there is not -- he has been

24   deterred.  I don't see that there is a need for additional

02:17:50  25   deterrence.  He's already been -- like I said, I won't go

1    over it again, but the circumstances that he has been under

2    the last three years he has not done anything that would

3    indicate that he will engage in this kind of activity in the

4    future.  He will be under the supervision of the court for

02:18:07  5    at least five years.  And the reason I think a five-year

6    probation instead of some kind of time and then supervised

7    release is appropriate because if there is any kind of an

8    issue, he will be looking at a much greater sentence than if

9    there were a supervised release violation.  I mean he would

02:18:21 10    go to prison if he violates probation or at least the court

11    would have that opportunity to send him to prison for an

12    extended period of time, longer than what this 11(c)(1)(C)

13    range is he could go to prison.

14          And I mean you have seen the research and I know

02:18:36 15    it is in my sentencing memo that the certainty of punishment

16    is a much greater deterrent than the length of punishment.

17    And I do think that with that hanging over his head, that

18    the court would have -- should have no concerns while he is

19    on probation.  I also think that five years is adequate

02:18:55 20    because he has done well already for three.  I think if he

21    is going to have a problem we'll see it within the next five

22    years and I just -- I don't think there is going to be a

23    problem here.  You saw Dr. Berlin.  He is a leading expert

24    in this field.  This is what he does.  He works with these

02:19:10 25    people day in and day out.  He is willing to work with

1    Stoney in whatever counseling the court provides.  And I do

2    think Stoney needs counseling.  He needs mental health

3    treatment and it wouldn't hurt him to have counseling.  I

4    agree with Dr. Berlin that traditional sex offender

02:19:24  5    treatment is not really going to be helpful for him, but it

6    certainly wouldn't hurt him to have counseling about

7    relationships, about handling himself in relationships.

8         I think that he and Mark are more committed than

9    they were before.  This has really changed their

02:19:42  10   relationship.  They did have an understanding when this took

11   place, and I know Stoney has mentioned that this has

12   strengthened their relationship, and that this is really not

13   something that he is interested in any more.  He is not

14   interested in being online, he is not interested in meeting

02:20:01  15   anyone, adults or anyone else, because of what has taken

16   place in this case.  This was a moment in Stoney's life.  It

17   was a moment one evening which completely changed the course

18   of his life.  And yeah, I mean we don't usually say we

19   should feel sorry for the offender, but -- and yes, we want

02:20:26  20   to protect our 13 year olds and Stoney wants to protect 13

21   year olds.  But there is not a victim here, it's one of the

22   things I hate about these cases is we just really never know

23   what the person would have done had an actual 13 year old

24   showed up, we never know for sure.  But this moment in time

02:20:52  25   destroyed his career, it hurt his relationships, it made it

1    so he wasn't able to spend time with his friends, it made it

2    -- so I mean he is doing very well with his son now and they

3    have -- they really have worked on their relationship and he

4    and his son have a good relationship right now.  He's still

02:21:10  5    struggling with his daughter, not because of this case

6    honestly at all, but that has to do with issues from the

7    divorce, and he is still working on that with his daughter

8    and he wants to continue to work on that.

9            So under the circumstances, the government and

02:21:27  10    ourselves we agreed that this was a lower range which is why

11    we went on the zero to two range.  But at this point, 39

12    months after the crime, and yes a lot of that has been

13    because of COVID and I'm not going to go into the COVID

14    factors now I did address that in my brief, but I do think

02:21:46  15    it is something that the court should consider.  I know

16    we're in a different place but it is still not something

17    that is just -- it's not off the table and I do think it is

18    important to consider when we send people to prison.

19            But we did come to an agreement that a lower

02:22:03  20    sentence was appropriate and I think at this point a

21    probation sentence, given all that it is going to encompass,

22    giving all of the collateral consequences to Stoney, the

23    invisible punishments that are going to follow him for life,

24    he is deterred from committing crime in the future

02:22:18  25    absolutely.  He never before did something, I can't see him

1    ever again doing anything of a criminal nature sexually

2    oriented or otherwise.  And a probationary sentence will

3    certainly put forth what the goals are under 3553(a).

4            I just want to -- I don't know if before I -- I

02:22:41  5    just wanted to read one thing in closing, but before I do

6    that is there anything specific that the court would like me

7    to address or any concerns that you have?

8            THE COURT:  I appreciate what you said,

9    Ms. Lewis.  I don't have anything in particular.  I asked

02:22:53  10   you a question or two while you were speaking, but just go

11   ahead with your closing quote.

12           MS. LEWIS:  Okay.  And I said a little bit go,

13   you know, Stoney is not a danger to the community.  In fact,

14   he has been an asset to the community his entire career.  He

02:23:07  15   gave me this little -- he actually gave me this quite a

16   while ago and I forgot I had it until I was looking for

17   something else the other day.  But this was from 12 years

18   ago and it was -- he had taught, along with another actor, a

19   Shakespeare class in a middle school to underprivileged

02:23:22  20   children and they wrote him a book thanking him.  And I

21   won't bore you with all of the 12, 13, and 14 year olds'

22   poems, but I did want to read you one because it struck me

23   as significant.  And this is actually from one of the

24   student's mothers.  And I think it gives a little bit of a

02:23:39  25   picture of who Stoney was and is and still is even though he

1    has found himself in the middle of this situation.

2         So this -- this mother wrote, and it is a little

3    odd because they were supposed to write it in poetry form so

4    bear with me.  "Encourage the kids to be strong and stand

02:23:57 5    tall.  Gave skills they could carry for a lifetime.  Learned

6    it is okay to try and sometimes fail.  New senses and skills

7    emerged without crying.  There was a flow of mutual respect.

8    Sometimes your requests were quite insightful.  Encouraged

9    time for inner circumspect.  Much time spent, serious, fun

02:24:12 10   and playful.  Thank you for giving much dedication.  So

11   extreme is your generosity, you gave so much time, much care

12   and patience, not something often found in the city.  Thank

13   you, Stoney, for all you have given, for enriching the lives

14   that we are all living."

02:24:25 15        That's who Stoney Westmoreland is and that's who

16   is before Your Honor today.  And I believe that a five-year

17   probation sentence is the appropriate result in this case.

18        THE COURT:  All right.  Thank you, Ms. Lewis.  I

19   appreciate your argument.

02:24:39 20        Mr. Westmoreland, you have the right to make a

21   statement or present information to mitigate your sentence.

22   I gather from Ms. Lewis you would like to make a statement

23   so you can do that now.

24        THE DEFENDANT:  I didn't know she was going to

02:24:52 25   read that.  Um, I don't want to take up too much time.  I

1   don't have anything to say other than I don't recognize the

2   man that you describe and my want to take it has been a long

3   three years trying to go through this, and the loss of

4   society and industry and family and everything.  The only

02:25:15  5   thing I know at this point, three and a half years in, is

6   that I am responsible for really poor judgment and I take

7   responsibility for that.  I still believe that there is a

8   chance for me, even just a chance for me, to do something

9   positive in my life and with my family and with the society

02:25:43  10   at large and I feel like I have done 49 years of really

11   strong work with children, not to be near them but to serve

12   them.  And I feel like I have some more to offer society

13   that isn't about living under a bridge or struggling to do

14   physical labor.  When I'm 52 years old, I tried to work at

02:26:08  15   UPS.  Never do that, it is impossible.  I feel like I have

16   things to offer.  And I feel like moving forward, whatever

17   happens today, is my job is to pick up the pieces, however

18   far and wide they may be and to create something.  That's

19   what I do is create something and I am a story teller and I

02:26:26  20   will learn to tell a story that will be beneficial not just

21   to me but to my family and to my friends and also to

22   society.  And I just want to say thank the court for its

23   time, and thank you, I know it has been three years, but I

24   appreciate all of that and I'm here today to say this is who

02:26:43  25   I am.  And it is weird to hear people talk about you when

1    you're in the room and no one asked you, but this is who I

2    am.  And that book is who I am.  And who I am is the 49

3    years before this, not the one evening of me not catching on

4    to what's going on.  Thank you for your time.

02:27:02  5          THE COURT:  All right.  Thank you,

6    Mr. Westmoreland.  I appreciate your statement.

7          All right.  Are there any final words from either

8    counsel?  Ms. Fojtik, do you have anything you would like to

9    add?

02:27:12 10          MS. FOJTIK:  Are there specific questions you

11   would like me to address, Your Honor?

12          THE COURT:  No, there are not.

13          MS. FOJTIK:  Okay.  We'll submit then.

14          THE COURT:  All right.  Any final words from you,

02:27:20 15   Ms. Lewis?

16          MS. LEWIS:  No, Your Honor.  Thank you.

17          THE COURT:  All right.  Well I appreciate what I

18   have heard today.  I appreciate the testimony from

19   Dr. Berlin from Mr. Stubbs.  I appreciated your statement,

02:27:41 20   Mr. Westmoreland.  I appreciated the arguments of counsel.

21          As a judge there is some days that I love my job

22   and some days that I don't.  And this is one of the days

23   that I don't because this is a hard case and I -- on the one

24   hand, the conduct to which Mr. Westmoreland has pled guilty

02:28:03 25   is extremely serious.  Our country has very strict laws to

1    protect children from sexual crimes and with good reason.

2    And the plea agreement here proposes a sentencing range well

3    below the penalties that would ordinarily apply.

4         It's my understanding that had Mr. Westmoreland

02:28:22  5    been convicted of the charge in the indictment, he would

6    have been subject to ten-year mandatory term of

7    imprisonment.  And even for the charge in the information to

8    which he pled guilty, the sentencing guidelines recommend a

9    term of imprisonment of 46 to 57 months.  So the grave

02:28:40 10   nature of the conduct at issue here and the significant

11   disparity between the sentencing range in the plea agreement

12   and the sentences that would otherwise apply give me serious

13   pause.

14        I do place considerable weight on

02:28:55 15   Mr. Westmoreland's lack of any criminal history and the lack

16   of any evidence that he has previously engaged in any sexual

17   misconduct though.  The offense here seems aberrational.

18   Just based on the evidence, this does not seem like it is

19   what happened on this date does not seem like a true

02:29:14 20   reflection of who Mr. Westmoreland really is.

21        And I want to be very clear, if I did think that

22   the conduct here reflected who Mr. Westmoreland really is, I

23   would without question reject the Rule 11(c)(1)(C) plea

24   agreement as insufficient to comply with the purposes of

02:29:33 25   sentencing set forth in Section 3553(a) given the serious

1    nature of the offense.

2         But as I said, I don't think this conduct

3    reflects who Mr. Westmoreland really is based on the -- on

4    what I have heard today.  But it is very serious conduct.

02:29:53  5         I also recognize that Mr. Westmoreland has done

6    quite well on supervised release or pretrial release.  I

7    mean his behavior has not always been perfect, but, you

8    know, it has been a long time.  I think counsel said

9    39 months or something like that.  And for the most part,

02:30:09  10   Mr. Westmoreland has behaved very well during that period.

11        And finally, I recognize that Mr. Westmoreland's

12   arrest and conviction likely destroyed his career as an

13   actor, a career that he appears to have loved and excelled

14   at.  And that is almost certainly true regardless of what

02:30:27  15   sentence I impose.  This is, of course, the consequence of

16   Mr. Westmoreland's own decisions and choices, but I still

17   believe it is a relevant consideration.

18        Now, for all of those reasons, and after careful

19   consideration of the factors set forth in 18 USC Section

02:30:49  20   3553(a) and the Sentencing Guidelines, as well as the

21   parties' submissions and everything I have heard today, I do

22   find that the proposed sentencing range is reasonable and

23   appropriate, under the circumstances, and for that reason I

24   will accept the plea agreement.  I want to emphasize,

02:31:12  25   though, that given the nature of the conduct at issue here

1    and the disparity between the agreed upon range and the

2    penalties that would ordinarily apply, I did have to

3    struggle somewhat to get to that point.

4         Now, as I said, I accepted the proposed plea

02:31:33  5    agreement and I do intend to impose a sentence of 24 months

6    incarceration and 10 years supervised release.

7         Now, I realize that's the high end of the agreed

8    upon range of imprisonment and that is almost certainly more

9    that Mr. Westmoreland has hoped for.  But in light of the

02:31:52  10   serious nature of the conduct, which he has pled guilty, and

11   in light of the penalties that would otherwise apply, I

12   think this is actually a very lenient sentence.

13        As I indicated, it was a struggle for me to get

14   down to two years and accept the plea agreement.  But having

02:32:08  15   got to that point, I cannot see my way to a lower sentence

16   than that.  I think that anything less than two years would

17   not serve the purposes of sentencing set forth in section

18   3553(a) and would create a significant risk of sentence

19   disparities amongst similarly situated defendants.

02:32:27  20        Accordingly, I find that a sentence of 24 months

21   incarceration with 10 years supervised release is sufficient

22   but not greater than necessary to comply with the purposes

23   of sentencing.

24        And again, there is -- this case is

02:32:43  25   heartbreaking.  I believe, based on what I have heard, that

1       Mr. Westmoreland is a good man.  He has a lot to offer and

2       Mr. Westmoreland you said you feel like you still have

3       things to offer and I believe you.  I think you do.  And I

4       don't think this has to be the end of your being able to

5       offer things.  You're still -- you're younger than me, we're

6       both getting older than we were though, but there's still

7       years ahead of us.

8               Now, as I said though, I just think given the

9       nature and the circumstances of the offense, that's -- I do

10      think that that is a necessary sentence.  And I do want in a

11      minute after we -- after we move a little further, I want to

12      discuss the terms of the supervised release because I think

13      there are some issues there that we need to discuss.

14              Before we get to that though, now that I have

15      accepted the Rule 11(c)(1)(C) plea agreement, Ms. Fojtik

16      does the United States move to dismiss the indictment?

17              MS. FOJTIK:  We would so move, Your Honor.

18              THE COURT:  All right.  I grant that motion.

19              Now, first of all I'm inclined talking about

20      terms of supervision, I'm inclined to suspend the

21      requirement that the defendant submit to mandatory drug

22      testing.  Mr. Westmoreland does not appear to have any

23      documented history of drug abuse and I cannot see any reason

24      to think he poses a risk of future drug abuse.  Does the

25      United States object to suspending that condition?

149

1          MS. FOJTIK:  We do not, Your Honor.

2          THE COURT:  All right.  Now, the proposed or

3    excuse me the probation officer has proposed eight special

4    conditions of supervision.  I have concerns or at least

02:34:32  5    questions about two of the proposed conditions.

6          One, I am not sure what to make of the fifth

7    condition of sex offender treatment and whether that is

8    warranted based on the evidence currently in front of me.

9    My inclination, candidly, is to order an additional

02:34:48 10    psychosexual evaluation and to condition treatment on the

11    outcome of the evaluation.  I understand that Dr. Berlin did

12    perform an evaluation and I appreciated his testimony.  I

13    certainly appreciate his expertise.  But I do think that

14    evaluation reflected certain assumptions that no longer hold

02:35:12 15    true in light of the guilty plea.  It also took place some

16    time ago.

17          Finally, you know, as I said, I'm inclined to

18    order that and have the treatment be conditional on the

19    outcome of the evaluation and I'm also inclined to modify

02:35:33 20    the treatment with regard to the polygraphing by saying

21    that, you know, if sex offender treatment is required that

22    the program approved by the U.S. Probation Office shall not

23    require the defendant to answer any questions that may tend

24    to incriminate the defendant in a separate criminal

02:35:51 25    proceeding.  But, as I said, I'm not sure about that and I

1    would like the parties views on it.

2              I will start with you, Ms. Lewis.  Do you have

3    views about what to do with that condition?

4              MS. LEWIS:  I think that's appropriate.  I think

02:36:03  5    another psychosexual upon his release would be appropriate.

6    I don't know who would be performing that exactly, and then

7    make a decision as to what kind of treatment would be best.

8              THE COURT:  Okay.

9              MS. LEWIS:  And I'm very much against those

02:36:19 10    polygraph tests even in other cases so I very much agree

11    that there not be polygraph testing even if he does have

12    sexual offender treatment.

13              THE COURT:  Right.  Well, I was not inclined to

14    suspend the polygraph requirement entirely but to just kind

02:36:33 15    of build in a kind of Fifth Amendment privilege aspect to it

16    if that makes sense.

17              MS. LEWIS:  All right.

18              THE COURT:  Ms. Fojtik, do you have comments

19    about any of that?

02:36:44 20              MS. FOJTIK:  No.  I think that's appropriate,

21    Your Honor.  I think an additional psychosexual evaluation

22    and just following the recommendations of that evaluation

23    makes sense.  Things have changed significantly as the court

24    has noted.  And I agree that the conditions that you are

02:36:59 25    outlining I think it is *Von Behren* is the Tenth Circuit case

1  about polygraphs and that is completely consistent with

2  that.  And I think that the polygraphs are always in the

3  context of therapy so the probation officer retains the

4  right to do them typically in the context of therapy.  So if

02:37:17  5  is not recommended, we can always cross that bridge at a

6  later date after the second psychosexual.

7       THE COURT:  Right.  Is there a reason why I

8  should even specify the treatment as opposed to just

9  imposing the condition of the evaluation and then letting

02:37:35  10  the parties at that -- after that evaluation is concluded

11  just make recommendations about modifying the conditions or

12  should I --

13       MS. FOJTIK:  Well, I can say, Your Honor, why

14  they're generally virtually every other psychosexual

02:37:48  15  evaluation recommends psychotherapy and sex offender

16  treatment.  So this is an unusual situation where we had a

17  psychosexual that is a little bit dated that doesn't

18  specifically recommend it, but as Dr. Berlin noted, it was

19  prior to the plea.  And so the results of that evaluation I

02:38:02  20  think need to be, you know, re-looked at in light of the

21  context of the guilty plea in this case.  So the reason it

22  is in there is because it is usually not an issue and this

23  is a rare case where it might be an issue depending on the

24  results of this additional evaluation.

02:38:15  25       THE COURT:  Right.  And just to be clear what my

1    question was, should my special condition be something like

2    he shall submit to a psychosexual evaluation and then

3    period.

4            MS. FOJTIK:  And treatment as recommended.

02:38:29  5            THE COURT:  And treatment as recommended.

6            MS. FOJTIK:  Yes, leave it that broad.

7            THE COURT:  Okay.  Very well.

8            All right.  Second, I have some concerns about

9    the eighth proposed special condition prohibiting access to

02:38:44  10   materials depicting sexually explicit conduct.  It's my

11   understanding that the Tenth Circuit precedent requires

12   particularized findings before a court may restrict access

13   to pornography as a condition of supervision.

14           Now it does appear that Mr. Westmoreland's phone

02:39:00  15   contained links to some web pages that contained at least

16   one sexually explicit story about a minor.  The government

17   submitted a portion of one of those stories.  It appears

18   that Mr. Westmoreland may have visited links to videos on

19   PornHub that referenced high school.  And then there is this

02:39:20  20   website on Nifty.org about something about trailer-park

21   boyslut, or something like that, and he visited --

22   apparently he visited that three times in the days before

23   the offense and I think there has been an allegation that

24   the supposed minor here had indicated in the chat that he

02:39:43  25   resided in a trailer park.  I -- it's hard to know what to

1    make of all of that.

2           You know, the only thing that we have here is an

3    excerpt of one of the stories and I don't know whether the

4    story would candidly fit within the scope of what is

02:40:02  5    prohibited by that special condition any way.  Also, neither

6    the psychosexual evaluation, admittedly dated, nor the PSR

7    identify any causal relationship between pornography and

8    Mr. Westmoreland's criminal conduct so I would like the

9    parties views on that.  I guess in many of these cases it's

02:40:21  10    pretty clear that pornography was a direct trigger for the

11    action, for the conduct, and I guess I'm not confident that

12    I am seeing that link here.

13           Ms. Fojtik, you were standing up.  I would like

14    your thoughts on that.

02:40:34  15           MS. FOJTIK:  Your Honor, the -- I think it is the

16    *Koch* or *Koch* case out of the Tenth Circuit that has recently

17    addressed this issue.  There is a couple of things.  First

18    of all, I think one of the issues we have right now is we

19    need a new psychosexual and that is often where the linkage

02:40:51  20    is made.  And since this was not a question before

21    Dr. Berlin, I think any -- we could maybe make this

22    condition subject to the second psychosexual because what is

23    very common and typical, I don't know of a single sex

24    offender treatment program that doesn't have a ban on

02:41:08  25    looking at adult pornography.  So if he is going to be in a

1    sex offender treatment program as a result of this

2    evaluation, it is going to be a condition as to that.  But

3    let me add some other facts as to independently aside from

4    treatment why it is an appropriate condition in this case.

02:41:22    5    And you have to go back to the chat.  There was an adult --

6    there was adult pornography distributed in the context of

7    the chat.  And if you looked to I think it is the, I'm going

8    to spell it wrong, but I think it is T-H-I-E-L-E-M-A-N, I

9    believe it is out of the Third Circuit or the Eleventh, the

02:41:39   10    fact that the adult pornography is interwoven in a chat with

11    minors goes to show that there is a linkage just based on

12    the facts of this case and then you tie in that in that chat

13    Mr. Westmoreland is asking for sexually explicit pictures of

14    the minor.  The conduct in this case is completely

02:41:57   15    interwoven.

16          I think it is also worth noting Mr. Westmoreland

17    had a PornHub account.  So though it may not have been

18    stored on his devices, it was something that he was looking

19    into pornography.  And PornHub is a generally well accepted

02:42:12   20    pornography site.  There is nothing illegal about it.  So I

21    do think there is facts in this case that support the

22    condition but typically we do have a psychosexual evaluation

23    which also establishes that linkage.  So maybe the proposed

24    condition could read, you know, and prohibitions on

02:42:30   25    reviewing the content as described in Section A, excuse me,

1        as in condition eight subject to the psychosexual, you know,

2        the second psychosexual evaluation.  If the court is not

3        inclined, I think there is enough in the record on its own

4        to include it, but in light of the fact that we're all

02:42:48  5   acknowledging that there is more we would like to know here

6        it may be wise to pause.

7               The other thing I will add, as it pops into my

8        head here, is Dr. Berlin did testify there is indications

9        that Mr. Westmoreland is a nonexclusive individual in terms

02:43:01 10   of his sexuality.  He is someone who is not just attracted

11       to children and I am not even saying he is, but he is

12       someone whose sexual appetites are broad.  And so this would

13       be something presumably that would help him and help prevent

14       him from re-offending in light of those comments from

02:43:18 15   Dr. Westmoreland.

16               THE COURT:  Or from Dr. Berlin, I think you mean.

17               MS. FOJTIK:  Dr. Berlin.  I keep saying that.  I

18       apologize.  Thank you.

19               THE COURT:  All right.  And I'll give you just a

02:43:26 20   chance in a minute, Ms. Lewis, but is there any reason that

21       we can't just kind of -- I can't order the psychosexual

22       evaluation and that we can't revisit after that point

23       whether this -- what kind of treatment, what kind of

24       restrictions of this sort would be appropriate?  It's always

02:43:48 25   possible to move to modify the conditions, is it not?  Do

1    you have thoughts about that, Ms. Fojtik?

2         MS. FOJTIK:  It is.  I just would hate to tie a

3    therapeutic hand.  That's my main concern.  If he is ordered

4    to do sex offender treatment, it is almost -- I don't know a

02:44:07  5    single case where it is not a condition of it.  That's my

6    main concern.

7         THE COURT:  All right.  Ms. Lewis, I would like

8    to hear your thoughts on this as well.

9         MS. LEWIS:  First off Dr. Berlin didn't say he

02:44:16 10    was nonexclusive, he said he wasn't interested in children.

11    So I just want to say that.  I -- here is the problem I have

12    with it.  I don't think Mr. Westmoreland's real interested

13    in looking and storing adult pornography.  I think though we

14    get on a real slippery slope when we order no sexually

02:44:36 15    explicit material.  I know he had an issue on pretrial

16    release where there was concerns about some R-rated movies

17    that he possessed because R-rated movies have sexual content

18    in them particularly a movie he himself directed that had a

19    plot that had to do with sexual conduct.  So I do have

02:44:57 20    concerns that that can turn into a real mess.  I don't think

21    it's necessary that he be prohibited from looking at all

22    sexually explicit material.

23         I have had at least one case that comes to mind

24    where Judge Stewart said they wouldn't violate someone for

02:45:17 25    looking at sexually explicit material that was not -- that

1   was adult oriented.  So it's not without precedent.  I am

2   all right with waiting until after he has another

3   psychosexual, but I really don't think it's going to

4   increase our risk factor in any way if that's not a

02:45:38  5   condition.  And I honestly I don't think it's a real big

6   issue other than his involvement in the entertainment

7   industry.  And even if he is not working, he does have a

8   body of work and he possesses things of that body of work

9   and I would hate to see that start to be a problem.

02:45:56  10   THE COURT:  Understood, Ms. Lewis.

11   My inclination on that, honestly, and I realize

12   it might -- it's nice when we can decide everything up front

13   but we're not always able do that.  My inclination is just

14   to -- with regard to -- with regard to the condition of --

02:46:29  15   let's see, the fifth special condition and the eighth

16   special condition I think is maybe just to direct that the

17   defendant must submit to an additional psychosexual

18   evaluation and just leave it at that.  And then, you know,

19   depending on the results of that evaluation, the probation

02:46:52  20   office and/or the United States or the defense can propose

21   what additional conditions would be warranted, what kind of

22   treatment, what kind of restrictions on materials and so

23   forth.  I just feel like -- I feel like I'm shorter on the

24   kinds of factual information I would want before I made

02:47:15  25   determinations like that than I usually am in a sentencing

1      hearing.

2              Are there any -- I mean obviously that's, you

3      know, makes maybe some logistical work down the road, but

4      are there any fundamental objections to that?

02:47:30  5      MS. FOJTIK:  None from the United States, Your

6      Honor, though I would defer to Mr. Manross.  I don't know if

7      probation would have any concerns, but we don't see any

8      concerns.

9              THE COURT:  Mr. Manross?

02:47:39  10      MR. MANROSS:  I have no concerns, Your Honor.

11              THE COURT:  Could we live with that?  And then

12      maybe once we have that report, then you could propose

13      amendments to the conditions.

14              MR. MANROSS:  I would also suggest that we allow

02:47:49  15      for a prison check-in date in 120 days which would give us

16      time to complete that psychosexual evaluation.

17              THE COURT:  So you would contemplate the

18      evaluation before?  It could be either way.  I think it

19      could be after or before.

02:48:03  20      MS. FOJTIK:  I think it might -- I think it could

21      be either way as well, I'm not sure what Mr. Westmoreland he

22      might choose to participate in therapy while incarcerated as

23      well.  So it might be better on the back end, you know,

24      after he has been through some treatment and things like

02:48:16  25      that it may be more useful to probation to have it at that

1     point than before.

2                    THE COURT:  Well, I would think that probably the

3     more current it is the better when they're trying to decide

4     what to make of it.

02:48:27  5                    MS. FOJTIK:  I'll defer to Your Honor.

6                    THE COURT:  Do you have thoughts about that,

7     Ms. Lewis?

8                    MS. LEWIS:  I think doing it before actually

9     would be fine.  I have some concerns who is going to do it,

02:48:38 10     you know, 14 months, 2 years down the line.  I would be more

11     comfortable if the probation office here was --

12                    THE COURT:  So doing it now would be your

13     preference?

14                    MS. LEWIS:  That would be my preference, yes.

02:48:49 15                    THE COURT:  Well, that certainly seems like it's

16     workable.  Okay.  Are there any other thoughts about the

17     special conditions?  As I said, I have mentioned that I am

18     going to waive the substance abuse testing.  I have

19     mentioned that I am going to probably eliminate eight for

02:49:07 20     now and trim down five just to the requirement of the

21     psychosexual evaluation and then at that point we can decide

22     where to go from that.

23                    Are there any other thoughts from the United

24     States about special conditions?

02:49:19 25                    MS. FOJTIK:  No, Your Honor.

                                                                    160

1            THE COURT:  Thank you.  Any other thoughts from

2       you Ms. Lewis about these conditions?

3            MS. LEWIS:  No, Your Honor.

4            THE COURT:  All right.  Okay, thank you.  I will

02:49:30  5  now impose the sentence.  Mr. Westmoreland, will you stand.

6            It's the judgment of the court that the

7       Defendant, Stoney Westmoreland, is placed in the custody of

8       the Federal Bureau of Prisons for a period of 24 months.

9       Upon release from confinement, the Defendant shall be placed

02:49:52 10  on supervised release for a term of 10 years.

11           The Defendant shall report in person to the

12      probation office in the district to which he is released

13      within 72 hours of release from custody of the Federal

14      Bureau of Prisons.

02:50:07 15           The Defendant shall be subject to the following

16      mandatory terms -- or the mandatory conditions of

17      supervision.  One, the Defendant must not commit another

18      federal, state, or local crime.  Two, the Defendant must not

19      unlawfully possess a controlled substance, and as a

02:50:23 20  convicted felon, shall be prohibited from possessing a

21      firearm or ammunition.

22           In accordance with the Violent Crime Control and

23      Law Enforcement Act of 1994, the Court suspends the

24      requirement that the Defendant submit to mandatory drug

02:50:37 25  testing because the Defendant has no documented history of

1    drug abuse, and does not appear to present any risk of

2    abusing drugs in the future.

3              The Defendant must cooperate in the collection of

4    a DNA sample at the direction of the Federal Bureau of

02:50:53  5    Prisons or the U.S. Probation Office.

6              The Defendant must comply with the requirements

7    of the Sex Offender Registration and Notification Act, 34

8    USC Section 20901, et sequitor, as directed by the probation

9    officer, the Bureau of Prisons, or any state sex offender

02:51:15  10   registration in the location where he resides, works, is a

11   student or was convicted.  This means that the Defendant

12   must report the address where he will reside and any

13   subsequent change of residence to the probation officer

14   responsible for supervision and must register as a sex

02:51:30  15   offender in any state where the Defendant resides, is

16   employed, carries on a vocation, or is a student.

17             In addition, the Defendant shall comply with the

18   standard conditions of supervision that have been adopted by

19   this Court.

02:51:44  20             The Court now imposes the following special

21   conditions.

22             First, the Defendant must cooperate with the

23   United States Probation and Pretrial Services Computer and

24   Internet Monitoring Program; Appendix A, Computer and

02:51:58  25   Internet use.  Not applicable to third-party employment.

1    Cooperation shall include, but not be limited to,

2    identifying computer systems as identified in 18 USC Section

3    1030(e)(1), internet capable devices, networks,

4    routers/modems, and/or similar electronic devices such as

02:52:18    5    external hard drives, flash drives, et cetera, to which the

6    Defendant has access.  All devices are subject to random

7    inspection and/or search configuration, and the installation

8    and monitoring software and/or hardware at the Defendant's

9    expense.

02:52:34   10         The Defendant must inform all parties who access

11    approved computers or similar electronic devices that the

12    devices are subject to search and monitoring.  The Defendant

13    may be limited to possessing only one personal computer

14    and/or internet capable device to facilitate the ability to

02:52:53   15    effectively monitor the Defendant's internet-related

16    activities.

17         Three, the Defendant must report any and all

18    electronic communication service accounts as defined in 18

19    USC Section 2510(15) and (17) used for user communications,

02:53:09   20    dissemination, and/or storage of digital media files such as

21    audio, video, images, documents, device backups to the U.S.

22    Probation Office.  This includes, but is not limited to,

23    e-mail accounts, social media accounts, and cloud storage

24    accounts.  The Defendant shall provide each account

02:53:28   25    identifier and password and shall report the creation of new

1　accounts.  Changes in identifiers and/or passwords,

2　transfer, suspension and/or deletion of any account shall be

3　reported within five days of such action.  The Defendant

4　must permit the U.S. Probation Office to access and search

5　any accounts.

6　　　　　Justification for these three conditions are that

7　the Defendant used electronic devices and the internet to

8　commit the criminal offense here.  The Court finds that

9　these conditions are necessary to protect the public, to

10　prevent the Defendant from committing new offenses using a

11　similar modus operandi, and to enable the probation office

12　to monitor the Defendant's compliance.

13　　　　　Four, the court orders that the presentence

14　report may be released to the state sex-offender

15　registration agency if required for purposes of sex-offender

16　registration.  The justification for that is that the law

17　requires that the Defendant register as a sex offender.

18　　　　　Five, the Defendant must submit to an additional

19　psychosexual evaluation.  Based on -- the justification here

20　is that based on the nature of the offense, I believe that

21　sex-offender treatment might be warranted to protect the

22　public and to facilitate the Defendant's rehabilitation.  I

23　am not certain of that, however.  I find the previous

24　psychosexual evaluation submitted by the Defendant is

25　inadequate for the reasons stated earlier in this

1    proceeding.  However, I find that another psychosexual

2    evaluation is necessary to determine the need for additional

3    treatment.

4           The sixth special condition is that the Defendant

02:55:08  5    is restricted from contact with individuals who are under

6    18 years of age without adult supervision as approved by the

7    U.S. Probation Office.

8           Seven, the Defendant must abide by the following

9    occupational restrictions.  Any employment shall be approved

02:55:22  10    by the U.S. Probation Office.  In addition, if third-party

11    risks are identified, the U.S. Probation Office is

12    authorized to inform the Defendant's employer of his

13    supervision status.

14           Justification for these conditions, five through

02:55:38  15    seven, is that based on the facts and circumstances of the

16    offense, the Defendant's employment history, and his prior

17    close proximity to minors, the Court finds that these

18    conditions are necessary to protect potential victims and

19    vulnerable populations.  Those are the special conditions.

02:55:57  20           Now pursuant to 18 USC Section 3664(f)(2), the

21    Court has considered the Defendant's financial resources and

22    other assets, projected earnings and other income, and

23    financial obligations.  The Court finds that the Defendant

24    does not have the ability to pay a fine and hereby waives

02:56:15  25    the fine pursuant to 18 USC Section 3572 and Sentencing

1    Guideline 5E1.2(a).

2            Finally, the Defendant shall pay a special

3    assessment fee in the amount of $100 which shall be due

4    immediately.

02:56:29  5            All right.  Mr. Westmoreland, that is your

6    sentence.  You may be seated now.

7            You can appeal your conviction if you believe

8    that your guilty plea was somehow unlawful or involuntary,

9    or if there is some other fundamental defect in the

02:56:45  10   proceedings that was not waived by your guilty plea.

11           Under some circumstances a Defendant also has the

12   right to appeal his sentence.  However, a Defendant may

13   waive that right as part of the plea agreement.  And you

14   have entered into a plea agreement which waives some or all

02:56:59  15   of your rights to appeal your sentence.  Such waivers are

16   generally enforceable, but if you believe the waiver itself

17   is not valid, you can present that theory to the appellate

18   court.

19           Any notice of appeal must be filed within 14 days

02:57:12  20   of the entry of judgment or within 14 days of the filing of

21   a notice of appeal by the government.  If requested, the

22   clerk will prepare and file a notice of appeal on your

23   behalf.  If you cannot afford to pay the cost of an appeal

24   or for appellate counsel, you have the right to apply for

02:57:29  25   leave to appeal in forma pauperis which means you can apply

1    to have the Court waive the filing fee.  On appeal, you may

2    also apply for court-appointed counsel at no expense to you.

3             All right.  Well, Mr. Westmoreland, I know that's

4    not what you were hoping for.  I do think that given the

5    circumstances and the very serious nature of the offense

6    it's an appropriate sentence.  I do wish you the best of

7    luck with the treatment that you need and I hope that you

8    are able to get the support that you need and so forth.

9             Ms. Lewis, do you have a question?

10            MS. LEWIS:  I was going to ask for a

11   recommendation in terms of --

12            THE COURT:  Oh, absolutely.

13            MS. LEWIS:  We would ask that the Court recommend

14   that his sentence be spent in Lompoc.  It's close to home

15   and for visitation purposes and to set a self-surrender date

16   as we discussed.

17            THE COURT:  Right.  And I was going to ask about

18   both of those things.  Let's take them one at a time.  First

19   of all, Ms. Fojtik, do you have any concerns about the

20   recommendation to Lompoc?

21            MS. FOJTIK:  No, Your Honor.  And we have no

22   objection to self-surrender 120 days out either.

23            THE COURT:  Okay.  Very good.  Now, the Bureau --

24   the Bureau of Prisons tells me they're most likely to accept

25   a recommendation if I state the rationale first and then

1      give the specific facility as an example rather than

2      recommend a specific facility.

3               So what I'm going to do is recommend that

4      Mr. Westmoreland be allowed to serve his sentence in a

02:59:12  5      facility close to where he resides to facilitate family

6      visitation and that he be allowed to serve his sentence

7      specifically at Lompoc if that's a possibility.

8               MS. LEWIS:  That's fine, Your Honor.

9               THE COURT:  All right.  Now -- and then it sounds

02:59:28  10     as though the United States does not object to

11     self-surrender and given Mr. Westmoreland's performance

12     during pretrial supervision, pretrial release and

13     supervision, I can't see any reason why that would not be

14     appropriate.

02:59:46  15              The Probation Office has suggested a date

16     120 days out and suggested that that would allow for the

17     psychosexual evaluation that I have ordered to take place

18     before the incarceration.  The Defendant has indicated that

19     that would be the preference.  So does that -- does that

03:00:07  20     sound good to you Ms. Lewis, 120 days?

21              MS. LEWIS:  That's fine.

22              THE COURT:  All right.  What -- where would that

23     take us?

24              THE LAW CLERK:  July 19, 2022.

03:00:19  25              THE COURT:  July 19th.  Is there any reason why

168

1    July 19th would not be a good day?

2              MS. FOJTIK:  Nothing from us, Your Honor.

3              THE COURT:  All right.  Are we likely to have a

4    BOP designation by that point?

03:00:37 5              MR. MANROSS:  Yes, Your Honor.

6              THE COURT:  All right.  The Defendant is to

7    report for service of sentence on July 19th, 2022.  The

8    release conditions previously established continue to apply.

9    Failure to report for service of sentence is a criminal

03:00:55 10   offense.

11             All right.  Is there anything else we need to

12   address at this time?

13             MS. FOJTIK:  Nothing from us, Your Honor.

14             THE COURT:  Anything from the defense?

03:01:04 15             MR. LEWIS:  No, Your Honor.

16             THE COURT:  All right.  Thank you.  Thank you

17   all.  And with that, Court is adjourned.

18             (Whereupon, the hearing concluded at 3:01 p.m.)

19

20

21

22

23

24

25

1                     **REPORTER'S CERTIFICATE**

2

3             Teena Green and Laura W. Robinson, Certified

4    Shorthand Reporters, Registered Professional Reporters

5    within and for the County of Salt Lake, State of Utah, do

6    hereby certify:

7             That the foregoing proceedings were taken before

8    me at the time and place set forth herein and were taken

9    down by me in shorthand and thereafter transcribed into

10   typewriting under my direction and supervision;

11            That the foregoing pages contain a true and

12   correct transcription of my said shorthand notes so taken.

13            In witness whereof we have subscribed our names

14   this 27th day of April, 2022.

15                          **Teena Green**

16                          RPR, CRR, CSR, CBC

17                          ***Laura W. Robinson***

18                          Laura W. Robinson

19                          RPR, FCRR, CSR, CP

20

21

22

23

24

25